1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   CHRISTOPHER M. WOOD (254908)
3  SUNNY S. SARKIS (258073)
   Post Montgomery Center
4  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6  shawnw@rgrdlaw.com
   cwood@rgrdlaw.com
7  ssarkis@rgrdlaw.com

8  Lead Counsel for Plaintiff

9  [Additional counsel appear on signature page.]

10  UNITED STATES DISTRICT COURT

11  NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALIGN TECHNOLOGY, INC., THOMAS M. PRESCOTT AND KENNETH B. AROLA,<br><br>Defendants. | No. 3:12-cv-06039-WHO<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

855373_1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................1

II.    JURISDICTION AND VENUE ...........................................5

III.   THE PARTIES...................................................................6

IV.    SOURCES OF INFORMATION .........................................6

V.     CONTROL PERSONS ........................................................7

VI.    BACKGROUND TO THE CLASS PERIOD .......................8

VII.   DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .........................12

VIII.  POST-CLASS PERIOD DISCLOSURES AND ADMISSIONS CONFIRM THAT GOODWILL WAS MATERIALLY OVERSTATED .........................29

IX.    DEFENDANTS' FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC RULES .........................31

       A.    Goodwill Accounting Standards.........................32

       B.    Defendants Intentionally Failed to Timely Write-Down Impaired Goodwill .........................34

       C.    Defendants' Failure to Timely Write-off Goodwill Associated with Cadent was Intentional or Deliberately Reckless.........................36

             1.    Align Used Unreasonable Assumptions in Its Goodwill Impairment Test at the End of 2011 .........................37

             2.    Align's Improper Goodwill Accounting for 1Q12 and 2Q12...................41

             3.    Determining the Fair Value of SCCS .......................46

X.     LOSS CAUSATION/ECONOMIC LOSS .........................49

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .........................50

XII.   CLASS ACTION ALLEGATIONS .................................52

XIII.  NO SAFE HARBOR .........................................................53

1  Lead Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System
2  ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and
3  through Plaintiff's undersigned attorneys, alleges the following against defendants, based upon
4  personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all
5  other matters based on the investigation conducted by and through Plaintiff's attorneys, which
6  included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings
7  by Align Technology, Inc. ("Align" or the "Company"), independent investigation, as well as media
8  reports about the Company and conference call transcripts.  Plaintiff believes that substantial
9  additional evidentiary support will exist for the allegations set forth herein after a reasonable
10  opportunity for discovery.

11  **I.     INTRODUCTION**

12      1.     Plaintiff brings this securities class action individually and on behalf of purchasers of
13  Align common stock between January 31, 2012 and October 17, 2012, inclusive (the "Class
14  Period"), under the Securities Exchange Act of 1934 (the "Exchange Act"), against Align and its
15  Chief Executive Officer ("CEO"), Thomas M. Prescott ("Prescott"), and former Chief Financial
16  Officer ("CFO"), Kenneth B. Arola ("Arola").

17      2.     Align designs, manufactures and markets Invisalign, a proprietary method for treating
18  malocclusion, or the misalignment of teeth, using a series of clear, removable orthodontic aligners.
19  This action stems from defendants' intentional or deliberately reckless failure to timely write-down
20  tens of millions of dollars of goodwill which was impaired soon after Align's acquisition of Cadent
21  Holdings, Inc. ("Cadent"), a provider of 3D digital scanning solutions for orthodontics and dentistry.

22      3.     In 2010, Align was facing a problem: The Company's organic growth was showing
23  signs of faltering and defendants were looking for new ways to drive sales and revenue growth.  On
24  April 29, 2011, following a failed attempt in 2010, Align acquired Cadent for $187.6 million in cash.
25  According to defendant Prescott, Align purchased Cadent primarily because of additional revenues
26  the Company stated Cadent would generate, as well as unspecified "revenue synergies" that Align
27  stated it could achieve as a result of the acquisition.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                           - 1 -

1       4.     Certain Wall Street analysts were immediately skeptical of the acquisition, opining,

2   for example, that Cadent's digital impression technology was "one of the worst technology

3   investments in dentistry," and stating that "[o]verall, we believe Align significantly overpaid for the

4   Cadent transaction at a time when the digital impression market is changing."

5       5.     And there was good reason to be skeptical.  Of the $187.6 million purchase price that

6   Align ultimately paid for Cadent, over two-thirds, or $135.3 million, was goodwill, while tangible

7   assets totaled a mere $19.4 million, approximately the same amount of liabilities that Align had

8   assumed from Cadent.[1]  Nevertheless, defendants claimed that the purchase price was conservative,

9   stating that the price was "midrange or even better . . . whether you look at a backwards, trailing, 12-

10   months' revenues or even on a forward basis."  Defendants claimed that Cadent had generated $40

11   million in revenue in 2010, and that revenue growth would exceed 20% a year, supposedly justifying

12   both the high purchase price and the resulting goodwill.  However, defendants knew at the time that

13   they purchased Cadent, and subsequent quarters would confirm, that their revenue growth and

14   margin projections, which were critical to their goodwill calculations, were woefully unreasonable.

15       6.     Through Align's due diligence, as well as its direct access to Cadent's internal

16   financial reports and company documents, troubling aspects of Cadent's fiscal year 2010 ("FY10")

17   revenues were readily apparent.  Apparently, in an effort to make themselves appear more valuable

18   to an acquirer, Cadent had offered substantial and unprecedented discounts to its customers in the

19   last quarter of 2010 ("4Q10") in order to drive up their revenues.  Cadent was able to dramatically

20   increase its scanner sales by over 147% in FY10 through these discounts.

21       7.     According to former employees ("FEs"), these discounts were so obviously an

22   attempt to increase the company's short-term revenues that dentists who were being pitched by

23   Cadent's sales associates specifically asked if Cadent was trying to sell itself, and were concerned

24   that a sale of the Company would affect their purchases.

25

26

27     [1]   Goodwill = Purchase Price - Fair Value of Net Assets Acquired.  Net Assets = Total Assets -
Total Liabilities.

28

8.      Nevertheless, upon completion of the acquisition, defendants confidently proclaimed that Cadent would achieve a 20%-plus growth rate based on Cadent's FY10 revenues of $40 million and that gross margins would improve to over 50%.[2]   These same projections were used as a justification for Align's goodwill balance of $135.3 million.

9.      But the anticipated revenue growth and margin improvement never materialized.  In fact, Cadent's margins plummeted from approximately 45% as a stand-alone company, to a range of 24%-36%, or an average of approximately 30%, after the acquisition.  Similarly, there was not a single quarter where Cadent's revenues met the projected revenue growth defendants had claimed.

10.      In 4Q11, defendants purportedly performed a goodwill impairment test as required by Generally Accepted Accounting Principles ("GAAP") in order to determine whether the $135.3 million Cadent-related goodwill was impaired.  Despite obvious signs that tens of millions of dollars in goodwill was indeed impaired because Align's expectations for Cadent were not being met and market trends were worsening, defendants failed to take the necessary write-down, instead claiming that "the fair value of our reporting units were significantly in excess of the carrying value."  In both 1Q12 and 2Q12, the same signs of impairment were exacerbated, yet defendants failed to even conduct an interim impairment test, let alone take the appropriate write-down.

11.      Defendants' failure to take the appropriate goodwill impairment charge in 4Q11, 1Q12, or 2Q12, rendered their financial statements and projections of future earnings materially false and misleading and in violation of GAAP.   Moreover, defendants knew that their financial statements and projections were false and misleading because, contrary to GAAP's requirements, they used assumptions in calculating goodwill that they knew to be unsupportable and unreasonable in order to delay an inevitable goodwill write-down.  Defendants did not want to timely recognize goodwill impairment because doing so would have been tantamount to an admission that defendants overpaid to acquire Cadent.

---

[2]   Gross Margin (%) = (Revenues - Cost of Revenues) ÷ Revenues.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                    - 3 -

1         12.    While Align's stock price was inflated as a result of defendants' misconduct, Prescott

2    and Arola sold hundreds of thousands of shares of Align stock at a time when they knew that the

3    Company's stock price was inflated, reaping over $14.8 million in unlawful proceeds.  Align's other

4    officers and directors sold even more.

5         13.    Finally, on October 17, 2012, the Company announced that it was in the process of

6    conducting step one of a goodwill impairment test for its scanners and CAD/CAM services

7    ("SCCS") reporting unit.  According to Align, the events that triggered the need for an interim

8    impairment test in 3Q12 were the decline in results of operations of its SCCS reporting unit (which

9    had been evident for at least nine months), and the discontinuation of their distribution relationship

10   with Straumann, which had long been troubled.  The Company announced that as a result of this

11   review, it would possibly take a substantial impairment charge which could erase a significant

12   amount of the goodwill value of Cadent.  Write-downs came in 3Q12, 4Q12 and 1Q13, erasing the

13   entire $77.3 million in goodwill associated with the scanner division in just six months.

14        14.    Align's October 17, 2012 disclosure caused Align's stock price to plummet more than

15   20%, from a close of $35.41 per share on October 17, 2012 to a close of $28.18 per share on October

16   18, 2012, on massive trading volume of 20 million shares.  This caused tens of millions in damages

17   to class members who purchased Align stock in reliance on defendants' materially false and

18   misleading statements, and were damaged when the truth about Align's goodwill was revealed.  The

19   chart below shows Cadent stock price throughout the Class Period in comparison to the NASDAQ

20   and Align's peer group.

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                      - 4 -



## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

17.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

18.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                     - 5 -

## III.    THE PARTIES

19.     Lead Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System is a public pension fund, which manages assets for approximately 290 current and retired police and fire workers.  Lead Plaintiff purchased the common stock of Align at artificially inflated prices during the Class Period and has been damaged by the conduct alleged herein.

20.     Defendant Align Technology, Inc. is incorporated in Delaware and maintains its headquarters at  2560 Orchard Parkway, San Jose, California 95131.  The Company designs, manufactures and markets the Invisalign system for treating malocclusion, or the misalignment of teeth.  The Company also designs, manufactures and markets 3D digital scanning solutions for orthodontics and dentists through its wholly-owned subsidiary, Cadent Holdings, Inc.

21.     Defendant Thomas M. Prescott is, and was at all relevant times, President and CEO of Align, as well as member of Align's Board of Directors.  Prescott has served in these capacities since 2002.  According to Align, Prescott was responsible for "completing the Cadent acquisition."

22.     Defendant Kenneth B. Arola was Align's CFO and Vice President of Finance from December 2007 until March 4, 2013, and served as Vice President, Finance and Corporate Controller between August 2005 and December 2007.  On January 30, 2013, Align announced that Arola was resigning as CFO effective March 4, 2013.  Arola was intimately involved in the Cadent acquisition and, according to Align, "played an essential role in the acquisition of Cadent and subsequent integration."

23.     The defendants named in ¶¶21-22 are sometimes referred to herein as the "Individual Defendants."

## IV.    SOURCES OF INFORMATION

24.     In addition to Plaintiff's analysis of publicly available information, including filings with the SEC, reports of securities analysts, press releases and new articles, among other things, the allegations pled herein are made, in part, on information and belief, and are supported by first-hand accounts of FEs.  These witnesses are comprised of former Align and Cadent employees.  As detailed below, each witness was in a position to know the facts and information reported.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                                      - 6 -

25.     FE1 was employed by Cadent as an Inside Sales Specialist between March 2006 and January 2011 and was part of a small team of Inside Sales Specialists at Cadent.   FE1's responsibilities included selling scanning packages to customers who already had Cadent's iTero scanner, generating leads for iTero scanner sales, as well as selling the OrthoCAD digital modeling software.   For most of her tenure at Cadent, FE1 reported to her supervisor, John Compton ("Compton"), Inside Sales Manager at Cadent.[3]   Compton reported to Kerri Sebring, Vice President of Marketing at Cadent from approximately January 2008 through May 2011, and thereafter Director of Marketing.

26.     FE2 is a former Cadent Vice President of Operations from November 2007 through Align's acquisition of Cadent in April 2011.   FE2 also continued to work for Align after Cadent's acquisition until September 2012.     As a Vice President of Operations, FE2's responsibilities included operational execution, iTero scanner sales and operations, business development and development of distributor relationships.   FE2 reported to Cadent CEO Tim Mack[4] while at Cadent.

27.     FE3 is a former Cadent Supervisor, Credit and Collections.   FE3 was employed at Cadent from July 2010 and remained with Align after Cadent was acquired until April 2012.   At Cadent, FE3 reported to Cadent's Controller Robin Kim who reported to Cadent CFO Roger Blanchette.   FE3 was responsible for collections on customer invoices.   As part of these responsibilities, FE3 had regular communications with Cadent's sales team and detailed knowledge of Cadent's sales practices.

**V.     CONTROL PERSONS**

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Align's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases

---

[3]   The pronouns "she" or "her" are utilized generically to refer to each individual former employee referenced herein.   Their use should not be understood to indicate gender.

[4]   Mack currently serves as Senior V.P. Marketing and Business Development.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                                          - 7 -

1   alleged herein to be misleading prior to or shortly after their issuance, and had the ability and

2   opportunity to prevent their issuance, or cause them to be corrected.  Because of their positions and

3   access to material non-public information available to them but not to the public, each of these

4   defendants knew that the adverse facts specified herein had not been disclosed to and were being

5   concealed from the public, and that the positive representations that were being made were then

6   materially false and misleading.  The Individual Defendants are liable for the false statements

7   pleaded herein, as those statements were each "group-published" information, the result of the

8   collective actions of the Individual Defendants.

9          29.    As alleged herein, each of the defendants acted with scienter in that each defendant

10  knew or recklessly disregarded that the public documents and statements issued or disseminated in

11  the name of the Company were materially false and misleading or omitted to state facts necessary in

12  order to make the statements made, in light of the circumstances under which they were made, not

13  misleading.   Each defendant knew that such statements or documents would be issued or

14  disseminated to the investing public and knowingly and substantially participated or acquiesced in

15  the making, issuance or dissemination of such statements or documents as a primary violation of the

16  federal securities laws.  By virtue of their receipt or reckless disregard of information reflecting the

17  true facts regarding Align, their control over and/or receipt and/or modification of Align's materially

18  misleading statements, and/or their other associations with the Company, each defendant was privy

19  to confidential information concerning Align and knowingly or recklessly participated in the

20  fraudulent scheme and conduct alleged herein.

21  **VI.     BACKGROUND TO THE CLASS PERIOD**

22         30.    Align Technology, Inc. is a Delaware corporation which, until 2011, operated as a

23  single business segment focused solely on the design, manufacturing and marketing of its Invisalign

24  system, a proprietary method for treating malocclusion, or the misalignment of teeth, through doctor-

25  prescribed, custom manufactured, clear plastic removable orthodontic aligners.  The Company had

26  its initial public offering in January 2001 and its shares trade on the NASDAQ under the ticker

27  symbol ALGN.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                              - 8 -

31.     In 2010, in the face of anemic revenue growth for its core Invisalign products, Align agreed to buy Cadent Holdings, Inc., a small private-held company based in Carlstadt, NJ, for $187.6 million in cash.  The agreement was memorialized in a December 15, 2010 letter of intent.   Cadent manufactured digital intra-oral scanners, marketed as the iTero or iOC, and provided CAD/CAM restorative models for use by dental professionals and/or labs, and services for orthodontic digital procedures.

32.     As reported by former Cadent employees, and detailed below, during 2010, several companies were considering purchasing Cadent, including Straumann, a European provider of implant dentistry solutions, and Carestream Health Inc. ("Carestream"), a company that provides medical and dentistry imaging.

33.     According to FE2, although Align had intended to close the acquisition in December 2010, Cadent's financial records were in such a poor, unreliable condition that the merger was not able to be completed in 4Q10.[5]

34.     Unable to complete the Cadent acquisition before year-end, on January 10, 2011, Align and Cadent entered into a joint development agreement to develop software applications, which would allow Cadent scanners to "optimize case assessment and planning for Invisalign treatment."  According to a January 10 press release announcing the agreement, Align would fund the development of these software applications in order to accelerate their availability, while also owning the rights to the new technology.

**Align Technology and Cadent Announce Joint Development Agreement**

*        *        *

Align Technology, Inc. (Nasdaq:ALGN) and Cadent, Inc., today announced an agreement to jointly develop software applications that will run on Cadent iTero™ and iOC™ scanners for use in Invisalign treatment.

*        *        *

---

[5]   FE2's report regarding Cadent's unreliable financial records is corroborated by Cadent's Consolidated Financial Statements which were filed by Align subsequent to the completion of the merger.  Those financial statements reveal that Cadent was required to restate its balance sheets to account for over $5.5 million in previously unaccounted-for tax liability.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

1   Align will fund several million dollars for Cadent software development over the
2   next few quarters in order to accelerate the availability of these chair-side
    applications.  Align will own all rights to the developed applications and technology.

3   Align Announces the Acquisition of Cadent and Assures Investors That Cadent Will Be
    Accretive to EPS in FY12
4

5       35.     On March 29, 2011, Align issued a press release announcing the acquisition of

6   Cadent for $190 million in cash.[6]  Align proclaimed that the combination of the two companies

7   would drive a growth rate for intra-oral scanners exceeding 20% between 2010 and 2015 and that the

8   transaction would be accretive to non-GAAP earnings per share ("EPS") for FY12:

9       **Align Technology to Acquire Intra-Oral Scanning Leader Cadent for $190
        Million**

10                              *       *       *

11      Align Technology, Inc. (Nasdaq:ALGN) today announced that it has signed a
        definitive agreement to acquire privately-held Cadent Holdings, Inc. (Cadent) . . . .
12
                                *       *       *
13
            Align anticipates that the acquisition of Cadent, on a GAAP basis, will dilute
14      fiscal 2011 earnings per share and expects non-GAAP diluted EPS for the year to be
        in a range of $0.70 to $0.75.  ***The Company expects the transaction to be accretive
15      to non-GAAP EPS for fiscal 2012*** . . . .

16      36.     Later the same day, March 29, Align hosted a conference call with financial analysts

17  and investors to discuss the acquisition.  The call was led by Prescott and Arola.  During the call,

18  Prescott tried to explain the Company's rationale for the Cadent acquisition to skeptical investment

19  analysts, claiming it would result in new growth opportunities, revenue synergies, increasing

20  strategic leverage, and cost improvements.  Additionally, defendants detailed Cadent's 2010

21  financial results including approximately $40 million in sales consisting of oral scanners, scan fees,

22  3D digital modeling, and lab services.  The representations during the March 29, 2011 conference

23  call were intended to assure investors that the acquisition price was reasonable based on Align's due

24  diligence and review of Cadent's trailing 12-month revenues and future projected revenues:

25          [AROLA:]  I'll start off.  When ***we looked at this thing from a valuation
        point of view, we think we're paying a pretty fair price here of $190 million***.  It
26

27  ───────────────────
    [6]    When the transaction was completed the final purchase price was actually $187.6 million.
28

ranges into the midrange or even better than median valuations for companies in the med tech space, ***whether you look at a backwards, trailing, 12-months' revenues or even on a forward basis, 2012/2013 revenues on EBITDA and a sales base of comparable kind of deals and fast-growth kind of companies, 20%-plus growth***.

\*       \*       \*

[PRESCOTT:] So we think it can be fairly evaluated intrinsically for its own merits ***as an attractive, high-growth, strategically valuable asset, as well as the complementary nature of these two businesses***.

37.    Nonetheless, certain Wall Street analysts were skeptical of Align's valuation of Cadent.  For example, on March 30, 2011, Northcoast Research issued a report titled "ALGN: Cadent Acquisition.  Reiterate NEUTRAL rating," stating that Align significantly overpaid because Cadent's business model was unsustainable:

ALGN described the Cadent opportunity with the acquisition as a revenue synergy story.  However, we believe the current business model for Cadent, in which a "per click" fee/annual subscription is used, is unsustainable.  This recurring revenue component represents more than 50% of Cadent's revenue and we believe the digital impression market is moving towards a "no fee" model (SIRO), thereby potentially eliminating a significant revenue opportunity for ALGN.

\*       \*       \*

We give credit to Cadent management for structuring a favorable deal, however we believe ALGN significantly overpaid for this transaction.

38.    A May 4, 2011 Northcoast  Research report titled "ALGN: Reducing Estimates to Reflect Cadent Rapidly Changing Market Creates Risks," reiterated this sentiment, stating that "the return on investment for the doctor for digital impression dentistry, Cadent included, is one of the worst technology investments in dentistry," and that "significant advancements" and "superior solution[s]" were being offered by Cadent's competitors.

39.    To be sure, Align paid a steep price for Cadent.  Of the approximately $187.6 million purchase price ultimately paid by Align, tangible assets amounted to a mere $19.4 million and intangible assets (other than goodwill) totaled $53.2 million.  The remainder, an enormous $135.3

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

million, was accounted for as goodwill.[7] The following table summarizes Align's final allocation of the purchase price of Cadent (in thousands of dollars):

| | |
|---|---|
| Assets | $    15,745 |
| Property, plant and equipment | 3,624 |
| Acquired indentifiable intangible assets: | 53,200 |
| *Goodwill* | *135,349* |
| Liabilities assumed | (20,330) |
| Total | $   187,588 |

40.     The fact that the vast majority of the purchase price was accounted for as goodwill was not the only troubling aspect of the acquisition.  More problematic was the fact that Cadent's approximately $40 million in FY10 revenues were generated through extraordinary end-of-year discounting which provided no basis whatsoever for projecting future revenue or revenue growth.

## VII.   DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

41.     <u>False Statement:</u>  On January 30, 2012, after the market closed, Align issued a press release and filed a Form 8-K with the SEC announcing the Company's 4Q11 and FY11 financial results.  The Company falsely reported: (a) $649.3 million in total assets; (b) $20.4 million in net profit for 4Q11; and (c) EPS of $0.25 for 4Q11.  In addition, Align falsely reported goodwill of $135.8 million.  The press release stated in part:

**Align Technology Announces Fourth Quarter and Fiscal Year 2011 Results**

- Record Q4 net revenues of $128.9 million increased 2.4% sequentially and 38.8% year-over-year
- Record Q4 Invisalign revenue of $118.9 million increased 4.1% sequentially and 28.0% year-over-year with record Invisalign case shipments of 82.6 thousand
- Q4 GAAP diluted EPS was $0.25 and Q4 Non-GAAP diluted EPS was $0.28

---

[7]     As detailed below in §IX, goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805-10-05-4 requires that a business combination be accounted for by applying what is referred to as the acquisition method.  Under the acquisition method, the assets acquired and liabilities assumed are recorded at their respective fair market values as of the date of the acquisition.  ASC 805-20-30-1. "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 805-10-20. The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. ASC 350-20-35-16.

- Record fiscal 2011 net revenues of $479.7 million increased 23.9% year-over-year

          *     *     *

"The fourth quarter was a strong finish to the year for Align and we're pleased to have delivered better than expected revenue and earnings, driven by increased Invisalign case volume and lower than projected operating expenses," said Thomas M. Prescott, Align president and CEO.

42.    <u>False Statement</u>: Based in part on these financial results, defendants also falsely forecast 1Q12 income per share of $0.17 - $0.19.

For the first quarter of fiscal 2012 (Q1 12), Align Technology expects net revenues to be in a range of $125.4 million to $127.9 million. GAAP earnings per diluted share for Q1 12 is expected to be in a range of $0.17 to $0.19. Non-GAAP earnings per diluted share for Q1 12 is expected to be in a range of $0.19 to $0.21. A more comprehensive business outlook is available following the financial tables of this release.

43.    Later that same day, January 30, 2012, the Company hosted a conference call for analysts and investors to discuss the Company's 4Q11 and FY11 financial results and 1Q12 outlook. The call was hosted by Prescott and Arola:

[PRESCOTT:] Moving on to our scanner and CAD/CAM services products. Q4 revenues for both was $10 million compared to $11.6 million in Q3. Q4 scanner sales were $5.2 million compared to $5.4 million in Q3. Q4 CAD/CAM service sales were $4.7 million compared to $6.2 million in Q3.

          *     *     *

[AROLA:] On the scanner and CAD/CAM services side of the business, while it is newer to us and we have not experienced a full annual cycle, Q4 is typically the strongest quarter for dentists and specialists to purchase capital equipment.

As such, we would expect Q1 to be down sequentially.  In addition, ***we continue to focus on how to re-stage growth in Europe and are working with our distribution partners to make that happen***.

44.    <u>False and Misleading Statement:</u>  On February 29, 2012, the Company filed its Form 10-K for the period ending December 31, 2011 with the SEC.  The Form 10-K was signed by Prescott and Arola.[8]  The Form 10-K repeated the following false and misleading financial results

---

[8]    In addition to being signed by  defendants Prescott and Arola, the false February 29, 2012 Form 10-K was signed by directors Joseph Lacob, Gregory Santora,  Raymond Larkin, Warren Thaler, David Collins Collins, George Morrow and David Nagel.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

first announced on January 30, 2012: (a) $649.3 million in total assets; (b) $20.4 million in net profit for 4Q11; and (c) EPS of $0.25 for 4Q11.  Align falsely reported $135.3 million in goodwill associated with Cadent, $58.4 million allocated to Clear Aligner and $76.9 million allocated to SCCS.  The Form 10-K falsely stated that the Company based its goodwill value estimates on reasonable assumptions, which included the Company's operating forecast and revenue growth sales, and management's best estimates.  The Form 10-K further and falsely stated that the fair value of Cadent was in fact "*significantly in excess*" of the carrying value:

> We conduct our goodwill impairment test annually, during the fourth quarter, *or whenever events or changes in facts and circumstances indicate that the fair value of the reporting unit may be less than its carrying amount*. . . .  During the fiscal year 2011 annual goodwill impairment test under the first step, during the fourth quarter, we used a combination of approaches to estimate each reporting unit's fair value.  We believed that at the time of impairment testing performed, the income approach and the market approach were equally representative of a reporting unit's fair value.

> \*       \*       \*

> *Estimates and assumptions with respect to the determination of the fair value of our reporting units using the income approach include, among other inputs, our operating forecast and revenue growth rates*.

> *Our estimates of revenues and costs are based on historical data*, various internal estimates and a variety of external sources . . . .  Based on the goodwill impairment analysis results during the fourth quarter of 2011, we determined that no impairment needed to be recorded as the fair value of our reporting units were *significantly in excess of the carrying value.  During the fiscal year ended December 31, 2011, there were no facts and circumstances that indicated that the fair value of the reporting units may be less than their current carrying amount*.

45.     <u>False and Misleading Statement</u>:  Finally, the FY11 Form 10-K also purported to warn that Align might be required to record significant charges to earnings *if* changes in circumstances indicated that the carrying value may not be recoverable:

> *If* our goodwill or amortizable intangible assets become impaired, *we may be* required to record a significant charge to earnings.

> \*       \*       \*

> Net sales growth, discount rates, earnings multiples and future cash flows are critical assumptions used to determine these fair values.  Slower net sales growth rates in the dental industry, an increase in discount rates, unfavorable changes in earnings multiples or a decline in future cash flows, among other factors, may cause a change in circumstances indicating that the carrying value of goodwill or amortizable intangible assets may not be recoverable.  We may be required to record a significant

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                                      - 14 -

charge to earnings in the financial statements during the period in which any impairment of goodwill or amortizable intangible assets is determined.

46.     After the filing of the February 29, 2012 Form 10-K, the Company's stock price increased from a close of $25.61 per share on February 29, 2012 to close at $26.18 per share on March 1, 2012.

47.     <u>Reasons Why Statements in ¶¶41-45 Were Knowingly False and Misleading:</u> Each of the statements in ¶¶41-45 and specifically (i) Align's reported 4Q11 and FY11 financial results, including reported assets, net profit, EPS and goodwill; (ii) Align's 1Q12 income per share forecast; and (iii) the statements in the 2011 Form 10-K filed on February 29, 2012 concerning goodwill were materially false and misleading for all of the reasons set forth below in §IX, titled "Defendants' Financial Statements Failed to Comply with GAAP and SEC Rules."  Specifically, defendants knew or deliberately disregarded that reported goodwill was materially overstated, as was the Company's  reported 4Q11 and FY11 assets, net profit and EPS.

(a)     Defendants' statements in ¶¶41-45 that during the fiscal year there were "no facts and circumstances" indicating that the reporting units' fair value may be less than their earning value were materially false and misleading because defendants knew or recklessly disregarded that the goodwill associated with the Cadent acquisition was at serious risk of impairment from the time the acquisition was completed, and should have been written-down at least by 4Q11 when the Company purportedly conducted their FY11 impairment testing.  Cadent's goodwill was at serious risk of immediate impairment because the assumptions used by Align to justify Cadent's purchase price, and therefore resulting goodwill, did not provide any basis for evaluating the value of the SCCS reporting segment;

(b)     As reported by former Cadent employees, Cadent's FY10 revenues, which formed the basis for Align's future growth projections and goodwill assumptions, were not the result of true demand for Cadent's products and services.  Instead, the revenue results were the result of steep discounts/promotions which generated an unsustainable revenue increase in FY10.  As a result of the sharp discounts/promotions offered to customers in 4Q10, Cadent was able to significantly increase FY10 revenues from $29.3 million in FY09 to $37.9 million in FY10.  According to FE1

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

1    and FE3, these huge customer discounts/promotions included unlimited scans for a period of time

2    with the purchase of a scanner and discounts on one-year and three-year packages of unlimited scans

3    for an upfront fixed price;

4            (c)    FE1, a former Cadent Inside Sales Specialist reported that in 4Q10 there was

5    an aggressive push at Cadent to generate more scanner leads and sell more scanning packages by

6    offering customers steep discounts, including one year and three year packages with unlimited scans.

7    According to FE1, this aggressive sales and discounting push was directed by Cadent Vice President

8    of Marketing Kerri Sebring and the discounts were unprecedented during FE1's tenure at Cadent.

9    Based on her own experiences, FE1 believed that the overall sales increase in Cadent's 4Q10 was a

10   result of these discounts and promotions.  These steep discounts allowed FE1 to increase her own

11   sales of Cadent products from an average of approximately $12,000-$18,000 a month to over

12   $192,000 in December 2010.  FE1 also reported that other Cadent sales specialists experienced

13   similarly sharp increases in sales during 4Q10.  According to FE1, these deep discounts even

14   prompted customers to inquire if Cadent was being sold and customers were concerned that whoever

15   acquired Cadent would not honor the terms of the discounted deals, particularly the unlimited scans.

16   Finally, FE1 reported that from her perspective, the sharp spike in 4Q10 sales would have been

17   apparent from a review of Cadent's financials during any due diligence process;

18           (d)    FE3, a former Cadent Credit and Collections Supervisor, corroborated the

19   reports of FE1 and reported that there was a significant increase in scanner sales in 4Q10 and that

20   they were the result of deals and promotions, which included unlimited scans with the purchase of a

21   scanner.  FE3 also confirmed that based upon her experience and review of the Company's records

22   as part of her job, Cadent sold far more scanners in 4Q10 than was typical;

23           (e)    Defendants, including Prescott and Arola, knew or recklessly disregarded the

24   abnormal and unrepeatable revenue trend generated by the 4Q10 Cadent discounts and promotions.

25   FE2, a former Cadent VP of Operations provided additional background to defendants' knowledge.

26   According to FE2, prior to 2010, while she was a Cadent Senior VP of Operations, she personally

27   spoke with Align's then VP of Operations, Emory Wright, about having Align distribute Cadent

28   products.  By fall 2010, the relationship was far beyond that and Align was engaged in efforts to

1   acquire Cadent.  FE2 reported those efforts were delayed however because Align wanted Cadent to

2   become SOX and GAAP-compliant.  FE2 reported that Align hired independent auditors to review

3   Cadent's financials as part of this process;

4           (f)        FE2 also stated that as part of the due diligence process, Cadent set up a data

5   room (essentially a shared hard drive) for Align, Straumann and Carestream, each of which were

6   potential acquisition partners.  The shared drive contained Cadent's forecasts, budgets, historical

7   financials and legal documents such as customer and distributor agreements, and according to FE2,

8   Cadent's CEO, Tim Mack, and Cadent's CFO, Roger Blanchette, were the people who loaded

9   documents onto the shared drive.  FE2 stated that she knew these facts because for a short period she

10  too had access to the data room;

11          (g)        With respect to increased sales in 4Q10, FE2 corroborated FE1's and FE3's

12  accounts and reported that a lot of special offers or promotions were in fact made to customers in

13  4Q10, which included flat price scanners with a year of service and a year of usage.  FE2 also stated

14  that in 4Q10, the Company also offered current users deals to switch to an annual subscription.

15  Whereas previous customers paid per scan, they could now pay a flat fee for unlimited scans;[9]

16          (h)        Notwithstanding defendants' knowledge or reckless disregard of these facts,

17  Align based their valuation of Cadent, and encouraged Align's analysts to base their projections, on

18  the assumption that Cadent had achieved $40 million in revenue in FY10, and that Cadent would

19  generate 20%-plus growth each year.  In fact, Cadent's actual FY10 revenue was only $37.9 million

20  and that such revenue levels were only generated through unprecedented and unsustainable discount

21  offers which slashed Cadent's scanner margins to a level far below that which Align represented

22  they would achieve;

23          (i)        The reports of FEs are further corroborated by Cadent's FY09 and FY10

24  revenues which reveal the sharp increase in scanner revenue between 2009 and 2010.  In 2009

25  Cadent recognized $29.3 million in revenue in 2009, the vast majority of which came from services.

26

27  [9]    Indeed, as future quarters would demonstrate, Align never came close to achieving the growth
    Prescott told investors they would achieve in SCCS revenues.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

In 2010, Cadent's revenue spiked to $37.9 million, almost entirely due to a ***147%*** increase in revenue from the sale of scanners;

(j)     Further, by 4Q11, defendants knew or deliberately disregarded that in 2Q11, 3Q11 and 4Q11, Cadent had failed to achieve the revenue and margin growth which defendants' projected and therefore knew or recklessly disregarded that the assumptions upon which Align's goodwill valuations were based were unreasonable and baseless, rendering goodwill materially overstated. *See*, §IX.  Had Align properly evaluated Cadent's poor financial performance and the adverse changes to its business climate on a timely basis in 4Q11, in compliance with GAAP, the Company would have recorded a goodwill impairment charge of at least $28.5 million by the close of 4Q11.  If Align had recorded a goodwill impairment charge of approximately $28.5 million in 4Q11, the Company's 4Q11 and FY11 income and diluted EPS would have been materially lower:

| (In Thousands of $ Except EPS) | **4Q 2011** |
|---|---|
| Net Income as Reported | $20,449 |
| Diluted EPS as Reported | $0.25 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,500) |
| **Net Income Reflecting Goodwill Write-Off** | **($8,051)** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($0.10)** |

(k)     Similarly and for the same reasons, the statements concerning purported warnings of circumstances of goodwill impairment in the Company's February 29, 2012 Form 10-K were false and misleading and defendants knew it.  For example, defendants' statement that a charge to earnings ***may*** be required "*[i]f* our goodwill or amortizable intangible assets become impaired," was materially false and misleading because the Cadent goodwill had ***already been impaired*** for all of the reasons detailed in §IX.  Defendants also knew or deliberately disregarded that in conducting Align's 4Q11 goodwill impairment testing, the Company did not base their fair value estimates on reasonable assumptions as required by GAAP and defendants had no reasonable basis to believe or contend they were reasonable; and

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

1         (l)     In addition to defendants' knowledge based upon their admitted due diligence on Cadent, the Company has also admitted that Prescott and Arola were intimately involved in the acquisition process.  On April 18, 2012, Align's Board of Directors stated in the Company's Form 14(a) Proxy Statement that Prescott was responsible for "completing the Cadent acquisition," and that Arola "played an essential role in the acquisition of Cadent and subsequent integration."  Indeed, based in part on the purported successful Cadent acquisition, Prescott and Arola were handsomely rewarded with record bonuses for their performance.  Align's Board of Directors specifically cited Arola and Prescott's involvement in the completion of the acquisition to justify over $1.2 million in cash bonuses to Prescott and Arola, in addition to over $3.5 million in stock and option awards in 2011.  Based on a review of Align's SEC filings, Prescott's and Arola's 2011 cash bonuses were the highest they had ever received, and Prescott's cash bonus was the largest cash incentive award ever reported by Align in its history as a public company.

<u>Prescott Collects Millions in Insider Trading Proceeds Prior to Align's Admissions that Cadent's Scanner Business Goodwill Was Substantially Impaired</u>

48.     While Align sought to convince investors that Cadent was a great investment for Align that would lead to record revenues and profits, Prescott and Arola wasted little time in unloading hundreds of thousands of shares of Align stock for over $14 million in profits during the Class Period, at prices of $25.85-$34.82 per share.  The largest of these stock sales was Prescott's February 29, 2012 sale of 322,751 shares of Align stock for proceeds of nearly $8.3 million.

49.     The February 29 stock sale was Prescott's largest ever sale of Align stock at that time and came seven months prior to Align's October 17, 2012 concession that Align would likely have to write-down a significant portion of goodwill associated with the Cadent acquisition.[10]

---

[10]    Academic research has established that corporate insiders often engage in insider trading by improperly selling stock while intentionally delaying the recognition and disclosure of goodwill impairments.  Karl A. Muller, III, Monica Neamtiu and Edward J. Riedl, *Do Managers Benefit from Delayed Goodwill Impairments?*, Social Science Research Network (July 2012), available at http://ssrn.com/abstract=1429615.  Prescott's February 29, 2012 sale is consistent with the academic literature which finds that insiders "distance their trades at least six months prior to the impairments' formal announcement, consistent with increased litigation risk for insider-selling surrounding large special items."  Prescott's smaller subsequent stock sales are consistent with the findings that insider

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO        

Defendants' 1Q12 Reported Earnings and 2Q12 Earnings Projections were Materially False and Misleading

50.     <u>False and Misleading Statement:</u>  On April 23, 2012, the Company announced its 1Q12 financial results in a press release, including 1Q12 non-GAAP earnings per share ("EPS") of $0.27, which beat Wall Street analyst estimates by $0.06 per share.   The press release falsely reported: (a) $670.4 million in total assets; (b) $21.0 million in net profit; and (c) GAAP EPS of $0.26.   The press release stated in part:

**Align Technology Announces First Quarter Fiscal Year 2012 Results**

- Q1 net revenues of $135.1 million increased 4.8% sequentially and 28.8% year-over-year

            *          *          *

- Q1 scanner and CAD/CAM services revenue of $11.8 million increased 17.8% sequentially

- Q1 GAAP diluted EPS was $0.26 and Q1 Non-GAAP diluted EPS was $0.27

            *          *          *

Thomas M. Prescott, Align president and CEO said, "I'm pleased to report a very strong quarter and a great start to the year.  Strong Invisalign volume, particularly from North American Orthodontists, drove better than expected revenue, margins and EPS . . . ."

51.     <u>False Statement:</u>  In addition to the historical financial results, the Company also falsely forecast 2Q12 income per share of $0.25 - $0.27:

Q2 Fiscal 2012 Business Outlook

        For the second quarter of fiscal 2012 (Q2 12), Align Technology expects net revenues to be in a range of $140.2 million to $143.7 million.  GAAP earnings per diluted share for Q2 12 is expected to be in a range of $0.25 to $0.27. Non-GAAP earnings per diluted share for Q2 12 is expected to be in a range of $0.26 to $0.28.  A more comprehensive business outlook is available following the financial tables of this release.

52.     <u>False Statement:</u> On April 23, 2012, following the press release, the Company held a conference call for analysts and investors to discuss the Company's 1Q12 financial results and 2Q12

selling is "substantially mitigated during the six months immediately before the impairment announcement."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                              - 20 -

forecast.  The call was hosted by Prescott and Arola.  During the call, defendants repeated the false 1Q12 profits and earnings results as well as the false 2Q12 forecast.  Discussing the SCCS segment, Prescott stated that Align was "bullish about this business over the long term," and that despite the division's poor performance, the Company's sales strategy was "ahead of our original plans."  While SCCS revenue was far below the levels defendants previously stated they would easily be able to achieve, defendants refused to admit that their prior projections were clearly turning out to be vastly inflated:

> [ANALYST:] [N]ow that we have the first-quarter results in hand it would appear your guidance for Invisalign growth on a year-over-year basis is a little slower. So maybe you can comment, Tom, on what you are seeing in the environment there on a month-to-month basis throughout the year so far that would lead you to those Q2 numbers?
>
>            *       *       *
>
> [AROLA:] *Yes, gosh, you know, I guess my view of it is we are showing some, I think, pretty strong growth Q2 to Q2, 20 plus percent on a year-over-year basis.*

53.     On April 23, 2012, Credit Suisse issued an analyst report titled "Better Than Expected Case Growth & Margins Drive Significant Beat."  The article repeated the 1Q12 results:

**Better Than Expected Case Growth & Margins Drive Significant Beat**

- **Bottom Line – Expect Shares to Trade Higher Off These Results**: ALGN reported non-GAAP EPS of $0.27 vs. consensus of $0.21, paced by nearly 20% case volume growth. . . .

- **2Q Guidance Suggests Continued Sequential Momentum**: ALGN's revenue, case shipment and non-GAAP EPS guidance of $0.26-$0.28 all point to continued sequential momentum in 2Q.

54.     In reaction to the April 23, 2012 announcement of Align's 1Q12 financial results and the forecasted EPS for 2Q12, the Company's stock price spiked 15% from a close of $27.44 per share on April 23, 2012 to a close of $31.76 per share on April 24, 2012, on massive trading volume of more than 5 million shares on April 24, 2012 compared to 1.4 million shares on April 23, 2012.

55.     <u>False and Misleading Statement:</u>  On May 8, 2012, the Company filed its Form 10-Q for the period ending March 31, 2012.  The Form 10-Q was signed by both Prescott and Arola.  In addition to repeating the false 1Q12 financial results, the Company made the following

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

representations concerning the goodwill associated with the Cadent acquisition, specifically stating

that the current value of the goodwill was $135.8 million and falsely stating that "***if***" goodwill

becomes impaired, Align "***may***" be required to take a charge: [11]

> Goodwill of $135.8 million primarily represents the excess of the purchase price of Cadent over the fair value of the underlying net tangible and identifiable intangible assets, and represents the expected relative synergies of the transaction and the knowledge and experience of the workforce in place.

*       *       *

> ***If our goodwill or amortizable intangible assets become impaired, we may be required to record a significant charge to earnings***.

56.     <u>Reasons Why Statements in ¶¶50-55 Were False and Misleading</u>. Defendants' knew

or deliberately disregarded that (i) Align's reported 1Q12 financial results, including reported assets,

net profit and EPS; (ii) Align's 2Q12 financial forecast for net income; and (iii) the statements in the

May 8, 2012, Form 10-Q concerning goodwill were each materially false and misleading for the

following reasons including all of the reasons set forth in §IX, titled "Defendants' Financial

Statements Failed to Comply with GAAP and SEC Rules":

(a)     Defendants knew or recklessly disregarded that in conducting Align's 4Q11

impairment testing, their estimates were not based upon reasonable assumptions nor did such

valuations reflect management's best estimates.  Rather, defendants knew that Cadent was not only

***already*** failing to meet 2011 revenue expectations, but defendants knew that they had no basis for

projecting that the revenue expectations that were established at the time Align acquired Cadent

would be met in 2012 either.  As detailed by FE accounts at ¶47, Defendants knew or deliberately

disregarded that Align had based its goodwill valuations on data and estimates which were

inconsistent with Cadent's actual and expected future results and which would and did allow Align

to improperly maintain and report materially overstated goodwill irrespective of whether such value

estimates were supportable or reasonable.

---

[11]  Align's goodwill balance of $135.3 million as of 4Q11 increased to $135.8 million as a result of an adjustment in 1Q12.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

(b)    Defendants knew or deliberately disregarded that when Align acquired Cadent, the massive amount of goodwill recorded in connection with the purchase was immediately at serious risk of impairment, and would require millions in write-downs which the Company failed to take.  §IX; ¶47.

(c)    Defendants knew or deliberately disregarded that Cadent's financial results for 2Q11, 3Q11, 4Q11 and 1Q12 had failed to achieve the revenue and margin results which defendants projected and therefore knew that the assumptions upon which Align's goodwill valuations were based were unreasonable and baseless.  §IX.  If Align had recorded a goodwill impairment charge of approximately $28.2 million in 1Q12,  the Company's 1Q12 income and diluted EPS would have been materially lower:

| (In Thousands of $ Except EPS) | 1Q 2012 |
|---|---|
| Net Income as Reported | $20,984 |
| Diluted EPS as Reported | $0.26 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,200) |
| **Net Income Reflecting Goodwill Write-Off** | **($7,216)** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($0.09)** |

(d)    Defendants' purported warning that a charge to earnings may be required "*[i]f our goodwill or amortizable intangible assets become impaired,*" was materially false and misleading because the Cadent goodwill had ***already*** been impaired.

Defendants Report False 2Q12 Financial Results and Issue False 3Q12 Earnings Projections

57.    False and Misleading Statement:  On July 19, 2012, the Company announced its 2Q12 financial results in a press release, including 2Q12 EPS of $0.34 which beat Wall Street analyst estimates by $0.06 per share.  The press release falsely reported: (a) $744.2 million in total assets; (b) $28.5 million in net profit; and (c) EPS of $0.34:

**Align Technology Announces Second Quarter Fiscal Year 2012 Results**

- Q2 net revenues of $145.6 million increased 7.8% sequentially and 21.3% year-over-year

*        *        *

1      •   Q2 scanner and CAD/CAM services revenue of $11.9 million increased 1.8%
2          sequentially

3      •   Q2 diluted EPS was $0.34

4         . . . Align Technology, Inc. today reported financial results for the second
quarter of fiscal 2012 ended June 30, 2012.

5                        *        *        *

6         ***"The second quarter was another great one for Align and I'm pleased to***
***report strong results for revenue, operating margin and EPS – all better than our***
7 ***outlook," said Thomas M. Prescott, Align president and CEO*** . . . .

8         Net profit for Q2 12 was $28.5 million, or $0.34 per diluted share.  This is
compared to net profit of $21.0 million, or $0.26 per diluted share in Q1 12 and net
9 profit of $11.2 million, or $0.14 per diluted share in Q2 11.

10         58.    <u>False and Misleading Statement</u>:  In addition to the false quarterly results, defendants

11 falsely forecast income per share of $0.26 - $0.28:

12 Q3 Fiscal 2012 Business Outlook

13         For the third quarter of fiscal 2012 (Q3 12), Align Technology expects net
revenues to be in a range of $136.8 million to $140.8 million.  Invisalign clear
14 aligner case shipments for Q3 12 are expected to be in a range of 94.8 to 96.3
thousand cases, which reflect a year-over-year increase of 19.5% to 21.3%. GAAP
15 earnings per diluted share for Q3 12 is expected to be in a range of $0.26 to $0.28.
Non-GAAP earnings per diluted share for Q3 12 is expected to be in a range of $0.27
16 to $0.29.

17         59.    <u>False and Misleading Statement</u>:  Later that same day, July 19, 2012, the Company

18 held a conference call for analysts and investors to discuss the Company's 2Q12 financial results and

19 3Q12 outlook.  The call was led by Prescott and Arola.  During the call, Defendants repeated falsely

20 reported EPS of $0.34 and net profit of $28.5 million, and claimed that the Company's EPS was

21 "better than our outlook."

22         60.    <u>False and Misleading Statement</u>: On August 2, 2012, the Company filed its Form

23 10-Q for the period ending June 30, 2012.  The Form 10-Q was signed by both Prescott and Arola.

24 The 10-Q repeated the following false and misleading financial results first announced on July 19,

25 2012: (a) $744.2 million in total assets; (b) $28.5 million in net profit; and (c) EPS of $0.34.  In

26 addition to repeating the 2Q12 financial results first reported in the July 19, 2012 press release, the

27 Company made the following specific representations concerning the goodwill associated with the

28 Cadent acquisition:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                             

*Goodwill of $135.3 million represents the excess of the purchase price over the fair value of the underlying net tangible and identifiable intangible assets, and represents the expected synergies of the transaction and the knowledge and experience of the workforce in place*.  None of this goodwill will be deductible for tax purposes.  Under the applicable accounting guidance, goodwill will not be amortized but will be tested for impairment on an annual basis or more frequently if certain indicators are present.  *We allocated approximately $77.3 million of the goodwill from the Cadent acquisition to our Scanner and CAD/CAM Services* reporting unit and approximately $58.0 million to our Clear Aligner reporting unit.  *We allocated this goodwill to our reporting units based on the expected relative synergies generated by the acquisition*.

\*        \*        \*

*If our goodwill or amortizable intangible assets become impaired, we may be required to record a significant charge to earnings*.

. . . [W]e review our goodwill and amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable.

61.  <u>Reasons Why Statements in ¶¶57-60 Were False and Misleading</u>.  Defendants knew or deliberately disregarded that (i) Align's reported 2Q12 financial results, including reported assets, net profit and EPS, (ii) Align's 3Q12 financial forecast for EPS, net income and operating expenses and (iii) the statements in the August 2, 2012 Form 10-Q concerning goodwill were each materially false and misleading for the following reasons:

(a)     Defendants knew or recklessly disregarded that in conducting Align's 4Q11 impairment testing, they did not base their estimates on reasonable assumptions nor did such valuations reflect management's best estimates.  ¶47.  Rather, defendants knew that that they had based their goodwill valuations on data and estimates which were inconsistent with Cadent's actual results and which would and did allow Align to improperly maintain and report materially overstated goodwill irrespective of whether such value estimates were supportable or reasonable.  If Align had recorded goodwill impairment charges of approximately $28.4 million in 2Q12,  the Company's 2Q12 income and diluted EPS would have been materially lower:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

| (In Thousands of $ Except EPS) | 2Q 2012 |
|---|---|
| Net Income as Reported | $28,492 |
| Diluted EPS as Reported | $0.34 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,400) |
| **Net Income Reflecting Goodwill Write-Off** | **$92** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **$.001** |

(b)     Defendants knew or deliberately disregarded that when Align acquired Cadent, the massive amount of goodwill recorded in connection with the purchase was immediately at serious risk of impairment, and would require millions of dollars in write-downs which the Company failed to take. §IX; ¶47;

(c)     Defendants knew or deliberately disregarded that in 2Q11, 3Q11, 4Q11, 1Q12 and 2Q12, Cadent had failed to achieve the revenue and margin growth which defendants' projected and therefore knew that the assumptions upon which Align's goodwill valuations were based were unreasonable and baseless; and

(d)     Defendants' statement that a charge to earnings may be required "*[i]f* our goodwill or amortizable intangible assets become impaired," was materially false and misleading because the Cadent goodwill had already been impaired.  §IX.

<u>Insiders Cash-in on the Artificial Inflation in Align's Stock Price to the Tune of $63.2 Million</u>

62.     Prescott was not the only insider to cash in on Align's inflated stock price during the Class Period.  Between February 8, 2012 and August 30, 2012, Align's officers and directors unloaded 1.9 million shares of the Company's stock for proceeds of $63.2 million at prices as high as $35.60, all while Align's stock was artificially inflated from defendants' failure to timely write-down the Company's goodwill.

| Filer Name | Position | Shares | Proceeds |
|---|---|---|---|
| Lacob, Joseph | Dir. | 445,905 | $15,441,098 |
| Prescott, Thomas | CEO | 428,155 | $11,784,902 |
| George, Roger | VP Legal Affairs, GC | 266,989 | $9,199,455 |
| Hedge, Len | SVP, Bus. Ops. | 257,575 | $8,218,909 |
| Ellis, Dan Scott | VP, N.A. Sales | 121,036 | $4,314,933 |

| Arola, Kenneth | CFO | 92,489 | $3,059,123 |
|---|---|---|---|
| Santora, Gregory | Dir. | 75,000 | $2,360,250 |
| Larkin, Raymond | Dir. | 75,000 | $2,322,750 |
| Thaler, Warren | Dir. | 64,750 | $2,091,762 |
| Cambra, Dana | VP, R&D | 58,095 | $1,491,299 |
| Collins, David | Dir. | 36,500 | $1,098,870 |
| Wright, Emory | VP, Operations | 30,680 | $962,738 |
| Twomey,Richard | VP, Intl. | 29,633 | $922,649 |
|  |  |  |  |
| TOTAL |  | 1,981,807 | *$63,268,738* |

63.     In these seven months, Align's officers and directors sold more shares than Align's officers and directors sold in the over ***three years*** prior to the Class Period, between January 1, 2009 and January 20, 2012.  During this period Align's officers and directors sold only 1.3 million for proceeds of $28.2 million.

<u>Align Reports Weak Financial Results, Weak Forecasts and Admits Cadent Goodwill May Need Write-Down – Stock Price Plummets</u>

64.     On October 17, 2012, the Company issued a press release announcing that the distribution agreement between Align and Straumann would be terminated.  Straumann had been the exclusive distribution partner in Europe and non-exclusive distribution partner in the United States for Cadent products, including iTero intra-oral scanners:

**Align Technology and Straumann to Terminate Distribution Agreements for iTero® Scanners**

. . . Align Technology, Inc. today announced that the Company has reached a mutual agreement with Straumann to terminate their distribution agreements for iTero intra-oral scanners in Europe and North America, effective December 31, 2012. The original exclusive distribution agreement in Europe was signed in December 2009 between Straumann and Cadent Inc., the developer of iTero, which was subsequently acquired by Align in April 2011. A subsequent agreement was operationalized in February 2011, awarding Straumann non-exclusive distribution rights for iTero intra-oral scanners in North America.

. . . Align and Straumann have worked together over the past few years to build a sales, services, and support model for the iTero scanner to benefit both companies. Despite collective efforts, the two companies have concluded that their current collaboration for distributing iTero scanners does not meet their strategic or financial requirements in the present economic environment.

65.     Also on October 17, 2012, after market hours, the Company issued a press release pre-announcing its 3Q12 financial results.  The reported 3Q12 financial results missed Wall Street analysts' revenue and earnings expectations.  As opposed to reporting forecasted revenue results of

up to $140.6 million, the Company reported revenue of $136.5 million.  In addition, the Company

reported that Cadent SCCS sales and services revenues had declined nearly *16%, year-over-year*.

The Company also disclosed that as a result of the termination of the Straumann distribution

agreement, business trends and decline in revenue and operations in the scanner business, it would

review goodwill and possibly take a substantial impairment charge erasing a significant amount of

the goodwill value of Cadent.  Finally, the Company issued a weak revenue and earnings outlook for

the 4Q12, well short of prior forecasts:

**Align Technology Announces Preliminary Third Quarter Fiscal Year 2012 Results**

\*       \*       \*

- Q3 net revenues of $136.5 million increased 8.4% year-over-year

\*       \*       \*

- *Q3 scanner and CAD/CAM services revenue of $9.8 million decreased 15.9% year-over-year*
- *Preliminary Q3 diluted GAAP EPS was $0.29, non-GAAP was $0.28*
- *Company Evaluating Possible Goodwill Impairment Charge*

\*       \*       \*

The discontinuation of Align's distribution relationship with Straumann in Europe and North America, announced in a separate press release today, and *the decline in results of operations of the Company's Scanner and CAD/CAM Services reporting unit triggers the risk of impairment of goodwill associated with the acquisition of Cadent.  . . .   The Company's evaluation could result in a non-cash impairment charge for a substantial portion of the $135.3 million book value of goodwill which would negatively affect net income although revenue and cash flow from operations would not be impacted*.

66.     On October 17, 2012, the *Associated Press* issued an article titled "Align Tech slumps

on 3Q estimate and 4Q outlook."  The article discussed the forecasted earnings miss, the potential

write down of goodwill and the termination of the Straumann distribution agreement:

**Align Tech slumps on 3Q estimate and 4Q outlook**

\*       \*       \*

Align Technology Inc., which makes the Invisalign clear braces system, slumped Wednesday after the company *gave disappointing estimates for its third-quarter results and offered a weak fourth-quarter forecast.*

\*       \*       \*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

1

2

*The company also said it is terminating a distribution agreement for its iTero intra-oral scanners, and it may have to take a goodwill impairment charge as a result*.

3

4

Align Technology shares skidded $7.05, or 20 percent, to $28.36 in aftermarket trading following the announcement. The stock reached an all-time high of $39.82 on Sept. 13.

5

\*        \*        \*

6

7

8

*The company said Straumann Holding of Switzerland will stop distributing the iTero scanners at the end of 2012. Straumann distributes the scanners in Europe and North America under agreements with Cadent Holdings, a company Align bought in March 2011*. Align said the companies decided to end the distribution deal because the arrangement didn't meet their strategic or financial requirements.

9

10

11

Align will continue direct sales of iTero scanners in North America and will market the devices on a more limited basis in Europe. *The company said it may have to write down the value of Cadent as a result of the termination and weaker results from its non-Invisalign business. The current value of that goodwill is $135.3 million*.

12

13

14

15

16

67.     On these October 17, 2012 disclosures, Align's stock price plummeted more than 20%, from a close of $35.41 per share on October 17, 2012 to as low as $25.33 and ultimately closing at $28.18 per share on October 18, 2012, on massive trading volume of more than 20 million shares, the second highest daily trading volume in more than 10 years.

17

**VIII.   POST-CLASS PERIOD DISCLOSURES AND ADMISSIONS CONFIRM THAT GOODWILL WAS MATERIALLY OVERSTATED**

18

19

20

68.     Shortly following the Class Period, defendants made further disclosures regarding SCCS goodwill impairment, including even further write-downs to the SCCS goodwill which would quickly be written off in its entirety.

21

22

23

24

25

26

27

69.     On November 9, 2012, Align filed a Form 10-Q setting forth their financial results for 3Q12 ended September 30, 2012.  The 10-Q was signed by Prescott and Arola.  The Form 10-Q provided further details about Align's goodwill write-down including trends that were known to defendants since the end of 2011, including:  (i) deteriorating business trends in the SCCS reporting unit; and (ii) lower financial results and future expectations for the SCCS reporting unit.  The Form 10-Q disclosed an impairment charge of $24.7 million, reducing the goodwill from $77.3 million to $52.6 million.

28

*Goodwill Impairment*. During the third quarter of 2012, we determined that sufficient indicators of potential impairment existed to require an interim goodwill impairment analysis of our SCCS reporting unit.  These indicators included the termination of the distribution arrangement with Straumann for iTero intra-oral scanners in Europe and North America, together with market conditions and business trends within the SCCS reporting unit.  While we continue to expect revenue growth in our SCCS business, our expectations for future growth and profitability rates projected for the SCCS reporting unit are lower than our previous estimates primarily driven by overall lower than expected financial results.  As of September 30, 2012, we concluded that the fair value of the SCCS reporting unit was less than its carrying value . . . . ***Based on our preliminary analysis, the implied fair value of goodwill was substantially lower than the carrying value of the goodwill for the SCCS reporting unit by an estimated $24.7 million which we recorded*** as impairment to goodwill in the third quarter of 2012.  In the fourth quarter of 2012, we expect to finalize the step two analysis and, if necessary, record any change from our original estimate.

70.     On January 30, 2013, Align issued a press release titled "Align Technology Announces Fourth Quarter and Record Fiscal Year 2012 Results."  The press release once again announced lackluster performance in Align's SCCS reporting unit, and Align announced that as a result of their continued impairment analysis, ***additional write-offs would be required, bringing the total to $36.6 million***:

In Q3 12, we determined that there were sufficient indicators of a potential impairment to the goodwill attributed to the scanner and CAD/CAM services reporting unit, therefore we conducted step one of the goodwill impairment analysis and concluded that the goodwill was impaired.  Based on our preliminary step two analysis, we recorded an estimated goodwill impairment charge of $24.7 million in Q3 12.  In Q4 12, we finalized step two of our analysis and recorded an additional goodwill impairment charge of $11.9 million.

71.     In a separate press release on the same day, the Company issued a press release announcing the departure of CFO Kenneth Arola:

**Align Technology Announces Departure of Kenneth B. Arola, VP Finance and CFO, Effective March 4, 2013**

*             *             *

Align Technology, Inc. (NASDAQ: ALGN) today announced that Kenneth B. Arola will step down as vice president, finance and chief financial officer effective March 4, 2013 and will remain an employee of the Company through June 28, 2013. Mr. Arola will remain in his capacity as CFO through the completed audit of the Company's 2012 financial statements and filing of the 2012 Form 10-K with the SEC.

72.     On April 18, 2013, Align issued a press release titled "Align Technology Announces First Quarter Fiscal 2013 Results."  In the press release, Align announced that they were writing off the entirety of the remaining SCCS goodwill.

> Recent changes in the competitive environment for intra-oral scanners including announcements in March 2013 of new low-priced scanners targeted at Orthodontists and GP Dentists in North America caused us to lower our expectations for growth and profitability for our scanner and CAD/CAM services business during Q1 13. As a result, we conducted an impairment analysis of long-lived assets and goodwill related to our scanner and CAD/CAM services reporting unit. Based on these analyses, we recorded a $26.3 million impairment of our long-lived assets and a $40.7 million impairment of goodwill. The $40.7 million represents the remaining goodwill balance in the scanner and CAD/CAM services reporting unit.

## IX.   DEFENDANTS' FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC RULES

73.     Defendants caused the Company to falsely report its financial results for 4Q11, FY11, 1Q12 and 2Q12 by failing to timely write-off impaired goodwill associated with its SCCS reporting unit, which materially overstated the Company's assets, net income and EPS for those periods.

74.     Align's financial results were included in a Form 10-K for the year ended 2011 and in Forms 10-Q for 1Q12 and 2Q12, filed with the SEC.  ¶¶44, 55, 60.  The results were also included in press releases disseminated to the public and discussed on conference calls with analysts and investors.  ¶¶41-43, 50-52, 57-60.  Defendants claimed that the financial information they reported was a fair statement of Align's financial results and that the results were prepared in accordance with GAAP. [12]

---

[12]   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162.*  FASB ASC became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing U.S. GAAP.  This complaint uses the ASC references because the Class Period is after September 15, 2009.

75.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Align's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

**A.     Goodwill Accounting Standards**

76.     Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  ASC 805-10-05-4 requires that a business combination be accounted for by applying what is referred to as the acquisition method.  Under the acquisition method, the assets acquired and liabilities assumed are recorded at their respective fair market values as of the date of the acquisition.  ASC 805-20-30-1.  "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  ASC 805-10-20.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.  ASC 350-20-35-16

77.     An asset is an item which provides economic value to an entity.  Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition.  ASC 805-30-20 ("goodwill" definition from glossary).

78.     Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20.  Goodwill is not amortized over a pre-determined number of years, but instead ASC 350-20-35-1 requires that a company test goodwill for impairment annually at a level of reporting referred to as a reporting unit.[13] "Impairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value."  ASC 350-20-35-2.  *Goodwill of a reporting unit shall be tested for impairment between annual tests if an event or circumstances change that would more likely than*

---

[13]  A reporting unit is an operating segment of a Company or one level below an operating segment (also known as a component).  ASC 350-20-20 ("reporting unit" definition from glossary).  Align had two operating segments during the Class Period: (i) SCCS; and (ii) Clear Aligner.  For purposes of its goodwill impairment testing, Align considers its operating segments to be its reporting units.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

*not reduce the fair value of a reporting unit below its carrying amount*.  ASC 350-20-35-28 through 35-30.  Examples of such events or circumstances include the following:

    (a)    *A significant adverse change in legal factors or in the business climate*;

    (b)    An adverse action or assessment by a regulator;

    (c)    Unanticipated competition;

    (d)    A loss of key personnel;

    (e)    A more-likely-than-not expectation that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of;

    (f)    The testing for recoverability under the Impairment or Disposal of Long-Lived Assets subsections of ASC Subtopic 360-10 of a significant asset group within a reporting unit; and

    (g)    Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.  ASC 350-20-35-30.

79.  Testing for goodwill impairment is a two-step process.  The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment.  In the first step, a company will compare the fair value of a reporting unit to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is not deemed to be impaired and thus the second step of the impairment test is unnecessary.  ASC 350-20-35-6. However, if the carrying value of the unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any.  ASC 350-20-35-8.

80.  The second step of the goodwill impairment test compares the implied fair value of goodwill with the carrying amount of that goodwill.  ASC 350-20-35-9.  If the carrying amount of goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.  ASC 350-20-35-11.  Subsequent reversal of a previously recognized goodwill impairment loss is prohibited once the measurement of that loss is recognized.  ASC 350-20-35-13.

**B.     Defendants Intentionally Failed to Timely Write-Down Impaired Goodwill**

81.     Defendants' failure to timely write-down the impaired goodwill associated with the Cadent acquisition in compliance with GAAP or ASC 350 is an all too common fraudulent scheme which scholars have proven through empirical evidence to be pervasive.

82.     In a recent academic study, the authors concluded that the implementation of SFAS 142 has resulted in "relatively inflated goodwill balances and untimely impairments."  They also concluded that "investors do not appear to fully anticipate the untimely nature of post SFAS 142 goodwill impairments" and that "managers exploit the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated."  Kevin K. Li and Richard G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (December 2012), available at http://ssrn.com/abstract=1466271.[14]

83.     Defendants here engaged in the exact same conduct Li and Sloan found to be prevalent by failing to record a goodwill impairment charge in 4Q11, 1Q12 or 2Q12 and materially overstating assets, net income and EPS.  Defendants failed to use reasonable and supportable assumptions regarding Cadent's projected revenues and profits for the 4Q11 impairment test that defendants represented resulted in no impairment charge to the goodwill, nor did such assumptions reflect management's "best estimates," as defendants represented.  During the Class Period, defendants ignored Cadent's poor financial performance, particularly in its SCCS reporting unit, along with certain other adverse changes to its business climate, including a significant deteriorating relationship with Straumann, their exclusive European distributor and non-exclusive North America distributor, which negatively impacted revenues.  Both the negative financial performance and adverse changes to the business climate triggered the requirement under GAAP that an interim goodwill impairment test be performed by Align prior to 3Q12, but defendants failed to do so.

---

[14]     FASB SFAS No. 142, *Goodwill and Other Intangibles*, is the same goodwill accounting standard that is referred to in this complaint under the new FASB codification as ASC 350.

84.     For instance, during the Class Period, defendants ignored that:

(a)     Revenues reported for Cadent were badly missing the 20%-plus annual growth rate that defendants had guided at the time of acquisition, and that expected revenue growth level was a key component to justify the price that Align originally paid to acquire Cadent and support the goodwill recorded;

(b)     Cadent's international sales after 3Q11 had been reduced down to virtually nothing due to a faltering relationship with Straumann along with an economic recession occurring in Europe;

(c)     Gross margins reported for Cadent post-acquisition plummeted more than 33% compared to gross margins reported for Cadent pre-acquisition, from approximately 45% in 2009 and 2010 to an average of approximately 30% from 2Q11 to 3Q12, and defendants' representation of Cadent being accretive to earnings by 2012 was not occurring; and

(d)     Competition in the intra-oral scanning market was significantly increasing during the Class Period causing a reduction to Cadent's sales.  Further, 50% of Cadent's revenues were in jeopardy of disappearing due to changing business strategies by competitors in the industry.

85.     Nonetheless, in order to avoid causing Align to miss earnings expectations or acknowledge that Align had vastly overpaid for Cadent, defendants chose to ignore and conceal all the above factors until the end of the Class Period, when they announced they were finally performing an interim goodwill impairment test that could (and ultimately would) result in a substantial impairment charge to the $77.3 million goodwill balance for its SCCS reporting unit.  In fact, the Company recorded an initial goodwill impairment charge of $24.7 million in 3Q12 and later increased the 3Q12 impairment charge another $11.9 million in 4Q12 bringing the total impairment charge to $36.6 million.  This left a remaining goodwill balance of $40.7 million which was written down to zero in 1Q13, less than two years from the time Cadent was acquired.

86.     Had the Company properly assessed Cadent's poor financial performance and the adverse changes to its business climate on a timely basis and in compliance with GAAP, the Company would have recorded a goodwill impairment charge of at least $28.5 million by the close of 4Q11.

87.     Cadent also failed to conduct interim goodwill impairment tests for 1Q12 and 2Q12. If the Company had performed the goodwill impairment test in 1Q12, they would have recorded an impairment charge of at least $28.2 million as of 1Q12.  And if the Company had performed the goodwill impairment test in 2Q12, they would have recorded an impairment charge of at least $28.4 million as of 2Q12.

88.     If Align had recorded goodwill impairment charges of approximately $28.5 million in 4Q11, $28.2 million in 1Q12, or $28.4 million in 2Q12, the Company's reported net income and diluted EPS would have dramatically decreased as follows:

| (In Thousands of $ Except EPS) | **4Q 2011** | **1Q 2012** | **2Q 2012** |
| --- | --- | --- | --- |
| Net Income as Reported | $20,449 | $20,984 | $28,492 |
| Diluted EPS as Reported | $0.25 | $0.26 | $0.34 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,500) | ($28,200) | ($28,400) |
| **Net Income Reflecting Goodwill Write-Off** | **($8,051)** | **($7,216)** | **$92** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($0.10)** | **($0.09)** | **$.001** |

C.     **Defendants' Failure to Timely Write-off Goodwill Associated with Cadent was Intentional or Deliberately Reckless**

89.     Prior to the acquisition of Cadent in April 2011, Align had virtually no goodwill recorded on its balance sheet.  The $187.6 million acquisition of Cadent was the first major purchase of a company by Align and defendants were determined to show the market that it was a smart business decision that would position Align as a major player to the intra-oral scanning market and increase sales of the Company's legacy product, Invisalign.  In fact, defendants, when announcing the acquisition on March 29, 2011, stated that Cadent's revenues were expected to grow in the 20%-plus range annually.[15]  As a result of the acquisition of Cadent, Align recorded approximately $135.3

---

[15]  Defendant Prescott in answering an analyst's question about his confidence in growing sales at least 20% annually stated, "We'd say on a CAGR [Compounded Annual Growth Rate] basis, we think that we ought to be able to grow as fast as the market growth or better.  I think the third-party data suggests that installed-based scanners are going to be growing 20%-plus.  I think that's a pretty good place to start for you."

1    million in goodwill with $77 million allocated to its SCCS reporting unit and $58 million allocated
2    to its Clear Aligner reporting unit.

3           90.    Though defendants attempted to spin the $187.6 million purchase price as "pretty
4    fair" and that it "range[d] into the midrange or even better" for comparable companies, Cadent had
5    more liabilities than tangible assets on its balance sheet at the time of acquisition and historically had
6    been an unprofitable company.  In fact, Cadent had generated only $37.9 million in revenues in
7    2010, had approximately $11.3 million in debt, and had a cumulative net loss of nearly $15 million
8    for 2009 and 2010.  Moreover, of the $187.6 million purchase price, 65% represented goodwill, 26%
9    represented intangible assets (other than goodwill), such as trademarks, existing technology and
10   customer relationships, and only 9% represented tangible and financial assets.[16]

11          91.    As alleged herein, defendants knew or deliberately disregarded that the historical
12   revenues reported by Cadent were inflated by the end of 2010 due to significant discounted pricing
13   of its scanners, apparently designed to make its total sales and revenues look more attractive to
14   possible acquirers.  Due to the significant discounts given to customers in 2010, Cadent's gross
15   margins for its scanner sales component had dropped nearly 23% from 44% in 2009 to only 34% in
16   2010.  As a result, defendants actually knew or deliberately disregarded that their representation that
17   Cadent's revenues would grow 20%-plus annually was without reasonable basis and was not
18   achievable because the Company's historical revenues had been inflated on heavy discounting to
19   improve their chances of being acquired.

### 1.    Align Used Unreasonable Assumptions in Its Goodwill Impairment Test at the End of 2011

22          92.    As prescribed by ASC 350-20, defendants were required in 4Q11 to conduct an
23   annual impairment test for the goodwill recorded as a result of the Cadent acquisition.  Based on
24   their testing, defendants maintained and reported that no impairment needed to be recorded for the
25   goodwill associated with either of its reporting units, SCCS and Clear Aligner.  The Company even

---

[16]    Intangible assets are assets (not including financial assets) that lack physical substance (the term intangible assets is used to refer to intangible assets other than goodwill).  ASC 350-20-20.

represented in its 2011 10-K that, based on their testing, the fair values of each of their reporting units "**were significantly in excess**" of their respective carrying values and hence asserted that no impairment charge was required.

93.     However, the Company could not have used reasonable assumptions or the "best estimates" for their impairment test regarding their SCCS reporting unit because Cadent's actual performance was in no respect a "significant" improvement over the metrics that defendants touted when they announced the deal in March 29, 2011.  In fact, Cadent's financial performance measured in revenues failed in each successive quarter following the acquisition to achieve the 20%-plus growth rates and "cost improvement(s)" defendants had expected and promised.

94.     For example, the chart below reflects Cadent's actual quarterly revenues reported for 2011 versus the significantly higher quarterly revenues that Align expected to report based on Cadent achieving a 20%-plus projected annual growth rate.  As the charts shows, Cadent missed its 20% annual growth rate expectation in every quarter in 2011.



95.     Further, defendants knew or deliberately disregarded that Cadent's international sales were almost nonexistent by the end of 2011 due to a faltering relationship with Straumann and an increasing economic recession in Europe.  For example, Cadent's 4Q11 international sales were a mere $362,000, a decline of over 85% from 3Q11 sales of $2.5 million.

96.     Indeed, defendants admitted throughout the Class Period that Cadent's international performance was woefully challenged, and it was plain that their relationship with Straumann was not close to meeting their expectations.  For instance, during the Company's January 30, 2012 conference call discussing the Company's 4Q11 financial results, Prescott acknowledged that SCCS division was still below their expectations, with declining revenues attributed to "lower than expected scanner sales in Europe, based on lower procedure volume and lab activity, as well as lower scanner-related CAD/CAM services."  Arola added that the Company expected scanner sales to decline even further in the following quarter:

> [PRESCOTT:]  The sequential decrease in Q4 revenue reflects lower than expected scanner sales in Europe, based on lower procedure volume and lab activity, as well as lower scanner-related CAD/CAM services.
>
> *       *       *
>
> [AROLA:] On the scanner and CAD/CAM services side of the business, while it is newer to us and we have not experienced a full annual cycle, Q4 is typically the strongest quarter for dentists and specialists to purchase capital equipment.
>
> As such, we would expect Q1 to be down sequentially. In addition, we continue to focus on how to re-stage growth in Europe and are working with our distribution partners to make that happen.

97.     Similarly, during the Company's April 23, 2012 conference call, Arola stated that the Scanner Division was still struggling internationally, and that Align continued "to see a more challenging environment for Scanners and CAD/CAM Services." Prescott characterized Europe as a "difficult environment" for selling scanners and stated that for the scanners they do sell, revenue streams for services were "lighter" than in North America.  Prescott also stated that the integration of Cadent caused Align problems, including "negatively impact[ing] several important customer-facing functions like customer service, tech support and even delivery schedules in some cases."

98.     During the Company's July 19, 2012 conference call, Prescott again discussed the Company's "disappointing results" in Europe and stated that because of the market conditions there and "great uncertainty" about Europe's economic future, the Company was "not expecting any significant improvement from our Scanner and CAD/CAM Services business in [Europe]." Arola further stated that the Company expected 3Q12 Scanner Division revenue to be "down sequentially from quarter two," and that 3Q12 scanner sales in Europe would be "flat."

99.     Defendants did not adequately consider this steep drop-off in international sales, its ongoing problems with Straumann and the economic recession in Europe when conducting its annual impairment test for 2011.

100.    A final item defendants disregarded in reaching their conclusion of no impairment at the end of 2011 was the significant decline in Cadent's gross margin after Align acquired Cadent. Before the acquisition, for example, Cadent had historically reported robust gross margins in the 45%-50% range.  Defendants justified the deal, in part, by confirming their expectation to analysts that gross margins would continue to be near 50%.[17] Defendants also stated that Align would have "lots of opportunities to improve cost structure" with Cadent.  However, the chart below shows no cost improvements and demonstrates a huge drop-off that occurred in gross margins reported for Cadent post-acquisition as compared to the gross margins reported for Cadent pre-acquisition.[18]

---

[17]    Defendant Arola on the March 29, 2011 conference call discussing the Cadent acquisition stated: "They have two different components of their business.  The service business has a higher margin, obviously, than the hardware part of their business in the scanner.  I would think the typical hardware margin's in the 50%-ish range."

[18]    It should be noted that Plaintiff has shown the post-acquisition gross margins conservatively in the chart as the non-GAAP gross margins reported by Align each quarter. These gross margin percentages are higher than the GAAP gross margins because non-recurring expenses are removed and therefore gross margin increases. Even showing the higher non-GAAP gross margin, the Company was badly missing its gross margin expectation for Cadent of approximately 50% as stated by defendant Arola at the time of acquisition.



101.    As the charts above demonstrate, defendants' actual results fell far short of their revenue and gross margin projections that were supposed to be met to justify the $187.6 million purchase price for Cadent and the associated $135.3 million additional goodwill reported as an asset on Align's balance sheet.  In addition, contrary to defendants' representation made at the time of acquisition, Cadent's forecasted earnings for 2012 were not expected to be accretive to EPS.  As a result, defendants at the end of 2011 could not have used reasonable assumptions in projecting Cadent's future performance as part of its impairment test or an impairment charge would have been recorded at that time.

### 2.    Align's Improper Goodwill Accounting for 1Q12 and 2Q12

102.    The Company continued to improperly delay the recording of an impairment charge for the $77.3 million of goodwill associated with its SCCS reporting unit by failing to conduct any impairment test in 1Q12 or 2Q12.  In fact, Cadent's poor financial performance, deteriorating relationship with Straumann that negatively impacted its international sales and the more competitive landscape in the industry, were each independently and in the aggregate triggering events that required defendants to conduct an interim goodwill impairment test in 1Q12 or 2Q12

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

1   under ASC 350-20-35-30.  "Goodwill of a reporting unit shall be tested for impairment **between**

2   **annual tests** [if there is a]. . . significant adverse change . . . in the business climate [or any other

3   "such events or circumstances"] . . . that would more likely than not reduce the fair value of a

4   reporting unit below its carrying amount [or book value]."  ASC 350-20-35-30.  But defendants

5   chose to disregard this requirement.  Similar to the end of 2011, had defendants completed a

6   goodwill impairment test in 1Q12 or 2Q12 with neutral and verifiable assumptions regarding

7   Cadent's performance, in accordance with the financial accounting concepts underlying GAAP,

8   defendants would have been required to report a significant impairment charge at each of those time

9   periods.[19]

10          103.    Ultimately, at the end of the Class Period, the Company could no longer delay an

11  impairment charge.  The Company pre-announced disappointing 3Q12 earnings on October 17, 2012

12  and stated it was in the process of conducting step one of a goodwill impairment test for its SCCS

13  reporting unit.  According to Align, the events that triggered the need for an interim impairment test

14  in 3Q12 were the discontinuation of their relationship with Straumann and the decline in results of

15  operations of its SCCS reporting unit.[20]

16

17  _____

18  [19]  "To be useful[,] financial information not only must represent relevant phenomena, but it also
    must faithfully represent the phenomena that it purports to represent.  To be a perfectly faithful

19  representation, a depiction would have three characteristics.  It would be *complete, neutral,* and *free
    from error. . . .* The Board's objective is to maximize those qualities to the extent possible." FASB

20  Statement of Concepts ("CON") No. 8, Qualitative Characteristic ("QC") 12.  "A neutral depiction is
    without bias in the selection or presentation of financial information.  A neutral depiction is not

21  slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability
    that financial information will be received favorably or unfavorably by users."  CON 8, QC 14.

22  "Verifiability helps assure users that information faithfully represents the economic phenomena it
    purports to represent.  Verifiability means that different knowledgeable and independent observers

23  could reach consensus, although not necessarily complete agreement, that a particular depiction is a
    faithful representation." CON 8, QC 26.

24  [20]  After the end of the Class Period, defendants finalized their goodwill impairment test which

25  resulted in a total impairment charge of $36.6 million to the SCCS reporting unit.  Defendants
    disclosed in their 2012 Form 10-K that an impairment charge was recorded because the **growth and**

26  **profitability projections utilized in their goodwill impairment test were lowered** from previous
    estimates due to lower than expected financial results.  But, defendants should not have waited until

27  the 3Q12 impairment test to lower their growth and profitability projections.  As the charts show,
    defendants were missing their sales and gross margin expectations for Cadent throughout 2011 and

28  into 2012.  Yet, defendants failed to use reasonable projections in their 2011 annual goodwill

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                     - 42 -

104.    However, as alleged herein, defendants knew or deliberately disregarded that well before 3Q12 its relationship with Straumann was untenable, as international sales had been hemorrhaging since 3Q11 – a year earlier, and Cadent never achieved the sales and margin projections that defendants used to justify paying the $187.6 million purchase price and more importantly, maintaining the reported $135.3 million goodwill balance.  In fact, the Company's 3Q12 10-Q disclosed that the projections utilized in its goodwill impairment test were lowered as compared to previous estimates *due to "overall lower than expected financial results"* for Cadent. However, the Company was missing its sales growth and profit projections for Cadent throughout 2011 and that pattern continued in 2012 up until the time defendants recorded a goodwill impairment charge in 3Q12.

105.    For example, the chart below extends out the time period from the chart seen at ¶94 to include Cadent's sales for the first three quarters of 2012.  This chart shows that Cadent's quarterly revenues in 2012 never achieved the sales levels that should have been realized if Cadent had been meeting the 20%-plus annual growth rate expectation that defendant Prescott represented would be "a pretty good place to start" at the time of acquisition.



impairment test and then improperly delayed the impairment by waiting until 3Q12 to perform an interim goodwill impairment test.

1   106.   Also, the competitive landscape in 2012 in the intra-oral scanning market was
2   increasing significantly with new product launches from competitors, which created another
3   challenge regarding Cadent's financial performance.  For example, an analyst from Northcoast
4   Research stated in a January 9, 2012 report that management knew there would be several new
5   entrants into the intra-oral scanning market that were "***likely to offer superior products at***
6   ***considerably lower prices***" in 2012.  Further, a Morgan Stanley analyst report dated April 24, 2012
7   stated that three competitive launches over the next two quarters were expected to compete with
8   Cadent in the intra-oral scanning market.  Finally, a July 19, 2012 William Blair analyst report noted
9   that Sirona, a competitor of Cadent and the leading company in the intra-oral scanning market, was
10  dominating sales in Germany and "making it harder for Cadent to gain traction there."

11  107.   In addition, Cadent's sales come from two distinct revenue streams: revenues from
12  actual scanner sales and service revenues generated from those scanners including, scan fees, 3D
13  digital modeling and lab services.  The split between the revenues generated by scanner sales versus
14  service sales was about a 50/50 split during the Class Period.  However, the same Northcoast
15  Research analyst report dated January 9, 2012 warned that the 50% of Cadent's revenues generated
16  from its service side of the business were at significant risk of disappearing because the industry was
17  moving to a newer model with "no per click or subscription fees."  The analyst noted:

18      In particular, while sales of digital impression systems are increasing, the market is
19      changing rapidly to a model with no per-click or subscription fees, which would
        eliminate about half of Cadent's revenues.  ALIGN described the Cadent opportunity
        as a revenue synergy story, but Cadent's current business model eliminates any
20      return on investment for the dentist.  As a result, we believe significant portions of
        Cadent's revenue could be at risk.

21  108.   The chart below supports the analyst's comment that a significant portion of Cadent's
22  service revenues were at risk, as the service revenues were declining throughout 2012:

1
2
3
4
5
6
7
8
9
10



11      109.    More importantly, defendants ignored that the growth rate of Cadent's service

12  revenues during 2012 was negative and badly missing the 20%-plus growth rate defendants had

13  represented would be achieved at the time of acquisition.

14      110.    As discussed herein, Cadent's disappointing financial performance, the adverse

15  changes in its business climate, and the increasing competitive landscape were all triggering events

16  that required Align to conduct an interim goodwill impairment test prior to 3Q12, but defendants

17  failed to do so.   Had defendants done so, and utilized neutral and verifiable assumptions, a

18  significant impairment charge would have been recorded during the Class Period.

19      111.    Defendants' statement that a goodwill impairment triggering event first occurred in

20  3Q12 is simply untrue.  As detailed herein, the "results of operations of the Company's Scanner and

21  CAD/CAM Services reporting unit" which Align claims was among the factors that triggered "the

22  risk of impairment," had been materially below Align's assumptions ever since Align acquired

23  Cadent in April 2011.  Cadent's poor performance in 3Q12 was simply the continuation of a known

24  trend that had been ongoing for over a year. Similarly, the discontinuation of Align's distribution

25  relationship with Straumann was simply a reflection of the poor and continually declining market

26  trends in sales for Cadent's scanners and in Align's relationship with Straumann.

27      112.    Indeed, Align's relationship with Straumann (inherited from Cadent) had been in

28  peril long before 3Q12.  While the initial agreement between Cadent and Straumann, announced in

1    December 2009, was intended to increase exposure and sales of Cadent scanners in Europe,

2    European sales had been in steep decline since 2011 and showed no signs of improving.  Cadent's

3    subsequent agreement with Straumann in February 2011 to allow Straumann to distribute Cadent

4    scanners non-exclusively in the US was of little utility to Align, which was focused on training their

5    own sales teams to sell scanners domestically.  Moreover, Straumann had little motivation to sell

6    Cadent scanners.  Selling Cadent scanners represented a tiny fraction of Straumann's revenues and

7    was a drag on their margins.  Selling Cadent scanners was also incompatible with Straumann's stated

8    attempts to raise sales of its higher margin dental restorative services through support of multiple

9    intra-oral scanners.  Therefore, regardless of when the Straumann distribution agreement was

10   formally terminated, the relationship was not economically viable long before 3Q12.

### 3.    Determining the Fair Value of SCCS

11   113.    As described in ¶79-80, testing for goodwill impairment is a two-step process.  The

12   first step in the process is used to identify potential goodwill impairment and the second step is used

13   to measure the amount of the impairment.  "The first step of the goodwill impairment test, used to

14   identify potential impairment, compares the fair value of a reporting unit with its carrying amount,

15   including goodwill."  ASC 350-20-35-4.  "The fair value of a reporting unit refers to the price that

16   would be received to sell the unit as a whole in an orderly transaction between market participants at

17   the measurement date."  ASC 350-20-35-22.  The second step of the goodwill impairment test

18   compares the implied fair value of goodwill with the carrying amount of that goodwill.  ASC 350-

19   20-35-9.  If the carrying amount of goodwill exceeds the implied fair value of that goodwill, an

20   impairment loss is recognized in an amount equal to that excess.  ASC 350-20-35-11.

21   114.    A reasonable indicator of the fair value of the SCCS reporting unit as of the end of

22   4Q11 would be to first determine the implied multiple of expected revenues that Align paid to

23   acquire Cadent and then to apply that multiple to Cadent's actual revenues as of 4Q11.  "In

24   estimating the fair value of a reporting unit, a valuation technique based on multiples of earnings or

25   revenue or a similar performance measure may be used if that technique is consistent with the

26   objective of measuring fair value."  ASC 350-20-35-24.

1     115.    To determine the implied multiple of expected revenues that Align paid to acquire Cadent, the $187.6 million purchase price is divided by the total revenues that Align expected Cadent to generate by the end of 2011.  Align's management indicated on the March 29, 2011 conference call that Cadent had approximately $40 million in annual revenue in 2010.  When defendants announced the acquisition, defendants indicated that Cadent's revenues were expected to grow in the 20%-plus annual range.  Defendant Prescott stated, in pertinent part, that "on a CAGR [Compounded Annual Growth Rate] basis. . . the third-party data suggests that installed-based scanners are going to be growing 20%-plus."  *See* ¶90 n.15.  Consequently, Align expected that Cadent would generate revenue of at least $48 million by the end of 4Q11 (*i.e.*, $40 million annual revenue in 2010 + 20% of $40 million = $48 million expected revenue in 2011).  Thus, Align effectively paid a forward revenue multiple of 3.9084 times Cadent's $48 million expected revenue in 2011 (*i.e.*, $187.6 million purchase price ÷ $48 million expected revenue in 2011 = 3.9084).

116.    But Cadent did not earn anywhere near $48 million revenue in 2011, let alone 20%-*plus* growth.  Cadent, in fact, only earned $40.707 million revenue in 2011, a substantial shortfall from the revenue that Align expected to earn from Cadent.  If Cadent were a publicly-traded company, had given guidance in early 2011 that the company projected revenues to be $48 million, and then ultimately reported that revenues missed that target by nearly $7.3 million, the market would have severely discounted Cadent's stock price. Consequently, a reasonable indication of the fair value of SCCS as of 4Q11 was $159.098 million (*i.e.*, $40.707 million actual revenue in 2011 × 3.9084 multiple of expected 2011 revenue = $159.098 million).  The fair value of SCCS, in effect, declined at least $28.5 million from $187.6 million at acquisition to $159.098 million by the end of 4Q11, a more than 15% drop in value.

117.    Similarly, even if the Company had delayed goodwill impairment testing until 1Q12, when revenue for SCCS improved from the prior quarter, the fair value of SCCS declined by at least

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

1  $28.2 million.  And if the Company had instead delayed goodwill impairment testing until 2Q12, the

2  fair value of SCCS declined by at least $28.4 million.[21]

3        118.    The implied declines in the fair values of SCCS of $28.5 million as of 4Q11, $28.2

4  million as of 1Q12, or $28.4 million as of 2Q12, are also reasonable proxies for the goodwill

5  impairment charges under step two of the goodwill impairment test for those respective time periods.

6  Step two would only indicate less goodwill impairment than step one results if the fair value of net

7  assets other than goodwill declined from the acquisition date to any of the three goodwill impairment

8  measurement dates.  But there could not have been any material decline in the fair value of net assets

9  other than goodwill during those time periods.  Indeed, defendants represented that amortizable

10 intangible assets – which comprise most of SCCS's net assets other than goodwill – were ***not***

11 impaired at 4Q11, 1Q12, and 2Q12.  Therefore, the amount of goodwill that Align should have

12 written-down as of 4Q11, 1Q12, or, at the latest, 2Q12, would not have been reduced because there

13 would have been no offsetting decrease in the fair value of Cadent's net assets.  Moreover the

14 estimated goodwill impairments of $28.5 million at 4Q11, $28.2 million at 1Q12, or $28.4 million at

15 2Q12 are conservative measurements because this forward revenue multiple valuation method does

16 not take into account that Cadent's gross margin plunged from about 45% in 2010 to an average of

17 approximately 30% from 2Q11 to 2Q12, which also adversely affected Cadent's value.

18        119.    Align was required under GAAP to record a goodwill impairment charge of at least

19 $28.5 million after the close of 4Q11, $28.2 million after the close of 1Q12, or at the very latest,

20 $28.4 million after the close of 2Q12 because the carrying amount of goodwill exceeded its implied

21 fair values on those respective time periods.  "Impairment is the condition that exists when the

22 carrying amount of goodwill exceeds its implied fair value."  ASC 350-20-35-2.  But the defendants

23 did not comply with GAAP, and defendants' representations regarding the financial information that

24 Align reported were false and misleading.

25

26 ─────────────────────

27 [21]   The negative financial impact to net income and EPS, had an impairment charge been recorded
   in 4Q11, 1Q12 or 2Q12, can be seen at ¶88.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                                                      - 48 -

1   X.      LOSS CAUSATION/ECONOMIC LOSS

2        120.    During the Class Period, as detailed herein, defendants made false and misleading

3   statements regarding the Company's current and future financial condition, its quarterly and year-

4   end financial statements, and engaged in a scheme which deceive investors regarding the same. The

5   false and misleading statements alleged herein fraudulently set investors' expectations and caused

6   Align's stock to trade at artificially inflated prices.  Later, when defendants' misrepresentations and

7   fraudulent conduct became known to the market, Align's stock price declined, as the prior artificial

8   inflation came out of the stock price. As a result of their purchases of Align's common stock during

9   the Class Period and defendants' conduct alleged herein, Plaintiff and other members of the Class

10  suffered economic loss, *i.e.*, damages, under the federal securities laws.

11        121.    Specifically, as alleged herein, the Company materially misstated its financial results

12  for each of the reporting periods alleged herein.  In addition to the false financial statements the

13  Individual Defendants and Align misrepresented the overall financial condition of the Company's

14  business by falsely and repeatedly misrepresenting the true facts concerning the Company's key

15  Cadent acquisition and the goodwill associated with certain of its business units, particularly, its

16  scanner business.  This known conduct or reckless disregard of the material overstatement of

17  goodwill, income and earnings masked the true financial condition of the Company as set forth in

18  detail herein and caused the financial statements to be materially false and misleading.

19        122.    For example, on January 30, 2012, the Company initially announced false 4Q11 and

20  FY11 financial results, which materially misstated the value of goodwill associated with the Cadent

21  acquisition and overstated Align's earnings and income.  The Company simultaneously set false

22  investor expectations based in part on those false financial results and related business condition and

23  prospects of Cadent.  The 4Q11 and FY11 false financial results were repeated in the Form 10-K

24  filed with the SEC on February 29, 2012, which included additional false statements concerning the

25  adequacy, thoroughness and results of the Company's purported goodwill impairment testing and

26  conclusions.

27

28

123.     On April 23, 2012, Align announced false, materially overstated 1Q12 EPS and income, and set false 2Q12 financial expectations while failing to take the required goodwill write-down for known goodwill impairment in its Cadent scanner unit.

124.     Similarly, on July 19, 2012, Align announced false materially overstated 2Q12 EPS and net income and set false 3Q12 financial expectations, again failing to take the required goodwill write-down for Cadent.

125.     These material misrepresentations and omissions caused Align stock to trade at artificially inflated prices during the Class Period, which reached a Class Period high of $39.82 on September 13, 2012.

126.     The artificial inflation in Align's stock price began to be removed following the Company's October 17, 2012 announcement of its 3Q12 financial report, which revealed the truth which their previous misstated financial statement had concealed – that a substantial portion of the goodwill associated with the Cadent acquisition was impaired and that growth in the Cadent scanner division would be materially lower than previously represented.   This October 17, 2012 announcement and disclosure substantially caused Align's stock price decline of over 20% on October 18, 2012, which closed at $28.18, down from a close of $35.41 on October 17, 2012.  On October 18, 2012, Align stock experienced massive trading volume of more than 20 million shares traded in one day.  Twenty million shares in volume trading was the highest trading volume the Company experienced since 2006.

## XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

127.     Plaintiff's claims for securities fraud are asserted under the fraud-on-the-market theory of reliance.  The market price of Align securities, including common stock, regularly traded on the NASDAQ, was artificially inflated by the false and misleading statements complained of herein, including Align's numerous false financial statements.  Defendants' false statements inflated the price of Align securities during the Class Period, including by maintaining the price of those securities at a level they would not have traded at, had the true financial condition and other matters concealed from investors been revealed at an earlier date, as alleged herein.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:12-cv-06039-WHO

1    128.   At all relevant times, the market for Align's common stock was an efficient market

2    for the following reasons, among others:

3    (a)   Align's stock met the requirements for listing, and was listed and actively

4    traded on the NASDAQ, a highly efficient and automated market;

5    (b)   As a regulated issuer, Align filed periodic public Reports with the SEC and

6    the NASDAQ;

7    (c)   Align regularly communicated with public investors via established market

8    communication mechanisms, including through regular disseminations of press releases on the

9    national circuits of major newswire services, publications on its website and other Internet sites, and

10   through other wide-ranging public disclosures, such as through conference calls, communications

11   with the financial press and other similar reporting services;

12   (d)   During the Class Period, Align was followed by securities analysts employed

13   by major brokerage firms, including Jefferies, Credit Suisse, William Blair, ROTH Capital Partners,

14   Morgan Stanley, ThinkEquity, SunTrust, Sidoti & Company, JMP Securities and RAM Partners.

15   Analysts covering Align wrote reports based upon the publicly available information disseminated

16   by defendants about Align.  These reports were distributed to the sales force and certain customers of

17   their respective brokerage firms; and

18   (e)   Through the foregoing mechanisms, the information publicly disseminated by

19   defendants about Align and its operations, and the import thereof, became widely available to and

20   was acted upon by investors in the marketplace such that, as a result of their transactions in Align

21   stock, the information disseminated by defendants, including the false and misleading statements

22   described above, became incorporated into and were reflected by the market price of Align's

23   publicly-traded securities.

24   129.   As a result of the foregoing, the market for Align's common stock promptly digested

25   current information regarding Align from all publicly available sources, and reflected such

26   information in Align's stock price.  Under these circumstances, all purchasers of Align's common

27   stock during the Class Period suffered similar injury through their purchase of Align's common

28

1    stock at artificially inflated prices and its subsequent decline in value, and a presumption of reliance

2    applies.

3    **XII.    CLASS ACTION ALLEGATIONS**

4        130.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the

5    Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the

6    common stock of Align during the Class Period, and who were damaged thereby (the "Class").

7    Excluded from the Class are defendants and their families, the officers and directors of the

8    Company, at all relevant times, members of their immediate families and their legal representatives,

9    heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

10       131.    The members of the Class are so numerous that joinder of all members is

11   impracticable.  Throughout the Class Period, Align common stock was actively traded on the

12   NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

13   only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

14   thousands of members in the proposed Class.  Record owners and other members of the Class may

15   be identified from records maintained by Align or its transfer agent and may be notified of the

16   pendency of this action by mail, using the form of notice similar to that customarily used in

17   securities class actions.

18       132.    Plaintiff's claims are typical of the claims of the members of the Class as all members

19   of the Class are similarly affected by defendants' wrongful conduct in violation of federal law

20   complained of herein.

21       133.    Plaintiff will fairly and adequately protect the interests of the members of the Class

22   and has retained counsel competent and experienced in class action and securities litigation.

23       134.    Common questions of law and fact exist as to all members of the Class and

24   predominate over any questions solely affecting individual members of the Class.  Among the

25   questions of law and fact common to the Class are:

26           (a)    whether the federal securities laws were violated by defendants' acts as

27   alleged herein;

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

1        (b)     whether statements made by defendants to the investing public during the

2    Class Period misrepresented material facts about the business and operations of Align;

3        (c)     whether the price of Align common stock was artificially inflated during the

4    Class Period; and

5        (d)     to what extent the members of the Class have sustained damages and the

6    proper measure of damages.

7        135.    A class action is superior to all other available methods for the fair and efficient

8    adjudication of this controversy since joinder of all members of the Class is impracticable.

9    Furthermore, as the damages suffered by individual Class members may be relatively small, the

10   expense and burden of individual litigation make it impossible for members of the Class to

11   individually redress the wrongs done to them.  There will be no difficulty in the management of this

12   action as a class action.

13   **XIII.   NO SAFE HARBOR**

14       136.    The statutory safe harbor provided for forward-looking statements under certain

15   circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

16   Many of the specific statements pleaded herein were not identified as "forward-looking statements"

17   when made.

18                                 **COUNT I**

19   **Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
     **Promulgated Thereunder Against All Defendants**
20

21       137.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

22   forth herein.

23       138.    During the Class Period, defendants disseminated or approved the materially false

24   and misleading statements specified above, which they knew or deliberately disregarded were

25   misleading in that they contained misrepresentations and failed to disclose material facts necessary

26   in order to make the statements made, in light of the circumstances under which they were made, not

27   misleading.  In addition, defendants Prescott and Arola, while in possession of material non-public

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO                                    - 53 -

1  information about the Company's true financial and business conditions, sold millions of dollars

2  worth of Align stock at artificially inflated prices.

3       139.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue

4  statements of material fact and/or omitted to state material facts necessary to make the statements

5  made not misleading; and (c) engaged in acts, practices and a course of business that operated as a

6  fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

7       140.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

8  the market, they paid artificially inflated prices for Align common stock.  Plaintiff and the Class

9  would not have purchased Align common stock at the prices they paid, or at all, if they had been

10  aware that the market prices had been artificially and falsely inflated by defendants' misleading

11  statements.

12       141.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

13  other members of the Class suffered damages in connection with their purchases of Align common

14  stock during the Class Period.

15  **COUNT II**

16  **Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

17

18       142.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

19  forth herein.

20       143.    The Individual Defendants acted as control persons of Align within the meaning of

21  §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or

22  directors of Align, their ownership of Align stock, and their statements made on behalf of the

23  Company, the Individual Defendants had the power and authority to cause Align and its officers and

24  employees to engage in the wrongful conduct complained of herein.  Align controlled the Individual

25  Defendants and the Company's other officers and employees.  By reason of such conduct,

26  defendants are liable pursuant to §20(a) of the Exchange Act.

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO          - 54 -

1

### PRAYER FOR RELIEF

2        WHEREFORE, Plaintiff prays for relief and judgment, as follows:

3        A.      Determining that this action is a proper class action and certifying Plaintiff as a Class

4   representative under Rule 23 of the Federal Rules of Civil Procedure;

5        B.      Awarding compensatory damages in favor of Plaintiff and the other Class members

6   against all defendants, jointly and severally, for all damages sustained as a result of defendants'

7   wrongdoing, in an amount to be proven at trial, including interest thereon;

8        C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

9   action, including counsel fees and expert fees; and

10       D.      Such other and further relief as the Court may deem just and proper.

11

### JURY DEMAND

12       Plaintiff hereby demands a trial by jury.

13   DATED:  July 11, 2013                        ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
14                                               SHAWN A. WILLIAMS
                                                 CHRISTOPHER M. WOOD
15                                               SUNNY S. SARKIS

16

17                                                      s/ Shawn A. Williams
                                                 _____
                                                      SHAWN A. WILLIAMS
18

19                                               Post Montgomery Center
                                                 One Montgomery Street, Suite 1800
20                                               San Francisco, CA  94104
                                                 Telephone:  415/288-4545
21                                               415/288-4534 (fax)

22                                               Lead Counsel for Plaintiff

23                                               VANOVERBEKE MICHAUD &
                                                    TIMMONY, P.C.
24                                               THOMAS C. MICHAUD
                                                 79 Alfred Street
25                                               Detroit, MI  48201
                                                 Telephone:  313/578-1200
26                                               313/578-1201 (fax)

27

28                                               Additional Attorneys for Plaintiff

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 11, 2013.

s/ Shawn A. Williams
SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

855373_1

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:12-cv-06039-WHO

# Mailing Information for a Case 3:12-cv-06039-WHO

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas John Clark**
  dclark@wsgr.com

- **Caz Hashemi**
  CHASHEMI@WSGR.COM,tbell@wsgr.com,vmendoza@wsgr.com

- **Kelley Moohr Kinney**
  kkinney@wsgr.com,tbell@wsgr.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Nicholas R Miller**
  nmiller@wsgr.com,rlustan@wsgr.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Sunny September Sarkis**
  Ssarkis@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Christopher Martin Wood**
  cwood@rgrdlaw.com,khuang@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)