1
2
3
4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7   CITY OF DEARBORN HEIGHTS ACT 345
    POLICE & FIRE RETIREMENT SYSTEM,          Case No.  12-cv-06039-WHO

8                  Plaintiff,
                                              **ORDER ON MOTION TO DISMISS**
9            v.
                                              Re: Dkt. No. 30
10  ALIGN TECHNOLOGY, INC., et al.,

11                 Defendants.

12          In its Amended Complaint, plaintiff City of Dearborn Heights Act 345 Police and Fire

13  Retirement System alleges that defendants Align Technology, Inc. ("Align") and two of its

14  officers violated the federal securities laws by failing to take a timely impairment charge to

15  Align's goodwill.  Plaintiff brings two causes of action against Align, Align's Chief Executive

16  Officer ("CEO") Thomas M. Prescott, and Align's Chief Financial Officer ("CFO") Kenneth B.

17  Arola, on behalf of the plaintiff and all other purchasers of Align common stock between January

18  31, 2012 and October 17, 2013 (the "Class Period").  The Amended Complaint alleges two causes

19  of action:  (1) that the defendants violated § 10(b) of the Securities Exchange Act, 15 U .S.C. §

20  78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to § 10(b) of the Securities

21  Exchange Act; and (2) that the defendants violated Section § 20(a) of the Securities Exchange Act,

22  15 U.S.C. § 78t(a).

23          Pending before the Court is the defendants' Motion to Dismiss both causes of action.  For

24  the reasons set forth below, the motion to dismiss is GRANTED with LEAVE to AMEND.

25                              **FACTUAL BACKGROUND**

26          The following facts are taken from the Amended Complaint and are taken as true for

27  purposes of the Motion to Dismiss.

28

*United States District Court*
*Northern District of California*

**A.  Align's Acquisition of Cadent Holdings, Inc. and Goodwill Valuation**

Align designs, manufactures, and markets Invisalign, a method for treating malocclusion, or the misalignment of teeth, using a series of clear, removable orthodontic aligners.  Compl. ¶ 2.  On April 29, 2011, Align acquired Cadent, a provider of digital scanning solutions for orthodontics and dentistry, for $187.6 million.  Compl. ¶¶ 2-3.  Of the $187.6 million purchase price, $135.3 million was considered "goodwill," *i.e.*, an amount exceeding the value of the net assets of the company.  Compl. ¶¶ 5, 39.  Of this $135.3 million, Align allocated approximately $76.9 million to the computer-aided design and manufacturing ("CAD/CAM") and scanner unit (together, the "SCCS" unit) and $58.4 million to the "Clear Aligner" unit.  Compl. ¶¶ 44.

Defendants allegedly knew when they purchased Cadent that these goodwill estimates were overstated and unsustainable.  Compl. ¶ 5.  According to confidential sources, Cadent offered "substantial and unprecedented discounts" to its customers in the fourth quarter of 2010 to drive up scanner sales and revenues by 147% and to make itself more appealing to potential acquirers.  Compl. ¶¶ 6, 47(b)-(g).  Defendants were allegedly aware of Cadent's inflated 2010 revenues through Align's due diligence and access to Cadent's internal financial reports and company documents.  Compl. ¶ 47(f).  According to the plaintiff, the defendants should have known that the Cadent goodwill "was at serious risk of impairment from the time the acquisition was completed . . . ."  Compl. ¶ 47(a).  Industry analysts were also allegedly skeptical of Align's valuation of Cadent and realized that Align had "overpaid" for the acquisition.  Compl. ¶¶ 37-38.

The inflated 2010 revenues allegedly formed the basis for Align's future growth projections and goodwill assumptions.  Compl. ¶ 47(b).  Prescott projected that the combination of the two companies would drive a growth rate for intra-oral scanners exceeding 20% between 2010 and 2015.  Compl. ¶¶ 3, 35-36.  But Cadent did not meet its anticipated 20% revenue growth in any post-acquisition quarter.  Compl. ¶¶ 105.  According to the plaintiff, these missed revenue targets should have alerted defendants that Align's goodwill was impaired.  Compl. ¶ 84-85.  Defendants also allegedly ignored other factors that should have caused Align to reevaluate its goodwill.  Cadent's international sales were dwindling due to a faltering relationship with Straumann, its exclusive distribution partner in Europe for Cadent products, gross margins for

2

1   Cadent had fallen from 45% pre-acquisition to 30% post-acquisition, and competition in the intra-

2   oral scanning market was increasing.  Compl. ¶ 84.

3         In 4Q11, Align conducted its annual goodwill impairment testing, concluding that the fair

4   value of Align's reporting units were "significantly in excess of carrying value" and that "there

5   were no facts and circumstances that indicated that the fair value of the reporting units may be less

6   than their current carrying amount."  Compl. ¶ 44.  Plaintiff alleges that the defendants

7   deliberately ignored that Cadent was no longer reasonably valued at $135.3 million over its book

8   value in 4Q11.  Compl. ¶ 47(a).  The plaintiff also alleges that the defendants failed to take an

9   interim impairment charge to its goodwill in 1Q12 and 2Q12 "in order to avoid causing Align to

10  miss earnings expectations or acknowledge that Align had vastly overpaid for Cadent."  Compl. ¶¶

11  83-88.  In other words, by failing to take an impairment charge, Align kept its assets and stock

12  price artificially inflated during the Class Period.

13        On October 17, 2012, Align issued a press release announcing that it terminated the

14  distribution agreement with Straumann.  Compl. ¶ 64.  Later that day, Align announced that its

15  3Q12 financial results missed revenue and earnings expectations, that SCCS revenues had

16  declined nearly 15.9%, and that it would review goodwill and possibly take an impairment charge.

17  Compl. ¶ 65.  The press release stated:

18        The discontinuation of Align's distribution relationship with Straumann in Europe
          and North America, announced in a separate press release today, and the decline in
19        results of operations of the Company's [SCCS] reporting unit triggers the risk of
          impairment of goodwill associated with the acquisition of Cadent . . . .  The
20        Company's evaluation could result in a non-cash impairment charge for a
          substantial portion of the $135.3 million book value of goodwill which would
21        negatively affect net income although revenue and cash flow from operations
          would not be impacted.
22

23  Compl. ¶ 65.  On October 18, 2012, Align's stock price decreased more than 20%.  On November

24  9, 2012, Align announced a goodwill write down of $24.7 million.  Compl. ¶ 69.  Additional write

25  downs followed.  Compl. ¶¶ 70, 72.  By 1Q13, Align had written down the SCCS unit's $77.3

26  million goodwill to zero.  Compl. ¶ 13, 85.

27        The stock price drop allegedly caused millions in damages to class members who

28  purchased Align stock.  Compl. ¶ 14.  According to the plaintiff, had the defendants properly

United States District Court
Northern District of California

3

assessed Align's financial condition and written down its goodwill earlier than it did, these dramatic losses would not have occurred or would have been mitigated.  Compl. ¶¶ 120-126.

### B.  Goodwill and Pertinent Accounting Guidelines

Generally Accepted Accounting Principles ("GAAP") are the guidelines and rules for financial accounting in the United States.  Compliance with GAAP is a basic obligation of publicly traded companies, and "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  The Financial Accounting Standards Board ("FASB") sets accounting standards for public companies by issuing pronouncements that address general or specific accounting issues.  These pronouncements include Statements of Financial Accounting Standards ("SFAS").

Under SFAS No. 141, goodwill is "an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized."  J.A. 940 (Business Combinations, SFAS No. 141 ¶ 3j (Fin. Accounting Standards Bd. 2007)).  "When an acquisition occurs, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or excess purchase price."  *Fait v. Regions Fin. Corp*., 655 F.3d 105, 110 (2d Cir. 2011).  GAAP also requires that goodwill be tested for impairment annually, or "more frequently if events or changes in circumstances indicate that the asset might be impaired."  J.A. 538 (Goodwill and Other Intangible Assets, SFAS No. 142 ¶ 17 (Fin. Accounting Standards Bd. 2001)).

### C.  The Defendants' Statements During the Class Period

The thrust of the plaintiff's allegations is that the defendants failed to comply with GAAP by ignoring signs that an earlier impairment charge was necessary, and therefore misled investors about the true nature of Align's financial health and growth prospects.  From this general premise, the plaintiff asserts that Align's earnings figures and growth projections for 4Q11, FY11, 1Q12, and 2Q12 were false and misleading because defendants failed to tell the truth about Align's overstated goodwill.  Compl. ¶¶ 41-47, 50-55, 57-60.  The Amended Complaint details several allegedly false statements in press releases, conference calls, and SEC filings released by Align

United States District Court
Northern District of California

4

during this period, as summarized below.

On January 30, 2012, Align issued a press release announcing allegedly inflated Q411 and FY11 financial results of $694.3 million in total assets, $20.4 million in net profit, $135.8 million in goodwill, and anticipated 1Q12 earnings per share ("EPS") of $0.17 - $0.19. Compl. ¶¶ 41-42. Prescott stated in the press release, "[t]he fourth quarter was a strong finish to the year for Align and we're pleased to have delivered better than expected revenue and earnings, driven by increased Invisalign case volume and lower than projected operating expenses." Compl. ¶ 41. On an investor conference call that same day, Align discussed its 4Q11 and FY11 financial results and 1Q12 outlook. During the call, Prescott stated that Q4 revenue for the SCCS unit was down to "$10 million compared to $11.6 million in Q3," that scanner sales were "$5.2 million compared to $5.4 million in Q3," and CAD/CAM services sales were "$4.7 million compared to $6.2 million in Q3." Compl. ¶ 43. Arola stated that the defendants expected sales to decline even further in the following quarter, but that they "continue to focus on how to restage growth in Europe and are working with our distribution partners to make that happen." Compl. ¶ 43.

On February 29, 2012 Align filed a Form 10-K with the SEC stating that Align conducted its annual goodwill impairment testing in 4Q11 and determined that no goodwill impairment was necessary. Compl. ¶ 44. It further stated that the fair value of Align's reporting units were "significantly in excess of carrying value" and that "there were no facts and circumstances that indicated that the fair value of the reporting units may be less than their current carrying amount." Compl. ¶ 44. But it observed that "[i]f our goodwill or amortizable assets become impaired, we may be required to record a significant charge to earnings." Compl. ¶ 45.

According to the plaintiff, these statements regarding goodwill were false. In the plaintiff's view, "Cadent's goodwill was at serious risk of impairment" because Align based its goodwill calculations on inflated and unsustainable 2010 results which did not provide a reasonable basis for evaluating the value of the SCCS unit. Compl. ¶ 47(a). The plaintiff also alleges that the warning regarding possible future goodwill impairment was false, because Cadent's failure to meet projected revenue should have signaled to defendants that "the Cadent goodwill had already been impaired . . . ." Compl. ¶ 47(k).

United States District Court
Northern District of California

On April 23, 2012 Align issued a press release announcing allegedly inflated 1Q12 financial results of $670.4 million in total assets, $21.0 million in net profit, and EPS of $0.27. Compl. ¶ 50.  The press release also announced that "Q1 net revenues of $135.1 million increased 4.8% sequentially and 28.8% year over year" and "Q1 scanner and CAD/CAM services revenue of $11.8 million increased 17.8% sequentially."  Compl. ¶ 50.  Prescott stated, "I'm pleased to report a very strong quarter and a great start to the year . . . better than expected revenue, margins, and EPS . . . ."  Compl. ¶ 50.  The press release also reported favorable anticipated results for 2Q12. Compl. ¶ 51.  On an investor conference call that day, Prescott, discussing the SCCS unit, stated that Align was "bullish about this business over the long term" and its sales were "ahead of our original plans."  When an analyst noted "slower" first-quarter results and questioned the basis of the favorable Q2 projections, Arola acknowledged that the SCCS division was still struggling internationally, but stated that, "I guess my view of it is that we are showing some, I think, pretty strong growth Q2 to Q2, 20 plus percent on a year-over-year basis."  Compl. ¶ 52.

On May 8, 2012 Align filed its Form 10-Q repeating the allegedly inflated 1Q12 financial results.  The Form 10-Q also reported that the value of goodwill was $135.8 million and stated that "[i]f our goodwill or amortizable assets become impaired, we may be required to record a significant charge to earnings."  Compl. ¶ 55.

On July 19, 2012, Align issued a press release and held a conference call announcing allegedly inflated 2Q12 financial results of $744.2 million in total assets, $28.5 million in net profit, and EPS of $0.34.  Compl. ¶ 57.  The press release stated that "net revenues of $145.6 million increased 7.8% sequentially and 21.3% year-over-year" and "Q2 scanner and CAD/CAM services revenue of $11.9 million increased 1.8% sequentially."  Compl. ¶ 57.  Prescott stated that the company was performing "better than our outlook."  Compl. ¶ 57.  However, Prescott stated that it was not expecting any significant improvement in its SCCS revenues in Europe, noting "disappointing results" in the region.  Compl. ¶ 98.  Arola also stated that 3Q12 SCCS revenue would be down from 2Q12 and that scanner sales would be "flat."  Compl. ¶ 98.

On August 2, 2012, Align filed a Form 10-Q that repeated the allegedly inflated 2Q12 financial results.  Compl. ¶ 60.  It also stated the following regarding the goodwill associated with

6

1    the Cadent acquisition:

2        Goodwill of $135.3 million represents the excess of the purchase price over the fair
         value of the underlying net tangible and identifiable intangible assets, and
3        represents the expected synergies of the transaction and the knowledge and
         experience of the workforce in place. . . .  We allocated approximately $77.3
4        million of the goodwill from the Cadent acquisition to our [SCCS] reporting unit
         and approximately $58.0 million to our Clear Aligner reporting unit.  We allocated
5        this goodwill to our reporting units based on the expected relative synergies
         generated by the acquisition. . . .  If our goodwill or amortizable intangible assets
6        become impaired, we may be required to record a significant charge to earnings. . .
         . [W]e review our goodwill and amortizable intangible assets for impairment when
7        events or changes in circumstances indicate the carrying value may not be
         recoverable.
8

9    *Id*.  The plaintiff alleges that these statements were false and misleading because they allegedly

10   relied on inflated goodwill based on unsustainable data, and by 1Q12 or 2Q12, the goodwill "had

11   already been impaired" because Cadent was not meeting revenue expectations.  Compl. ¶¶ 56, 61.

12        **D.  Factual Allegations Specific to Defendants Prescott and Arola**

13        Prescott and Arola sold hundreds of thousands of shares of Align stock during the Class

14   Period for a combined total of over $14 million.  Compl. ¶ 48.  These sales amounted to 31% and

15   37% of their stock holdings, respectively.  Dkt. No. 30, Defendants' Motion to Dismiss "Mtn." at

16   22; Exs. Q, R, S.  The largest of these stock sales during the Class Period was Prescott's February

17   29, 2012 sale of 322,751 shares for proceeds of nearly $8.3 million.  *Id*.  Prescott and Arola also

18   sold large amounts of stock prior to the Class Period.  On February 2, 2010 Prescott sold 328,596

19   shares, and on April 26, 2011, Arola sold 100,000 shares.  Mtn. Exs. R, S.

20        On January 30, 2013, Align issued a press release announcing that defendant Arola would

21   step down from his position as vice president and CFO of Align effective March 4, 2013, but

22   would remain in his capacity as CFO through June 28, 2013, until the completed audit of Align's

23   2012 financial statements.  Compl. ¶ 71.

24        **REQUEST FOR JUDICIAL NOTICE**

25        In connection with their motion to dismiss, defendants ask this Court to take judicial notice

26   of twenty-five documents, including SEC filings, transcripts of earnings calls, Forms 4 for

27   Prescott and Arola, NASDAQ reports of Align's historical daily stock prices, analyst reports, and

28   accounting standards issued by the Accounting Standards Board.  Defendants' Request for Judicial

1    Notice, Dkt. No. 31.

2            The Court finds that judicial notice is proper for the following reasons.  Pursuant to

3    Federal Rule of Evidence 201, documents alleged in a complaint and essential to a plaintiff's

4    allegations may be judicially noticed.  *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1295 (9th

5    Cir. 1998).  "Although generally the scope of review on a motion to dismiss for failure to state a

6    claim is limited to the Complaint, a court may consider evidence on which the complaint

7    necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the

8    plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6)

9    motion."  *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation

10   marks and citation omitted).  The court may "treat such a document as part of the complaint, and

11   thus may assume that its contents are true for purposes of a motion to dismiss under Rule

12   12(b)(6)."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  A court may also take judicial

13   notice of documents on which allegations in the complaint necessarily rely, even if not expressly

14   referenced in the complaint, provided that the authenticity of those documents are not in dispute.

15   *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 837-38 (N.D. Cal. 2000).

16           Plaintiff opposes the taking of judicial notice of Forms 4 filed with the SEC.  Dkt. No. 34,

17   Plaintiff's Opposition to Motion to Dismiss ("Opp.") at 22 n.18.  However, a court may take

18   judicial notice of Forms 4 when a plaintiff's allegations rely on a defendant's stock sales.  *In re*

19   *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (granting request for judicial

20   notice of Forms 4 even though plaintiff questioned their veracity).  Here, the plaintiff asserts that

21   Prescott and Arola's stock sales strongly suggest that defendants knew that the goodwill of the

22   SCCS unit was impaired months before the impairment was announced, an argument that is

23   significant to the plaintiff's scienter allegations.  Compl. ¶¶ 48-49, Opp. 21-22.  Accordingly, the

24   Court hereby GRANTS defendants' Request for Judicial Notice.

25                                      **LEGAL STANDARD**

26   **A.  Federal Rule of Civil Procedure 12(b)(6)**

27           A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

28   sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint

United States District Court
Northern District of California

8

"must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal under Rule 12(b)(6) may be based on either (1) the "lack of a cognizable legal theory," or (2) "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In considering whether the complaint is sufficient to state a claim, the court accepts as true all of the factual allegations contained in the complaint. *Iqbal*, 129 S.Ct. at 1949. However, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).

### B.  Securities and Exchange Act, sections 10(b) and 20(a)

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under the authority of Section 10(b), in turn, provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Thus, the basic elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Systems, Inc*. 411 F.3d 1006, 1014 (9th Cir. 2005).

### C.  Federal Rule of Civil Procedure 9(b) and the PSLRA

Securities fraud claims must satisfy the heightened pleading standards of Rule 9(b) of the

United States District Court
Northern District of California

9

Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); s*ee Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In addition, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners*, 552 F.3d at 990–91; *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

With respect to falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). With respect to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To satisfy the requisite state of mind element, "a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (citation omitted). Facts showing mere recklessness, or a motive to commit fraud and opportunity to do so, provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). As such, the Court "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material holistically, not "scrutinized in isolation." *VeriFone*, 704 F.3d at 701.

### DISCUSSION

The defendants' Motion to Dismiss asserts that the Amended Complaint (1) fails to specify its allegations of falsity with particularity, and (2) fails to allege facts creating a strong inference that the defendants acted with the requisite mental state. As explained below, the Court concludes that the Amended Complaint fails to allege falsity and scienter under the PSLRA.

# I.   CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO SECTION 10(B) AND RULE 10(B)(5)

## A.  Falsity

The Amended Complaint alleges that Align's financial results and goodwill calculations were false and not in conformity with GAAP because the defendants deliberately inaccurately assessed Cadent's goodwill.  According to plaintiffs, various factors showed that the goodwill was worth less than the $135.3 million Align paid for that goodwill when it acquired Cadent.  These factors include that:  (1) the SCCS unit was missing the 20% plus annual revenue growth rate that defendants had projected in March 2011; (2) international scanner sales were down; and (3) post-acquisition gross margins were not meeting expectations and and competition in the intra-oral scanner market was increasing.  Compl. ¶ 84.  The Amended Complaint alleges that due to these factors, Align should have impaired the Cadent goodwill when it conducted its annual goodwill testing in 4Q11, and that Align should have conducted interim impairment testing in 1Q12 or 2Q12 and reported an impairment at that time.  However, as detailed below, the Amended Complaint fails to plead with particularity that any of the challenged statements were false or misleading.

### 1.  SCCS Unit Revenues

The Amended Complaint does not plead with particularity why SCCS revenues should have led to an impairment charge at the end of 2011, or triggered interim goodwill testing in 2012 that would have resulted in an impairment charge.

First, the Amended Complaint pleads no facts to suggest that the 2011 revenue results, which were publicly announced in Align's press releases and SEC filings and acknowledged by Align executives, were not accounted for in the 2011 goodwill impairment testing.  While the plaintiff alleges that the defendants were using pre-acquisition results, rather than results from April 2011 to December 2011, in its 4Q11 goodwill assessment, the Amended Complaint provides no facts, documents, or confidential witness testimony to support that allegation.  The Amended Complaint pleads statements by former employees who allege that the Cadent 2010 sales figures were based on unsustainable discounting, but they say nothing about how these sales numbers

impacted the impairment analysis in 4Q11 or during the Class Period.  Compl. ¶¶ 47(b)-(f).

This reflects a more fundamental problem with plaintiff's allegations that Align's 2011 impairment testing was false and misleading because "the assumptions used by Align to justify Cadent's purchase price, and therefore resulting goodwill, did not provide any basis for evaluating the value of the SCCS reporting segment . . . ."  Compl. ¶ 47(a).  To plead with particularity here, the plaintiff would need to identify, at a minimum, which of Align's assumptions were unfounded when it conducted its 2011 goodwill testing.  Yet the Amended Complaint has not pleaded what assumptions were used in goodwill testing, let alone that they were unreasonable or improper.  It is no substitute to allege that because the SCCS reporting unit failed to reach revenue projections, the assumptions used in testing goodwill must have been "unreasonable and baseless."  Compl. ¶¶ 47(j).

Second, the Amended Complaint fails to allege why the 2012 SCCS sales results should have led to interim impairment testing in 1Q12 or 2Q12.  Even though Align publicly announced that it expected 2012 SCCS sales to be down, SCCS revenues rose considerably.  In 1Q12 and 2Q12, Align reported SCCS revenue of $11.8 million and $11.9 million.  Compl. ¶¶ 50, 57.  Q411 international sales were $362,000, and plaintiffs allege that "there was no reason to believe that such trends would improve in 1Q12."  Compl. ¶¶ 95-96; Opp. at 8-9.  However, in 1Q12 international sales increased to $631,000.  Defendants' Reply in Support of Motion to Dismiss ("Reply") at 6, Mtn. Ex. O.  There are no factual allegations in the Amended Complaint that attempt to reconcile why interim impairment testing should have been conducted in the face of these positive results.  Similarly, although the plaintiff argues that "contemporaneous evidence throughout 2011" indicated that "Cadent's revenues were substantially below the projections that purported to justify Cadent's purchase price and resulting goodwill" there are no allegations stating what projections Align actually used in 4Q11, 1Q12, or 2Q12.  Instead, the Amended Complaint cites to Align's 20% projections from March 2011, a year earlier.  Compl. ¶¶ 3, 47, 84, 91, 105.  But the Amended Complaint pleads no facts alleging that the defendants continued using

United States District Court
Northern District of California

this projection in 4Q11 or during the Class Period.[1]  The Amended Complaint offers little more than the conclusory allegation that the defendants "failed to use reasonable and supportable assumptions regarding Cadent's projected revenues and profits" without offering facts as to what the underlying assumptions were, or that they were wrong.  Compl. ¶¶ 83, 93-94, 100-101, 113-119.

The plaintiff's sweeping allegations fail especially when one considers that a goodwill evaluation is based on several factors present at the time the assessment is made "which are not matters of objective fact."  *Fait v. Regions Financial Corp.*, 655 F. 3d 105 (2d Cir. 2011).  Although the Amended Complaint recites the various factors that influence a goodwill assessment, it ignores the importance of this subjective, multi-factored test by asserting in blanket fashion that the defendants used "unsupportable and unreasonable" assumptions about the SCCS unit without pleading what those assumptions were.  Compl. ¶¶ 10-11, 42, 46-47, 58, 61.

*In re Wet Seal, Inc. Securities Litigation*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007), is instructive here.  There, the court concluded that the plaintiffs did not plead sufficient facts to support their allegation that the defendants' goodwill estimates were unfounded.  The court dismissed the case despite the fact that at the start of the class period the company had already experienced 20 months of declining sales and publicly reported five quarters of losses.  *Id*. at 1162.  The court held the allegations that defendants delayed taking a charge fell "well short" of the requirements of the PSLRA, as the complaint did not provide enough information "even in light of Wet Seal's weakened position" to lead to an inference that the defendants used "unfounded" estimates.  *Id*.  The plaintiff's case here is even weaker than in *Wet Seal*, because here there was not a sustained decline in sales revenue.  As detailed above, SCCS sales and revenue were up and down in 2011, and the unit performed better than expected during the Class Period in 1Q12 and 2Q12.  These better than expected results indicate that "it is equally plausible that [Align] did not impair assets during the Class Period because it believed that it was

---

[1] The defendants assert that in April 2012, when Prescott stated "we are showing some, I think, pretty strong growth Q2 to Q2, 20 plus percent on a year-over-year basis" the actual results showed that the SCCS unit had in fact achieved 20% gross margins.  Compl. ¶ 52; Defendants' Reply in Support of Motion to Dismiss ("Reply") at 7 (citing Mtn. Exs. L, O, P.)

successfully addressing problems and its business prospects were bright."  *In re ICN Pharm., Inc.,*

*Sec. Litig.*, 299 F. Supp. 2d 1055, 1066 (C.D. Cal. 2004) *aff'd sub nom. Bedford Oak Partners, LP*

*v. ICN Pharm. Inc.*, 184 F. App'x 672 (9th Cir. 2006).

### 2.   International Scanner Sales

The Amended Complaint does not plead with particularity why SCCS sales in Europe or

Align's "faltering relationship with Straumann" should have led to an impairment charge at the

end of 2011 or interim goodwill testing in 2012.  Compl. ¶ 84.  As the Amended Complaint

acknowledges, SFAS No. 142 requires interim goodwill impairment testing only where "events or

circumstances change that would more likely than not reduce the fair value of a reporting unit

below its carrying amount."  Compl. ¶ 78.  The Amended Complaint, however, contains only

conclusory statements, not factual allegations, to support the plaintiff's contention that, at some

point before October 2012, the defendants had knowledge of events or circumstances which would

have required them to reach the conclusion that SFAS No. 142's "more likely than not" standard

had been met with regard to the SCCS unit's European sales.  As to international sales

specifically, Q411 international sales were $362,000, and increased in 1Q12 to $631,000.  Mtn.

Ex. O.  As detailed above, the plaintiff does not explain why the defendants should have taken an

impairment charge despite the increased 1Q12 sales and increased overall 1Q12 and 2Q12 SCCS

revenue.  Additionally, there are no factual allegations that these results, which were publicly

announced, were not taken into account in the defendants' goodwill considerations.

Furthermore, the Amended Complaint's allegations regarding the downward trajectory of

Align's European sales and relationship with Straumann do not plausibly demonstrate at any

specific time during 4Q11, 1Q12, or 2Q12 that it was more likely than not that the "defendants

would have been required to report a significant impairment charge at each of those time periods."

Compl. ¶ 102.  Especially given that the SCCS unit performed better in 1Q12 and 2Q12 than prior

quarters, a reasonable inference exists that no impairment was believed to exist at that time.

These facts plausibly suggest that the defendants may have had overly optimistic views of

its business outlook in that region.  In January 2012, Arola stated that they expected sales to

decline in 2012, but that they "continue to focus on how to restage growth in Europe and are

United States District Court
Northern District of California

working with our distribution partners to make that happen."  Compl. ¶ 43, 96.  In April 2012, Prescott characterized Europe as a "difficult environment" and that revenue in Europe was "lighter" than in North America.  Compl. ¶ 97.  In July 2012, Prescott stated that the company was performing "better than our outlook" but that it was not expecting any significant improvement in its SCCS revenues in Europe, noting "disappointing results" in the region.  Compl.  ¶ 57-59, 98.

Those statements do not indicate that the defendants knew that they were required to conduct impairment testing, that the Europe business would fail, or that the Straumann relationship would terminate.  In *Wet Seal*, the court dismissed the complaint where it found that management knew future prospects were bleak but nevertheless maintained an optimistic outlook:

> The problem with the [complaint] is that it is largely premised on the idea that management and members of the board knew the new line would fail, which in turn meant they knew that Wet Seal would fail to recapture its customer base and to generate sufficient cash flows to support its balance sheet.  But Plaintiffs fail to plead the concrete facts that support their premise-they do not explain the precise information, known to Defendants but not to the investing public, that indicated the 2004 line would fail.  The omission of such facts from the [complaint] is fatal, because, Defendants repeatedly warned that, if the 2004 back-to-school line were not successful, they might face charges to earnings or insolvency.  These disclosures mean Defendants' conduct was more consistent with their understanding of the difficult financial condition of the company and their honest hope that their turn-around efforts would succeed and thereby return Wet Seal to profitability.

*Wet Seal*, 518 F. Supp. 2d 148, 1151-1152 (C.D. Cal. 2007).

Similarly, the Amended Complaint does not plead any specific facts that would suggest the defendants were aware that their forecasts about Europe were unreasonable, nor does it allege that the defendants concealed any material facts from investors regarding those forecasts.  The Amended Complaint alleges that the "relationship with Straumann was untenable" and had "been in peril long before 3Q12" without pleading specific facts to support these allegations.  Compl. ¶ 104, 112.  These general allegations are not substitutes for facts showing that Align's expectations were unreasonable.  Further, there are no factual allegations suggesting that the failure to take an impairment charge earlier was an incorrect application of GAAP, much less an error so serious that it rose to the level of fraud.  "A plaintiff arguing for a quicker write-down of goodwill would have to explain how, in a given quarter, the company's optimism about that market was not just

wrong . . . but so wholly unfounded that it was fraudulent." *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp*., 2010 WL 1287058 at *18 (E.D. Wis. March 30, 2010); *Wet Seal*, 518 F. Supp. 2d at 1162 ("that [company] cash flow estimates proved in hindsight to be too optimistic does not mean that the failure to take an impairment charge earlier was a violation of GAAP"); *In re ICN Pharms., Inc*., 299 F. Supp.2d 1055, 1065 (C.D. Cal. 2004) ("even a delinquent write down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision").

### 3.  Gross Margins and Increasing Competition

The Amended Complaint also fails to allege why gross margin results for the SCCS unit and increasing competition in the intra-oral scanner market suggested that an impairment charge was necessary. *See* ¶¶ 8, 91, 100-101, 118.  As with the alleged missed revenue targets, the Amended Complaint provides no facts about what gross margin figures or information regarding market competition were used in the 2011 goodwill testing.  The Amended Complaint does cite to Align's gross margin projection from March 2011 (Compl. ¶ 100), but pleads no facts alleging that this projection was used in calculating goodwill in 4Q11 or during the Class Period.  The Amended Complaint also does not take into account that the defendants publicly disclosed declining gross margins for the SCCS unit, and the factors that contributed to that decline, in 3Q11 through 2012.  Mtn. Exs. F at 8, H at 9.  There are no factual allegations that these results, which were publicly announced, were not taken into account in the 2011 goodwill impairment testing.

In the absence of particularized allegations regarding what assumptions Align used in its goodwill calculations, it is equally plausible that Align took into account market competition and adjusted its gross margin projections in 3Q11 through 2Q12, in lieu of using the outdated projection from March 2011.  Again, the plaintiff has failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by GAAP that the failure to take such a charge was fraudulent, particularly in view of the public disclosures of the performance of the SCCS unit.

In sum, the competing inferences outweigh any inference that the defendants intended to commit fraud.  Rather than attributing the course of events to fraud, it is more reasonable to

United States District Court
Northern District of California

16

1  conclude that although the Cadent acquisition did not pan out, the defendants maintained

2  reasonable (if unrealized) hopes of success.  These hopes, bolstered by 1Q12 and 2Q12 profits,

3  justified a continued belief that Cadent's goodwill was sound.  Along the way defendants couched

4  these hopes in cautionary language and publicly disclosed information regarding the declining

5  SCCS unit's business.  Therefore, the plaintiff has failed to plead falsity in the form of a GAAP

6  violation.

7  **4.   Statements That Are Not Actionable Under The PSLRA**

8       Under the PSLRA "Safe Harbor" Provision, "forward-looking statements" and "assertions

9  of corporate optimism" are not actionable as a matter of law if they are identified as such and

10 accompanied by "meaningful cautionary statements identifying important facts that could cause

11 actual results to differ materially from those in the forward looking statement."  15 U.S.C. § 78u–

12 5(c)(1)(A)(i).  A forward looking statement is "any statement regarding (1) financial projections,

13 (2) plans and objectives of management for future operations, (3) future economic performance, or

14 (4) the assumptions 'underlying or related to' any of these issues."  *No. 84 Employer–Teamster*

15 *Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003).

16 "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary

17 statements, then the state of mind of the individual making the statement is irrelevant, and the

18 statement is not actionable regardless of the plaintiff's showing of scienter*."  In re Cutera Sec.*

19 *Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).  Alternatively, if a forward-looking statement is not

20 identified as such or is unaccompanied by meaningful cautionary statements, then the statement is

21 actionable only if the plaintiff proves that the forward-looking statement "was made with actual

22 knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B);

23 *see Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996).

24 **i.    Forward-Looking Statements**

25       Eight of the statements that the Amended Complaint alleges are false and misleading are

26 not actionable under the PSLRA's Safe Harbor.  These statements all concern either the

27 defendants' revenue projections or answers to questions regarding revenue and sales forecasts.

28 See 15 U.S.C. § 78u–5(i)(1) (defining "forward-looking statement"); *In re LeapFrog Enters., Inc.*

United States District Court
Northern District of California

1  *Sec. Litig.*, 527 F.Supp.2d 1033, 1046 (N.D. Cal. 2007) (holding that statements predicting the

2  company's future expected sales or other financial results fell squarely within the scope of the

3  Safe Harbor provision); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, No. 10-03451, 2012

4  WL 1868874 (N.D. Cal. May 22, 2012) (holding unactionable statements regarding "revenue

5  projections and forecasts, such as, '[w]e now expect our dV P procedures to grow between 35 and

6  39% this year,' 'revenue is expected to grow 57% to 58% this year,' and '[w]e are now forecasting

7  system revenue to grow 38 to 40% over 2007, ... up from our previous forecast.'").

8  • "For the first quarter of fiscal 2012 (Q1 12), Align technology expects net
9  revenues to be in a range of 125.4 million to 127.9 million.  GAAP earnings
   per diluted share for Q1 12 is expected to be in a range of $0.17 to $0.19.
10  Non-GAAP earnings per diluted share for Q1 12 is expected to be in a
    range of $0.19 to $0.21."  Compl. ¶ 42.

11
12  • "As such, we would expect Q1 to be down sequentially.  In addition, we
   continue to focus on how to re-stage growth in Europe and are working with
13  our distribution partners to make that happen."  Compl. ¶ 43.

14  • "For the second quarter of fiscal 2012 (Q2 12), Align technology expects
   net revenues to be in range of $140.2 million to $143.7 million.  GAAP per
15  diluted share for Q2 12 is expected to be in range of $0.25 to $0.27.  Non-
   GAAP earnings per diluted share for Q2 12 is expected to be in a range of
16  $0.26 to $0.28."  Compl. ¶ 51.

17  • "For the third quarter of fiscal 2012 (Q3 12), Align Technology expects net
18  revenues to be in a range of $136.8 million to $140.8 million.  Invisalign
   clear aligner case shipments for Q3 12 are expected to be in a range of 94.8
19  to 96.3 thousand cases, which reflect a year-over-year increase of 19.5% to
   21.3%.  GAAP earnings per diluted share for Q3 12 is expected to be in
20  range of $0.27 to $0.29."  Compl. ¶ 58.

21  **ii.  Expressions of Corporate Optimism**

22  Additionally, in the Ninth Circuit, "vague, generalized assertions of corporate optimism or

23  statements of 'mere puffing' are not actionable material misrepresentations under federal

24  securities laws" because no reasonable investor would rely on such statements.  *Glen Holly*

25  *Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003); *see In re Cutera*, 610 F.3d at

26  1111 ("When valuing corporations . . . investors do not rely on vague statements of optimism like

27  'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111.  Therefore,

28  for example, a court has held unactionable as "mere puffery" statements that "[w]e are very

18

pleased with the learning from our pilot launch," "so far we're getting really great feedback," and

"we are very pleased with our progress to date."  *Wozniak v. Align Tech., Inc*., No. 09-3671, 2012

WL 368366, at *4–5 (N.D. Cal. Feb. 3, 2012).  Likewise, "statements projecting 'excellent

results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over

the next several years'" have been held unactionable as mere puffery.  *In re Cornerstone Propane*

*Partners, L.P. Sec. Litig*., 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Copper*

*Mountain Sec. Litig*., 311 F.Supp.2d 857, 868–89 (N.D. Cal. 2004) ("run-of-the-mill" statements

such as "business remained strong" are not actionable under § 10(b)); *In re LeapFrog*, 527

F.Supp.2d at 1050 (vague and amorphous statements such as "This is going to be a very big

second half for us," "Our underlying sell-through at the retail level remained very strong

throughout the third quarter," and "We are pleased with our progress" were unactionable under §

10(b)).

The following statements are examples of such "mere puffery" and thus cannot support a

claim under the PSLRA.

- "The fourth quarter was a strong finish to the year for Align and we're pleased to have delivered better than expected revenue and earnings . . . ." Compl. ¶ 41.

- "I'm pleased to report a very strong quarter and a great start to the year." Compl. ¶ 50.

- "Yes, gosh, you know, I guess my view of it is we are showing some, I think, pretty strong growth Q2 to Q2, 20 plus percent on a year-over-year basis." Compl. ¶ 52.

- "The second quarter was another great one for Align and I'm pleased to report strong results for revenue, operating margin and EPS - all better than our outlook . . . ." Compl. ¶ 57.

### iii.    Cautionary Language

The eight statements above were also adequately accompanied by cautionary language.

Each of the press releases, SEC filings, and conference calls cited in the Amended Complaint

included notices that forward-looking statements would be present in the document or oral

statement.  Mtn. Ex. L (January 20, 2012, press release stating, "This news release, including

United States District Court
Northern District of California

tables below, contains forward looking statements . . .") Ex. F, at 2 (January 30, 2012 earnings call where Align representative began call by stating that opinions and statements regarding revenue guidance will contain forward looking statements); Ex. E, at 3; Ex. V; Ex. W. The Ninth Circuit has found similar statements to be adequately cautionary. *See In re Cutera Sec. Litig*., 610 F.3d 1103, 1112 (9th Cir. 2010) (finding that defendant properly identified statements as forward-looking by beginning an analyst call with a notice that the remarks and responses contain forward-looking statements and are subject to variance based on certain factors). Accordingly, under the allegations currently pled, Defendants may not be held liable for the eight statements above because those statements are subject to PSLRA Safe Harbor protection.

**B.     Scienter**

Even if the Amended Complaint had alleged falsity, it fails to sufficiently plead scienter. The Amended Complaint's allegations of scienter are based on: (1) defendants' alleged GAAP violations; (2) allegations of insider trading by Prescott and Arola; and (3) Arola's departure from Align.

**1.     Alleged GAAP Violations**

The Amended Complaint alleges that the defendants violated GAAP when they failed to timely impair Cadent's goodwill. Compl. ¶ 89. Specifically, the "defendants knew or deliberately disregarded that the historical revenues reported by Cadent were inflated by the end of 2010 due to significant discounted pricing" and "[a]s a result, defendants actually knew or deliberately disregarded that their representation that Cadent revenues would grow 20%-plus annually was without reasonable basis and was not achievable". Compl. ¶ 91. In support of this statement, the plaintiff cites the publicly available information outlined above and concludes that based on this information, the defendants used unreasonable assumptions in the SCCS unit's goodwill valuations. Compl. ¶¶ 92-112.

Here, even presuming that the defendants were aware of Cadent's inflated revenues, there are no facts to suggest defendants' alleged improper use of these figures in estimating goodwill either intentionally or with deliberate recklessness. "The proof of scienter in fraud cases is often a matter of inference from circumstantial evidence. However, the mere publication of inaccurate

20

accounting figures, or a failure to follow GAAP, without more, does not establish scienter. Rather, scienter requires more than a misapplication of accounting principles.  The plaintiff must prove that the accounting practices were so deficient . . . or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *DSAM Global Value Fund v. Altris Software, Inc*., 288 F.3d 385, 390 (9th Cir. 2002) (citation omitted).  As stated above, the Amended Complaint does not establish what projections or assumptions Align actually used when it performed goodwill testing in 4Q11, let alone that these assumptions were "so deficient" or "egregious" that they were unreasonable.  *Id*.

Furthermore, there are insufficient factual allegations suggesting that any defendant knew that goodwill was impaired at any time prior to 3Q12.  *In re Pac. Gateway Exch., Inc., Sec. Litig*., 169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001) (no indication how or when each defendant became aware of allegedly improper accounting).  The Amended Complaint asserts that the defendants should have known that goodwill was impaired due to the SCCS unit's missed revenue targets. But neither the alleged missed revenue targets nor the publicly disclosed revenue results are a substitute for allegations of actual knowledge that the defendants' assumptions about goodwill were unreasonable.  *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp*., 679 F.3d 64, 68 (2d Cir. 2012) (declining revenues did not plausibly demonstrate that defendants knew, or had reason to know, that it was more likely than not that interim impairment testing would reveal that goodwill was overvalued); *Kovtun v. Vivus, Inc*., No. 10-4957, 2012 WL 4477647 at *18 (N.D. Cal. Sept. 27, 2012) (allegations contained no facts that "contradicted defendants' public statements" or explaining "when such information was allegedly known or who knew it").

In addition, plaintiffs do not allege facts plausibly suggesting that the defendants knew or believed that their goodwill numbers were inaccurate.  *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp*., 679 F.3d 64, 68 (2d Cir. 2012) (affirming dismissal where complaint failed to allege that defendants did not believe in their statements of opinion concerning goodwill even when considering declining revenue); *Fait v. Regions Fin. Corp*., 655 F.3d 105, 110 (2d Cir. 2011) (affirming dismissal where complaint failed to allege defendants did not believe statements

about goodwill).  Absent more specific allegations that the defendants knew that their judgment was improper under the accounting rules, the plaintiff has not pleaded with particularity that Align's goodwill calculations were made without a reasonable or genuine basis, let alone that they were erroneously calculated intentionally or with deliberate recklessness.

Finally, the confidential witnesses provide only conclusory assertions about the defendants' scienter.  The Amended Complaint alleges that a former employee "provided additional background to defendants' knowledge," but the rest of the paragraph does not support this statement.  Compl. ¶ 47.   None of the confidential witnesses is alleged to have any other information as to the state of mind of the individual defendants.

### 2.  Stock Sales

The Amended Complaint contends that the defendants' motive in allegedly delaying an impairment charge was to appear attractive to investors by keeping Align's stock price inflated. Compl. ¶¶ 11, 47, 48-49, 62-63, 85.  The plaintiff alleges that defendants Prescott and Arola in particular were motivated to "cash in on Align's inflated stock price during the Class Period." Compl. ¶ 62.  Prescott and Arola sold hundreds of thousands of shares of Align stock during the Class Period for a combined total of over $14 million.  Compl. ¶ 48.  These sales amounted to 31% and 37% of their stock holdings, respectively.  Dkt. No. 30, Defendants' Motion to Dismiss "Mtn." at 22; Exs. Q, R, S.  The largest of these stock sales during the Class Period was Prescott's February 29, 2012 sale of 322,751 shares for proceeds of nearly $8.3 million.  *Id.*

Among three factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (citation omitted).  "Although unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.*

The timing of these sales and the prior trading history weigh against an inference of

scienter.  First, as the Amended Complaint demonstrates, Prescott's large sale of shares on February 29, 2012, occurred well before the stock rose to its peak price during the Class Period and when the stock was nearly at its lowest price during the Class Period.  *See* chart titled "Align v. NASDAQ and Proxy Peer Group" at Compl. ¶ 14.   Second, the sales followed the public filing of Align's February 29, 2012 10-K which disclosed positive financial results, including the results of the 2011 goodwill impairment testing.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures.").  Prescott's and Arola's prior trading history show that they also sold large amounts of stock the preceding February, prior to the Class Period.  On February 2, 2010 Prescott sold 328,596 shares, and on April 26, 2011, Arola sold 100,000 shares.  Mtn. Exs. R, S.  The timing and size of these sales are consistent with the sales made during the Class Period.

Because there is no allegation in the Amended Complaint that Prescott and Arola's stock sales, though significant, are inconsistent with their usual trading patterns, no inference of scienter can be inferred from the plaintiff's stock sale assertions.  *Silicon Graphics*, 183 F.3d at 986 (holding that stock sales of individual defendants are only indicative of scienter where they are "dramatically out of line with prior trading practices").

### 3.  Arola's Departure

The plaintiff asserts that the January 30, 2013 announcement of Mr. Arola's departure is further evidence of scienter.  Opp. at 23-24.  "Although resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter," *Zucco*, 552 F.3d at 1002, Arola's departure is not so suspicious as to raise such an inference.  Arola was not "terminated," as the plaintiff argues, but rather stepped down as vice president and remained an employee of the company through June 28, 2013.  Compl. ¶ 71.  The Ninth Circuit has held that where a resignation occurs, a plaintiff must plead facts refuting other reasonable assumptions in order for a resignation to be strongly indicative of scienter. *See, e.g.*, *Zucco*, 552 F.3d at 1002 ("For other resignations occurring during the relevant time period, a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one"); *In re*

United States District Court
Northern District of California

*U.S. Aggregates, Inc. Sec. Litig.*, 235 F.Supp.2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that [defendant's employee] was fired simply because the errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department.").

The Amended Complaint does not allege any facts that Arola's departure is relevant to scienter. The bare fact of Arola's resignation cannot support a strong inference of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter.") Without more specific allegations linking Arola's resignation to the required state of mind, the plaintiff's allegations fail under Rule 9(b) and the PSLRA as overly general and speculative.

### 4. Holistic Analysis

Although none of the Amended Complaint's allegations of scienter are individually cogent or compelling enough to survive under the PSLRA, the Court must also "consider the complaint in its entirety" to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *VeriFone*, 704 F.3d at 701 (citation omitted). When conducting this holistic review, the Court must also "take into account plausible opposing inferences" that could weigh against a finding of scienter. *Id.* (citation omitted).

The Amended Complaint alleges that beginning with the January 30, 2012 press release announcing Align's 4Q11 and FY11 financial results, until the end of the Class Period, Align falsely reported its financial results in violation of GAAP by failing to write down Cadent goodwill earlier than it did. Compl. ¶¶ 41-45, 50-55, 57-60. The Amended Complaint asserts that Align's financial results were overstated because of alleged "unsupportable and unreasonable" assumptions about the SCCS unit that the defendants allegedly used in assessing goodwill. Compl. ¶¶ 10-11, 42, 46-47, 58, 61.

As explained above, the plaintiff fails to identify with particularity what those assumptions were, let alone that they were unsupportable or unreasonable, or that they were used erroneously with deliberate recklessness. Such assertions are too broad to satisfy the standards of the PSLRA,

United States District Court
Northern District of California

1    and fail to identify any awareness by the defendants that an impairment charge was necessary.

2    The plaintiff's failure to adequately plead facts giving rise to a strong inference of scienter - and in

3    fact the dearth of information on how Align's accounting decisions were made - defeats the

4    plaintiff's section 10(b) and 20(a) claims.

5         Further, even together the Amended Complaint's allegations are not as cogent or

6    compelling as a plausible alternative inference - namely, that even if Align overpaid for Cadent,

7    there was no specific intent to fabricate the accounting statements at issue here.  Instead, the facts

8    alleged suggest that Align was cautiously optimistic that Cadent's outlook would improve.  Given

9    that the SCCS unit performed better than expected during the Class Period in 1Q12 and 2Q12, a

10   reasonable inference exists that no impairment was believed to exist prior to the termination of the

11   relationship with Straumann, when the write-downs were quickly taken.

12   **II.   CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO SECTION 20(A)**

13   Plaintiffs also allege that each defendant is liable as a control person under Section 20(a) of the

14   1934 Act, 15 U.S.C. § 78t(a).  In the Ninth Circuit, in order to prove a prima facie case under §

15   20(a), a plaintiff must prove:  (1) a primary violation of federal securities laws; and (2) that the

16   defendant exercised actual power or control over the primary violator.  *Howard v. Everex Sys.*,

17   228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted).  Without a primary violation, there can be

18   no control person liability.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n. 15 (9th Cir.

19   2002) ("to prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a

20   violation of § 10(b) or Rule 10b 5").  Because the Amended Complaint fails to adequately plead a

21   primary violation, the Section 20(a) claim fails.

22                                **CONCLUSION**

23        For the reasons above, the defendants' Motion to Dismiss is GRANTED with LEAVE to

24   AMEND.  The plaintiff shall file any amended complaint 30 days from the date of this Order.

25        **IT IS SO ORDERED**.

26   Dated: December 9, 2013

27

28   WILLIAM H. ORRICK
     United States District Judge

United States District Court
Northern District of California