1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   CHRISTOPHER M. WOOD (254908)
3  SUNNY S. SARKIS (258073)
   Post Montgomery Center
4  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6  shawnw@rgrdlaw.com
   cwood@rgrdlaw.com
7  ssarkis@rgrdlaw.com

8  Lead Counsel for Plaintiff

9  [Additional counsel appear on signature page.]

10                       UNITED STATES DISTRICT COURT

11                      NORTHERN DISTRICT OF CALIFORNIA

12  CITY OF DEARBORN HEIGHTS ACT 345      )   No. 3:12-cv-06039-WHO
    POLICE & FIRE RETIREMENT SYSTEM,      )
13  Individually and on Behalf of All Others )   CLASS ACTION
    Similarly Situated,                   )
14                                        )   SECOND AMENDED COMPLAINT FOR
                            Plaintiff,    )   VIOLATIONS OF THE FEDERAL
15                                        )   SECURITIES LAWS
          vs.                             )
16                                        )
    ALIGN TECHNOLOGY, INC., et al.,       )
17                                        )
                            Defendants.   )
18  _____  )   DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

901090_1

1

## TABLE OF CONTENTS

2

Page

3    I.      INTRODUCTION ........................................................................................1

4    II.      JURISDICTION AND VENUE .................................................................5

5    III.      THE PARTIES............................................................................................6

6    IV.      SOURCES OF INFORMATION ...............................................................7

7    V.      CONTROL PERSONS ..............................................................................8

8    VI.      BACKGROUND TO THE CLASS PERIOD ...........................................8

9    VII.      DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ...........................................12

10

         A.      False Statements Regarding 4Q11 and FY11 ......................................12

11

         B.      False Statements Regarding 1Q12 .......................................................28

12

         C.      False Statements Regarding 2Q12 .......................................................31

13

   VIII.      POST-CLASS PERIOD DISCLOSURES AND ADMISSIONS CONFIRM THAT GOODWILL WAS MATERIALLY OVERSTATED ...........................................34

14

15    IX.      DEFENDANTS' FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC RULES ...............................................................36

16

         A.      Goodwill Accounting Standards ..........................................................37

17

         B.      Defendants Intentionally Failed to Timely Write-Down Impaired Goodwill ..............................................................................................39

18

19          C.      Defendants' Failure to Timely Write-off Goodwill Associated with Cadent was Intentional or Deliberately Reckless..............................................42

20

                1.      Align Used Unreasonable Assumptions in Its Goodwill Impairment Test at the End of 2011 .........................................43

21

22                 2.      Align's Improper Goodwill Accounting for 1Q12 and 2Q12...................46

23                 3.      Determining the Fair Value of SCCS Under the Market Approach ..........51

24                 4.      Determining the Fair Value of SCCS Under an Income Approach...........56

25    X.      LOSS CAUSATION/ECONOMIC LOSS ..............................................58

26    XI.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ...........................................................................59

27

   XII.      CLASS ACTION ALLEGATIONS .......................................................61

28

1

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Page**

XIII.    NO SAFE HARBOR .............................................................................................62

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                    - ii -

1    Lead Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System

2  ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and

3  through Plaintiff's undersigned attorneys, alleges the following against defendants, based upon

4  personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all

5  other matters based on the investigation conducted by and through Plaintiff's attorneys, which

6  included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings

7  by Align Technology, Inc. ("Align" or the "Company"), independent investigation, as well as media

8  reports about the Company and conference call transcripts.   Plaintiff believes that substantial

9  additional evidentiary support will exist for the allegations set forth herein after a reasonable

10  opportunity for discovery.

11  **I.     INTRODUCTION**

12    1.    Plaintiff brings this securities class action individually and on behalf of purchasers of

13  Align common stock between January 31, 2012 and October 17, 2012, inclusive (the "Class

14  Period"), under the Securities Exchange Act of 1934 (the "Exchange Act"), against Align and its

15  Chief Executive Officer ("CEO"), Thomas M. Prescott ("Prescott"), and former Chief Financial

16  Officer ("CFO"), Kenneth B. Arola ("Arola").

17    2.    Align designs, manufactures and markets Invisalign, a proprietary method for treating

18  malocclusion, or the misalignment of teeth, using a series of clear, removable orthodontic aligners.

19  This action stems from defendants' intentional or deliberately reckless failure to timely write-down

20  tens of millions of dollars of goodwill which was impaired soon after Align's acquisition of Cadent

21  Holdings, Inc. ("Cadent"), a provider of 3D digital scanning solutions for orthodontics and dentistry.

22    3.    In 2010, Align's organic growth was showing signs of faltering and defendants were

23  looking for new ways to drive sales and revenue growth.  Following a failed attempt in 2010, Align

24  acquired Cadent on April 29, 2011 for $187.6 million in cash.  According to defendant Prescott,

25  Align purchased Cadent primarily because of additional revenues the Company stated Cadent would

26  generate, as well as unspecified "revenue synergies" that Align stated it could achieve as a result of

27  the acquisition.

28

901090_1

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                          - 1 -

4.      Certain Wall Street analysts were immediately skeptical of the acquisition, opining, for example, that Cadent's digital impression technology was "one of the worst technology investments in dentistry," and stating that "[o]verall, we believe Align significantly overpaid for the Cadent transaction at a time when the digital impression market is changing."

5.      And there was good reason to be skeptical.  Of the $187.6 million purchase price that Align ultimately paid for Cadent, over two-thirds, or $135.3 million, was goodwill, while tangible assets totaled a mere $19.4 million, approximately the same amount of liabilities that Align had assumed from Cadent.[1]  Nevertheless, defendants claimed that the purchase price was conservative, stating that the price was "midrange or even better . . . whether you look at a backwards, trailing, 12-months' revenues or even on a forward basis."  Defendants claimed that Cadent had generated $40 million in revenue in 2010, and that revenue growth would exceed 20% a year, supposedly justifying both the high purchase price and the resulting goodwill.  However, defendants knew at the time that they purchased Cadent, and subsequent quarters would confirm, that their revenue growth and margin projections, which were critical to the original goodwill valuation and any subsequent impairment tests performed, were woefully unreasonable.

6.      Through Align's due diligence, as well as its direct access to Cadent's internal financial reports and company documents, troubling aspects of Cadent's fiscal year 2010 ("FY10") revenues were readily apparent.  In an effort to make themselves appear more valuable to an acquirer, Cadent had offered substantial and unprecedented discounts to its customers in the last quarter of 2010 ("4Q10") in order to drive up its revenues.  Cadent was able to dramatically, yet unsustainably, increase its scanner sales by over 147% in FY10 through these discounts.

7.      According to former employees ("FEs"), these discounts were so obviously an attempt to increase the company's short-term revenues that dentists who were being pitched by Cadent's sales associates specifically asked if Cadent was trying to sell itself, and were concerned that a sale of the Company would affect their purchases.

---

[1]    Goodwill = Purchase Price - Fair Value of Net Assets Acquired.  Net Assets = Total Assets - Total Liabilities.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO                                                                                      - 2

1      8.     Upon completion of the acquisition, defendants nevertheless confidently proclaimed

2  that Cadent would achieve a 20%-plus growth in sales and that gross margins would improve to over

3  50%.[2]  These same projections were used as a justification for Align's goodwill balance of $135.3

4  million, and achieving those projections were key to keeping Align from having to record an

5  impairment charge.

6      9.     But the anticipated revenue growth and margin improvement never materialized.  In

7  fact, Cadent's margins plummeted from approximately 45% as a stand-alone company, to a range of

8  24%-36%, or an average of approximately 30%, after the acquisition.  Similarly, there was not a

9  single quarter where Cadent's revenues met the projected revenue growth defendants had claimed.

10  This was fatal to Align's justification for avoiding an impairment charge given the importance future

11  growth and profitability projections have in a goodwill impairment test.

12      10.    In 4Q11, defendants reported that they had performed a goodwill impairment test as

13  required by Generally Accepted Accounting Principles ("GAAP") in order to determine whether the

14  $135.3 million Cadent-related goodwill was impaired.  At the time the impairment test was

15  conducted, defendants knew or recklessly disregarded each of the following facts:

16  •    Cadent was falling materially short of the projections that the Company had publicly
17       used to justify Cadent's purchase price and the reported goodwill, which were both
         relied on by investors, at the time of the purchase

18  •    Under both the "income approach" and the "market approach," Align's reported
19       goodwill could not have been honestly believed or justified

20  •    New competition was entering the market for scanners which would devastate iTero
         sales

21  •    International sales had declined by 86% in 4Q11 and there was no sign of material
22       improvement

23  •    Cadent's pre-acquisition discounting had saturated the market for iTero scanners

24  •    The scanner division's value had been negatively impacted by aggressive integration
         efforts which were affecting customer service, tech support and delivery schedules,
25       and reducing sales.

26      11.    Despite known facts demonstrating that tens of millions of dollars in goodwill was

27  impaired, defendants failed to take the necessary write-down and instead issued numerous

28  ---

[2]    Gross Margin (%) = (Revenues - Cost of Revenues) ÷ Revenues.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                      - 3 -

1  knowingly false and misleading statements relating to the Company's financial condition throughout

2  the Class Period.

3      12.   In 4Q11, 1Q12 and 2Q12, Align issued false and misleading financial results which

4  materially overstated the Company's goodwill in violation of GAAP.  ¶¶44-45, 65, 67, 74-75.  Based

5  upon the facts known to defendants, these statements were false and could not have been honestly

6  believed at the time they were made.

7      13.   In addition, defendants made numerous qualitative statements which were

8  independent of merely reporting the goodwill valuation.  Align separately assured investors that "the

9  fair value of our reporting units **were significantly in excess of the carrying value**," and that "there

10 were **no facts and circumstances** that indicated that the fair value of the reporting units may be less

11 than their current carrying amount."  ¶¶50, 63.  Align also assured investors that they "perform an

12 impairment test whenever events or changes in circumstances indicate that the carrying value of such

13 assets **may** not be recoverable."  ¶¶71, 80.  These statements were materially false and misleading,

14 and were designed to assure investors not just that Align's reported goodwill was unimpaired, but

15 that the reported goodwill was unlikely to be impaired anytime in the near future.

16     14.   While Align's stock price was inflated as a result of defendants' misconduct, Prescott

17 and Arola sold hundreds of thousands of shares of Align stock at a time when they knew that the

18 Company's stock price was inflated, reaping over $14.8 million in unlawful proceeds.  Align's other

19 officers and directors sold even more.

20     15.   Finally, on October 17, 2012, the Company announced that it was in the process of

21 conducting step one of a goodwill impairment test for its scanners and CAD/CAM services

22 ("SCCS") reporting unit.  According to Align, the events that triggered the need for an interim

23 impairment test in 3Q12 were the decline in results of operations of its SCCS reporting unit (which

24 had been evident for at least nine months), and the discontinuation of their distribution relationship

25 with Straumann, which had long been troubled.  The Company announced that as a result of this

26 review, it would possibly take a substantial impairment charge which could erase a significant

27 amount of the goodwill value of Cadent.  Write-downs came in 3Q12, 4Q12 and 1Q13, erasing the

28 entire $77.3 million in goodwill associated with the scanner division in just six months.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO                                                                                          - 4 -

16.     Align's October 17, 2012 disclosure caused Align's stock price to plummet more than 20%, from a close of $35.41 per share on October 17, 2012 to a close of $28.18 per share on October 18, 2012, on massive trading volume of 20 million shares.  This caused tens of millions in damages to class members who purchased Align stock in reliance on defendants' materially false and misleading statements, and were damaged when the truth about Align's goodwill was revealed.  The chart below shows Cadent stock price throughout the Class Period in comparison to the NASDAQ and Align's peer group:



## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

19. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

20. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. THE PARTIES

21. Lead Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System is a public pension fund which manages assets for approximately 290 current and retired police and fire workers. Lead Plaintiff purchased the common stock of Align at artificially inflated prices during the Class Period and has been damaged by the conduct alleged herein.

22. Defendant Align Technology, Inc. is incorporated in Delaware and maintains its headquarters at 2560 Orchard Parkway, San Jose, California 95131. The Company designs, manufactures and markets the Invisalign system for treating malocclusion, or the misalignment of teeth. The Company also designs, manufactures and markets 3D digital scanning solutions for orthodontics and dentists through its wholly-owned subsidiary, Cadent Holdings, Inc.

23. Defendant Thomas M. Prescott is, and was at all relevant times, President and CEO of Align, as well as member of Align's Board of Directors. Prescott has served in these capacities since 2002. According to Align, Prescott was responsible for "completing the Cadent acquisition."

24. Defendant Kenneth B. Arola was Align's CFO and Vice President of Finance from December 2007 until March 4, 2013, and served as Vice President, Finance and Corporate Controller between August 2005 and December 2007. On January 30, 2013, Align announced that Arola was resigning as CFO effective March 4, 2013. Arola was intimately involved in the Cadent acquisition and, according to Align, "played an essential role in the acquisition of Cadent and subsequent integration."

25. The defendants named in ¶¶24-25 are sometimes referred to herein as the "Individual Defendants."

1    IV.    SOURCES OF INFORMATION

2        26.    In addition to Plaintiff's analysis of publicly available information, including filings

3    with the SEC, reports of securities analysts, press releases and news articles, among other things, the

4    allegations pled herein are made, in part, on information and belief, and are supported by first-hand

5    accounts of FEs.  These witnesses are comprised of former Align and Cadent employees.  As

6    detailed below, each witness was in a position to know the facts and information reported.

7        27.    FE1 was employed by Cadent as an Inside Sales Specialist between March 2006 and

8    January 2011 and was part of a small team of Inside Sales Specialists at Cadent.  FE1's

9    responsibilities included selling scanning packages to customers who already had Cadent's iTero

10   scanner, generating leads for iTero scanner sales, as well as selling the OrthoCAD digital modeling

11   software.  For most of her tenure at Cadent, FE1 reported to her supervisor, John Compton

12   ("Compton"), Inside Sales Manager at Cadent.[3]  Compton reported to Kerri Sebring, Vice President

13   of Marketing at Cadent from approximately January 2008 through May 2011, and thereafter Director

14   of Marketing.

15       28.    FE2 is a former Cadent Vice President of Operations from November 2007 through

16   Align's acquisition of Cadent in April 2011.  FE2 also continued to work for Align after Cadent's

17   acquisition until September 2012.    As a Vice President of Operations, FE2's responsibilities

18   included operational execution, iTero scanner sales and operations, business development and

19   development of distributor relationships.  FE2 reported to Cadent CEO Tim Mack[4] while at Cadent.

20       29.    FE3 is a former Cadent Supervisor, Credit and Collections.  FE3 was employed at

21   Cadent from July 2010 and remained with Align after Cadent was acquired until April 2012.  At

22   Cadent, FE3 reported to Cadent's Controller Robin Kim who reported to Cadent CFO Roger

23   Blanchette.  FE3 was responsible for collections on customer invoices.  As part of these

24   responsibilities, FE3 had regular communications with Cadent's sales team and detailed knowledge

25   of Cadent's sales practices.

26   ---
     [3]    The pronouns "she" or "her" are utilized generically to refer to each individual former employee
27   referenced herein.  Their use should not be understood to indicate gender.

     [4]    Mack currently serves as Senior V.P. Marketing and Business Development.
28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                    - 7 -

## V.     CONTROL PERSONS

30.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Align's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance, or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

31.     As alleged herein, each of the defendants acted with scienter in that each defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   Each defendant knew that such statements or documents would be issued or disseminated to the investing public and knowingly and substantially participated or acquiesced in the making, issuance or dissemination of such statements or documents as a primary violation of the federal securities laws.  By virtue of their receipt or reckless disregard of information reflecting the true facts regarding Align, their control over and/or receipt and/or modification of Align's materially misleading statements, and/or their other associations with the Company, each defendant was privy to confidential information concerning Align and knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

## VI.     BACKGROUND TO THE CLASS PERIOD

32.     Align Technology, Inc. is a Delaware corporation which, until 2011, operated as a single business segment focused solely on the design, manufacturing and marketing of its Invisalign

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO                                                                                       - 8 -

1   system, a proprietary method for treating malocclusion, or the misalignment of teeth, through doctor-

2   prescribed, custom manufactured, clear plastic removable orthodontic aligners.  The Company had

3   its initial public offering in January 2001 and its shares trade on the NASDAQ under the ticker

4   symbol ALGN.

5          33.    In 2010, in the face of anemic revenue growth for its core Invisalign products, Align

6   agreed to buy Cadent Holdings, Inc., a small privately-held company based in Carlstadt, New Jersey,

7   for $187.6 million in cash.  The agreement was memorialized in a December 15, 2010 letter of

8   intent.  Cadent manufactured digital intra-oral scanners, marketed as the iTero or iOC, and provided

9   CAD/CAM restorative models for use by dental professionals and/or labs, and services for

10  orthodontic digital procedures.

11         34.    As reported by former Cadent employees, and detailed below, during 2010, several

12  companies were considering purchasing Cadent, including Straumann, a European provider of

13  implant dentistry solutions, and Carestream Health Inc. ("Carestream"), a company that provides

14  medical and dentistry imaging.

15         35.    According to FE2, although Align had intended to close the acquisition in December

16  2010, Cadent's financial records were in such a poor, unreliable condition that the merger was not

17  able to be completed in 4Q10.[5]

18         36.    Unable to complete the Cadent acquisition before year-end, on January 10, 2011,

19  Align and Cadent entered into a joint development agreement to develop software applications,

20  which would allow Cadent scanners to "optimize case assessment and planning for Invisalign

21  treatment."  According to a January 10, 2011 press release announcing the agreement, Align would

22  fund the development of these software applications in order to accelerate their availability, while

23  also owning the rights to the new technology:

24         **Align Technology and Cadent Announce Joint Development Agreement**

25                                    *       *       *

26  _____
   [5]    FE2's report regarding Cadent's unreliable financial records is corroborated by Cadent's
27  Consolidated Financial Statements which were filed by Align subsequent to the completion of the
   merger.  Those financial statements reveal that Cadent was required to restate its balance sheets to
28  account for over $5.5 million in previously unaccounted-for tax liability.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                      - 9 -

Align Technology, Inc. (Nasdaq:ALGN) and Cadent, Inc., today announced an agreement to jointly develop software applications that will run on Cadent iTero™ and iOC™ scanners for use in Invisalign treatment.

\*      \*      \*

Align will fund several million dollars for Cadent software development over the next few quarters in order to accelerate the availability of these chair-side applications. Align will own all rights to the developed applications and technology.

37.     The January 10 press release was false because defendants intentionally omitted any mention of the fact that Align and Cadent had signed a letter of intent in December 2010, and that Align was soon to acquire Cadent. Defendants omitted discussion of the impending acquisition because they did not want investors to know that the acquisition was delayed due to Cadent's inability to certify the accuracy of its financial statements.

<u>Align Announces the Acquisition of Cadent and Assures Investors That Cadent Will Be Accretive to EPS in FY12</u>

38.     On March 29, 2011, Align issued a press release announcing the acquisition of Cadent for $190 million in cash.[6] Align proclaimed that the combination of the two companies would drive a growth rate for intra-oral scanners exceeding 20% between 2010 and 2015 and that the transaction would be accretive to non-GAAP earnings per share ("EPS") for FY12:

**Align Technology to Acquire Intra-Oral Scanning Leader Cadent for $190 Million**

\*      \*      \*

Align Technology, Inc. (Nasdaq:ALGN) today announced that it has signed a definitive agreement to acquire privately-held Cadent Holdings, Inc. (Cadent) . . . .

\*      \*      \*

Align anticipates that the acquisition of Cadent, on a GAAP basis, will dilute fiscal 2011 earnings per share and expects non-GAAP diluted EPS for the year to be in a range of $0.70 to $0.75. ***The Company expects the transaction to be accretive to non-GAAP EPS for fiscal 2012*** . . . .

39.     Later the same day, March 29, 2011, Align hosted a conference call with financial analysts and investors to discuss the acquisition. The call was led by Prescott and Arola. During the call, Prescott tried to explain the Company's rationale for the Cadent acquisition to skeptical

---

[6]     When the transaction was completed the final purchase price was actually $187.6 million.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO

1   investment analysts, claiming it would result in new growth opportunities, revenue synergies,

2   increasing strategic leverage, and cost improvements.  Additionally, defendants detailed Cadent's

3   2010 financial results including approximately $40 million in sales consisting of oral scanners, scan

4   fees, 3D digital modeling, and lab services.   The representations during the March 29, 2011

5   conference call were intended to assure investors that the acquisition price was reasonable based on

6   Align's due diligence and review of Cadent's trailing 12-month revenues and future projected

7   revenues:

8            [AROLA:]  I'll start off.  When *we looked at this thing from a valuation
             point of view, we think we're paying a pretty fair price here of $190 million*.  It
9            ranges into the midrange or even better than median valuations for companies in the
             med tech space, *whether you look at a backwards, trailing, 12-months' revenues or
10           even on a forward basis, 2012/2013 revenues on EBITDA and a sales base of
             comparable kind of deals and fast-growth kind of companies, 20%-plus growth*.

11                            *        *        *

12

13           [PRESCOTT:] So we think it can be fairly evaluated intrinsically for its own
             merits *as an attractive, high-growth, strategically valuable asset, as well as the
14           complementary nature of these two businesses*.

15       40.      Nonetheless, certain Wall Street analysts were skeptical of Align's valuation of

16   Cadent.  For example, on March 30, 2011, Northcoast Research ("Northcoast") issued a report

17   entitled "ALGN: Cadent Acquisition.  Reiterate NEUTRAL rating," stating that Align significantly

18   overpaid because Cadent's business model was unsustainable:

19           ALGN described the Cadent opportunity with the acquisition as a revenue
             synergy story.  However, we believe the current business model for Cadent, in which
20           a "per click" fee/annual subscription is used, is unsustainable.   This recurring
             revenue component represents more than 50% of Cadent's revenue and we believe
21           the digital impression market is moving towards a "no fee" model (SIRO), thereby
             potentially eliminating a significant revenue opportunity for ALGN.

22                            *        *        *

23           We give credit to Cadent management for structuring a favorable deal, however we
             believe ALGN significantly overpaid for this transaction.
24

25       41.      A May 4, 2011 Northcoast report entitled "ALGN: Reducing Estimates to Reflect

26   Cadent Rapidly Changing Market Creates Risks," reiterated this sentiment, stating that "the return on

27   investment for the doctor for digital impression dentistry, Cadent included, is one of the worst

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                    - 11 -

technology investments in dentistry," and that "significant advancements" and "superior solution[s]" were being offered by Cadent's competitors.

42.     To be sure, Align paid a steep price for Cadent.  Of the approximately $187.6 million purchase price ultimately paid by Align, tangible assets amounted to a mere $19.4 million and intangible assets (other than goodwill) totaled $53.2 million.  The remainder, an enormous $135.3 million, was accounted for as goodwill.[7]  The following table summarizes Align's final allocation of the purchase price of Cadent (in thousands of dollars):

| | |
|---|---|
| Assets | $       15,745 |
| Property, plant and equipment | 3,624 |
| Acquired intangible assets: | 53,200 |
| *Goodwill* | *135,349* |
| Liabilities assumed | (20,330) |
| Total | $      187,588 |

43.     The fact that the vast majority of the purchase price was accounted for as goodwill was not the only troubling aspect of the acquisition.  More problematic was the fact that Cadent's approximately $40 million in FY10 revenues were generated through extraordinary end-of-year discounting which provided no basis whatsoever for projecting future revenue growth.

## VII.   DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.      False Statements Regarding 4Q11 and FY11

44.     <u>False Statement</u>: On January 30, 2012, after the market closed, Align issued a press release and filed a Form 8-K with the SEC announcing the Company's 4Q11 and FY11 financial results.  The Company falsely reported: (a) $649.3 million in total assets; (b) $20.4 million in net

---

[7]    As detailed below in §IX, goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805-10-05-4 requires that a business combination be accounted for by applying what is referred to as the acquisition method.  Under the acquisition method, the assets acquired and liabilities assumed are recorded at their respective fair market values as of the date of the acquisition.  ASC 805-20-30-1. "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 805-10-20. The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. ASC 350-20-35-16.

1  profit for 4Q11; and (c) EPS of $0.25 for 4Q11.  In addition, Align falsely reported goodwill of

2  $135.8 million.  The press release stated in part:

3  **Align Technology Announces Fourth Quarter and Fiscal Year 2011 Results**

4  · Record Q4 net revenues of $128.9 million increased 2.4% sequentially and
      38.8% year-over-year

5

6  · Record Q4 Invisalign revenue of $118.9 million increased 4.1% sequentially
      and 28.0% year-over-year with record Invisalign case shipments of 82.6
      thousand

7

8  · Q4 GAAP diluted EPS was $0.25 and Q4 Non-GAAP diluted EPS was $0.28

9  · Record fiscal 2011 net revenues of $479.7 million increased 23.9% year-
      over-year

10                                          *         *         *

11     "The fourth quarter was a strong finish to the year for Align and we're
12  pleased to have delivered better than expected revenue and earnings, driven by
    increased Invisalign case volume and lower than projected operating expenses," said
13  Thomas M. Prescott, Align president and CEO.

14     45.   <u>False Statement</u>: On February 29, 2012, the Company filed its Form 10-K for the

15  period ending December 31, 2011 with the SEC.  The Form 10-K was signed by Prescott and Arola.[8]

16  The Form 10-K repeated the following false and misleading financial results first announced on

17  January 30, 2012: (a) $649.3 million in total assets; (b) $20.4 million in net profit for 4Q11; and (c)

18  EPS of $0.25 for 4Q11.  Align falsely reported $135.3 million in goodwill associated with Cadent,

19  $58.4 million allocated to Clear Aligner and $76.9 million allocated to SCCS.

20     46.   After the filing of the 2011 Form 10-K, the Company's stock price increased from a

21  close of $25.61 per share on February 29, 2012 to close at $26.18 per share on March 1, 2012.

22     47.   <u>Reasons Why Statements in ¶¶44-45 Were Knowingly False and Misleading:</u> Each of

23  the statements in ¶¶44-45 and specifically Align's reported 4Q11 and FY11 financial

24  results, including reported assets, net profit, EPS and goodwill, were materially false and misleading

25  for all of the reasons set forth below in §IX, entitled "Defendants' Financial Statements Failed to

26  Comply with GAAP and SEC Rules," and as set forth below.  Align's reported goodwill and

---

[8]   In addition to being signed by defendants Prescott and Arola, the false 2011 Form 10-K was
signed by directors Joseph Lacob, Gregory Santora, Raymond Larkin, Warren Thaler, David Collins,
George Morrow and David Nagel.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                      - 13 -

1  reported 4Q11 and FY11 assets, net profit and EPS were false, and were not honestly believed by

2  defendants at the time the statements were made.

3       48.    Align's reported goodwill and reported 4Q11 and FY11 assets, net profit and EPS

4  were objectively false and were not and could not be honestly believed by defendants because:

5       (a)    It is not plausible that Align's goodwill could remain unchanged when the

6  assumptions used to justify the reported goodwill just months prior were known to have not been

7  met.  In conducting its year-end 2011 goodwill impairment test, Align purported to utilize the

8  income approach and the market approach.  Under both approaches, Align used objectively

9  unsupportable assumptions in order to arrive at a conclusion of no impairment;

10       (b)    The income approach provides an estimate of fair value based on discounted

11  expected future cash flows.  As noted in Align's 2011 Form 10-K, key inputs under the income

12  approach include the Company's operating forecast and its revenue growth rates.  Cadent's actual

13  revenues for 2011 were badly missing the projected revenues assuming a 20% growth rate was

14  achieved.  Given the $187.6 million purchase price and the resulting $135.3 million of goodwill

15  recorded was based on an expectation that Cadent revenues would grow 20% annually, Align must

16  have knowingly used unreasonable "revenue growth rate" assumptions in its 2011 goodwill

17  impairment test in order to arrive at a conclusion of no impairment;

18       (c)    Additionally, the operating forecast Align relied on for its 2011 goodwill

19  impairment test must have included unreasonable and unsupportable gross margin projections.  As

20  discussed earlier, Cadent's actual gross margins were significantly below the 50% margin

21  expectation that defendant Arola disclosed at the time of the acquisition.  Again, given the fact that

22  Cadent's purchase price and resulting goodwill recorded was based on historical gross margins of

23  almost 50%, Align must have used unreasonable gross margin assumptions as part of its operating

24  forecast in order to arrive at a conclusion of no impairment for 2011;

25       (d)    The market approach clearly demonstrates that Align's reported goodwill,

26  assets, net profit and EPS during the relevant time period were false.  The market approach allows a

27  company to estimate the fair value of a reporting unit by comparing, for example, multiples of

28  earnings or revenues of other entities with "comparable operations and economic characteristics."

1   ASC 350-20-35-24.   Because the market approach primarily relies on assumptions that are

2   observable and verifiable, as required by GAAP to the extent possible, the market approach also

3   serves as a "sanity check" on other valuation techniques, such as the discounted cash flow method

4   under the income approach;

5          (e)   As discussed in more detail in §XI, utilization of the market approach

6   demonstrates that between 4Q11 and 2Q12, SCCS was valued much less than the original $187.6

7   million that Align paid to acquire Cadent:

8          (i)   As of 4Q11, SCCS was valued approximately $44.6 million less (*i.e.*,

9   $187.6 million purchase price – $143.0 million estimated fair value);

10          (ii)   As of 1Q12, SCCS was valued approximately $22.9 million less (*i.e.*,

11   $187.6 million purchase price – $164.7 million estimated fair value); and

12          (iii)   As of 2Q12, SCCS was valued approximately $35.5 million less (*i.e.*,

13   $187.6 million purchase price – $152.1 million estimated fair value);

14          (f)   The implied declines in the fair values of SCCS of $44.6 million as of 4Q11,

15   $22.9 million as of 1Q12 and $35.5 million as of 2Q12 are also reasonable proxies for the goodwill

16   impairment charges under step two of the goodwill impairment test for those respective time periods;

17          (g)   The market approach demonstrates that the SCCS' valuations were false and

18   could not have been honestly believed as defendants deliberately relied on unobservable,

19   unsupportable, unsustainable and unreasonable inputs in order to achieve their objective of inflating

20   the valuations of the SCCS reporting unit to evade goodwill impairment in violation of GAAP;

21          (h)   Another reasonable valuation indicator of the fair value of the SCCS is to

22   apply SCCS's implied forward revenue multiple, based on the Company's own expected revenues

23   and growth rate assumption, to SCCS's actual revenue results.   This valuation calculation is, in

24   effect, a partial discounted cash flow valuation under the income approach, expressed as a multiple.

25   Under this method, the implied declines in the fair values of SCCS were $28.3 million as of 4Q11,

26   $28.2 million as of 1Q12, and $28.4 million as of 2Q12.   These amounts are also reasonable proxies

27   for the goodwill impairment charge under step two of the goodwill impairment test for those

28   respective time periods.   This indicator provides valuation results that are generally more biased

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                          - 15 -

1    toward overvaluation of SCCS (and hence a lesser amount of indicated goodwill impairment)

2    relative to the market approach because this indicator uses the Company's own forecasted revenues

3    and growth rate assumption, rather than observable market-based inputs.[9]

4           (i)     By 4Q11, defendants knew or deliberately disregarded that in 1Q11, 2Q11,

5    3Q11 and 4Q11, Cadent had failed to achieve the revenue and margin growth which defendants

6    projected and therefore knew or recklessly disregarded that the assumptions upon which Align's

7    goodwill valuations were based were contradicted by objective facts, rendering goodwill materially

8    overstated.  *See* §IX.  Had Align properly evaluated Cadent's poor financial performance and the

9    adverse changes to its business climate on a timely basis in 4Q11, in compliance with GAAP, the

10   Company would have recorded a goodwill impairment charge of at least $28.3 million by the close

11   of 4Q11.  If Align had recorded a goodwill impairment charge of approximately $28.3 million in

12   4Q11,  the Company's 4Q11 and FY11 income and diluted EPS would have been materially lower:

13

| (In Thousands of $ Except EPS) | **4Q 2011** |
|---|---|
| Net Income as Reported | $20,449 |
| Diluted EPS as Reported | $0.25 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,300) |
| **Net Income Reflecting Goodwill Write-Off** | **($7,851)** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($0.10)** |

20   <u>Academic Studies Show that Delaying Goodwill Impairment Is a Common Fraudulent Practice</u>

21          (j)     In recent years, several academic studies have shown that companies routinely

22   and intentionally delay recording impairments to goodwill, despite knowing that goodwill is

23   impaired and should be written down.  These studies also show that managers exploit the discretion

24   [9]  Plaintiffs have conservatively calculated impairment charges that should have been recorded by
25   Align under both the income and market approach had the Company properly complied with GAAP.
     Per Align's 2011  Form 10-K, the goodwill impairment test was conducted under the "income
26   approach, the market approach, or a combination thereof, to determine each reporting unit's fair
     value."  In this complaint, the tables showing the impairment charges and material negative impact
27   to income and EPS have been shown under the income approach.  However, the market approach
     yielded similar impairment charges ranging from $22.9 million to $44.6 million during the Class
28   Period.  *See* ¶48(f).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                    - 16 -

1   provided by SFAS 142 by selling stock at inflated prices with the knowledge that necessary write-

2   downs have not been taken and that it is precisely the perceived difficulty in pursuing litigation

3   based on inflated goodwill that motivates managers to dissemble in valuing goodwill;

4           (k)     Academic studies suggest, based on empirical research, that after the

5   implementation of Statement of Financial Accounting Standards ("SFAS") 142, goodwill

6   impairments are taken less timely.  Kevin K. Li & Richard G. Sloan, *Has Goodwill Accounting Gone*

7   *Bad?*,   Social   Science   Research   Network   (Sept.   1,   2009),   available   at

8   http://ssrn.com/abstract=1466271.  Li and Sloan find that goodwill impairments are more likely and

9   that more managers wait until the fair value of their firms' assets fall far below their carrying values

10  before taking goodwill impairments.  Further, their research suggests that the elimination of periodic

11  amortization, along with the difficulty of verifying the fair value of goodwill, has led to relatively

12  more inflated goodwill balances and less timely impairment write-downs.  Li and Sloan demonstrate

13  that the incidence of untimely impairments has been exacerbated in the post-SFAS 142 period;

14          (l)     The FASB promulgated SFAS 142 in an effort to better reflect the underlying

15  economics of goodwill and other intangible assets, and to improve financial statement users' ability

16  to assess future profitability and cash flows.  However, in their statistical study, Li and Sloan find

17  that as SFAS 142 replaces the systematic amortization of goodwill with a periodic impairment test,

18  this   new   accounting   standard   leads   to   relatively   inflated   goodwill   balances   and   untimely

19  impairments.  The evidence indicates that managers delay impairment until the value of the goodwill

20  has largely expired;

21          (m)     Specifically,   goodwill   impairment   in   the   pre-SFAS   142   period   lags

22  deteriorating operating performance and stock returns by at least two years.  Li and Sloan also

23  provide evidence suggesting that impairments under SFAS 142 are less timely and provide no more

24  information about future profitability than previous standards (SFAS 121).  By eliminating the

25  periodic amortization and posting a more stringent impairment requirement, the FASB hoped to

26  provide   more   economically   meaningful   information   about   goodwill.   However,   the   evidence

27  suggests that, in practice, managers use the discretion granted by SFAS to delay the reporting of

28  goodwill impairments; and

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                          - 17 -

1          (n)     Li and Sloan's research was built on prior research which evidenced

2    managements' use of the discretion in SFAS 142 to opportunistically delay impairments.  Karthik

3    Rammana & Ross L. Watts, *Evidence on the Use of Unverifiable Estimates in Required Goodwill*

4    *Impairment*,   Review   of   Accounting   Studies   (Jan.   31,   2011),   available   at

5    http://ssrn.com/abstract=1134943.  Rammana and Watts theorized that it is precisely this difficulty in

6    proving the falsity of goodwill estimates in court that was leading managers to exploit SFAS 142 for

7    their own purposes, resulting in financial reporting that "do[es] not reflect economic reality" and

8    "little accountability for acquired goodwill."

9          49.     In addition to the facts set forth above, defendants did not honestly believe, and could

10   not have honestly believed, their statements regarding Align's reported goodwill and reported 4Q11

11   and FY11 assets because: (i) defendants had actual knowledge of the accounting standards regarding

12   goodwill impairment; (ii) defendants were intimately involved with the Cadent acquisition and

13   integration, as well the subsequent financial results; (iii) defendants made numerous materially false

14   and misleading statements during the Cadent acquisition to cover-up serious problems at Cadent; and

15   (iv) defendants profited from the acquisition and subsequent failure to write down the goodwill:

16         (a)     Defendants knew of the accounting standards regarding the impairment of

17   goodwill.  In Align's 2011 Form 10-K, filed February 29, 2012, defendants characterized goodwill,

18   and the impairment of goodwill, as one of their "critical accounting policies and estimates."

19   Defendants also recognized that the impairment of goodwill could cause "a significant charge to

20   earnings in the financial statements during the period in which any impairment of goodwill or

21   amortizable intangible assets is determined," and described in detail the methods by which goodwill

22   impairment was supposed to be determined;

23         (b)     Prescott and Arola were intimately involved in the acquisition and integration

24   of Cadent.  On April 18, 2012, Align's Board of Directors stated in the Company's Form 14(a)

25   Proxy Statement that Prescott was responsible for "completing the Cadent acquisition," and that

26   Arola "played an essential role in the acquisition of Cadent and subsequent integration."  During a

27   January 10, 2011 discussion at the JP Morgan HealthCare Conference in San Francisco, Prescott

28   confirmed that during 2010, Align had "got to know a lot about [Cadent]";

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                    - 18 -

1           (c)     Many of defendants' statements regarding the Cadent acquisition were false,

2    and were designed to cover-up serious problems at Cadent and make the acquisition look more

3    attractive to Align investors.  For instance, on January 10, 2011, Align and Cadent announced "an

4    agreement to jointly develop software applications that will run on Cadent iTero and iOC scanners

5    for use in Invisalign treatment," which Prescott stated was in line with Align's "long-term strategic

6    initiatives of improving the Invisalign customer experience through innovation."  This statement

7    omitted, and failed to disclose, that Align had been planning on acquiring Cadent outright since 2010

8    and had signed a letter of intent dated December 15, 2010.  Defendants failed to disclose their intent

9    to acquire Cadent because they did not want investors to know that their acquisition plans had been

10   delayed due to Cadent's shoddy accounting practices.  Similarly, as described below, when

11   defendants finally announced the acquisition on March 29, 2011, they never disclosed that Cadent's

12   historical revenues were not indicative of future performance, as Cadent had saturated the market for

13   their iTero scanners in 4Q10 by offering unprecedented discounts to customers;

14          (d)     Based in part on the purported successful Cadent acquisition, Prescott and

15   Arola were handsomely rewarded with record bonuses for their performance.  Align's Board of

16   Directors specifically cited Arola and Prescott's involvement in the completion of the acquisition to

17   justify over $1.2 million in cash bonuses to Prescott and Arola, in addition to over $3.5 million in

18   stock and option awards in 2011.  Based on a review of Align's SEC filings, Prescott's and Arola's

19   2011 cash bonuses were the highest they had ever received, and Prescott's cash bonus was the

20   largest cash incentive award ever reported by Align in its history as a public company.  While Align

21   sought to convince investors that Cadent was a great investment that would lead to record revenues

22   and profits, Prescott and Arola wasted little time in unloading hundreds of thousands of shares of

23   Align stock for over $14 million in profits during the Class Period, at prices of $25.85-$34.82 per

24   share.  The largest of these stock sales was Prescott's February 29, 2012 sale of 322,751 shares of

25   Align stock for proceeds of nearly $8.3 million.  The February 29 stock sale was Prescott's largest

26   ever sale of Align stock at that time, in dollar value, and came seven months prior to Align's October

27   17, 2012 concession that Align would likely have to write-down a significant portion of goodwill

28   associated with the Cadent acquisition;

(e)     Academic studies regarding the relationship between insider trading and goodwill impairments are consistent with the alleged fraudulent intent here and provide evidence, based upon a comparison of firms that record goodwill impairments and firms that do not take impairment charges, that officers have private information regarding eventual goodwill impairments and trade on that information prior to taking a write-down.  Karl A. Muller, III, Monica Neamtiu & Edward J. Riedl, *Do Managers Benefit from Delayed Goodwill Impairments?*, Social Science Research Network (July 31, 2012), available at http://ssrn.com/abstract=1429615; *see also* Li & Sloan, *supra*.  These statistical studies show a considerable, abnormal selling of shares by corporate insiders in the two years preceding the formal announcement of goodwill impairments, and that insiders distance their trades at least six months prior to the impairments' formal announcement. Controlling for other factors, including trading as a result of general pessimism or other bad news, research further shows that managers have access to regularly updated internal budget estimates that contain profitability forecasts critical to assessing the value of recorded goodwill amounts, which are not typically disclosed externally; and

(f)     According to Muller *et al.*, corporate officers face incentives to behave strategically with respect to their trades.[10]  Indeed, stock sales by insiders increase three to nine quarters prior to a break in a string of consecutive quarterly earnings increases.  Because SFAS 142 requires annual impairment testing, insiders may obtain private information about future impairments at least one year before the actual loss is publicly reported.  The results of these researchers' tests are consistent with insiders possessing private information regarding goodwill impairments, and suggest that even despite high visibility and attendant high litigation risk associated with goodwill impairments, officers sell their shares strategically in advance of reporting the impairment.  The results of these studies suggest that officers distance their sales from the impairment announcement to minimize the latter litigation risk.  Consistent with these findings, on February 29, 2012, defendant Prescott made a large sale of 322,751 shares of Align stock for

---

[10]   Li and Sloan further find that due to the elimination of the periodic amortization of goodwill requirement, SFAS 142 has increased management's incentive to delay goodwill impairments.  Li & Sloan, *supra*; Rammana & Watts, *supra* (same).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO                                                                                          - 20 -

1  proceeds of nearly $8.3 million.  This sale occurred seven months prior to Align's October 17, 2012

2  concession that Align would take a significant goodwill write-down, which is consistent with the

3  insider sales pattern identified consistently in these academic studies.

4        50.    <u>False Statement</u>:  The Company's 2011 Form 10-K, filed February 29, 2012, also

5  stated that "[d]uring the fiscal year ended December 31, 2011, there were **no facts and**

6  **circumstances** that indicated that the fair value of the reporting units may be less than their current

7  carrying amount."  This statement represented to the market not just that Align's goodwill valuations

8  were reasonable, but also that there was no reason to believe that the Company's reported goodwill

9  could be impaired in any way.

10        51.    <u>Reasons Why Statement in ¶50 Was Knowingly False and Misleading</u>    This

11 statement was materially false and misleading because there were numerous facts and circumstances,

12 which defendants knew demonstrated that the fair value of the scanner division may be less than its

13 carrying value.

14        52.    First, there was new and unanticipated competition entering the market for intra-oral

15 scanners which reduced the fair value of the scanner division.  At the time Align acquired Cadent,

16 Cadent had a 50% market share in the digital impression business, with an installed base of 1,550

17 units, according to a May 4, 2011 Northcoast report entitled "ALGN: Reducing Estimates to Reflect

18 Cadent Rapidly Changing Market Creates Risk."  The same report also indicated that **Cadent's**

19 **business model was not sustainable** due to the poor, "**non-existent**" return on the investment for the

20 doctor.  Northcoast intimated that their bullish outlook for the digital impression market in general

21 was "due to new market entrants and a significant change in the process by which these products are

22 sold that will allow growth and penetration levels to accelerate."

23        53.    Specifically, Cadent could not build a sustainable business from scanner sales alone,

24 and therefore relied upon a "click charge" or "annual fee/model charge" to improve returns for

25 Cadent.  By adding these fees, however, doctors were unable to "economically justify" the

26 equipment purchase, and Cadent was facing significant pressure to eliminate or reduce such fees by

27 the beginning of the Class Period, if not before.

28

54.     During the first six months of 2011, subsequent to Align signing the letter of intent to purchase Cadent, new digital market participants (Cadent's competitors) improved the value of digital impression technology for doctors and introduced meaningful advancements to existing technology.  Sirona, a large manufacturer of dental technology, originally introduced the stand-alone Bluecam digital impression system in January 2009.  With the Chairside Economical Restoration of Esthetic Ceramics ("CEREC") system, also introduced by Sirona, doctors could purchase a stand-alone digital impression system for approximately $26,000, with zero incremental fees.  In fact, throughout 2010 and 2011, Sirona was repeatedly improving its scanner technology, which directly competed with the iTero, including the elimination of scan fees in October 2010.

55.     In March 2011, Sirona unveiled CEREC SW 4.0, new software which allowed practitioners "the ability to create chairside, durable, highly esthetic all-ceramic bridges, crowns, inlays/onlays and veneers," features which distinguished it from the iTero.  If the doctor later determined he or she wanted to bring restorative CAD/CAM chairside, the doctor could later purchase the CEREC MCXL milling unit and software to do so.  At the time, this was the only system that had both digital impression and chairside milling capability.  Sirona had already established a strong distribution partner in Patterson Company, Inc. ("PDCO") and the largest installed base of dental laboratory systems (CEREC inLab) for lab based connectivity.  The system was also the only applicable system to offer the doctor complete integration with a 3D imaging/cone beam computed tomography ("CBCT") system.  By comparison, Cadent's system required usage and model fees, and did not have connectivity with CBCT imaging or chairside milling.

56.     Market leaders in traditional dental impression materials, including 3M Co. ("3M"), Dentsply International, Inc. ("Dentsply") and Danaher Corporation ("Danaher"), stood to lose meaningful dental revenue if the business quickly transitioned to digital impressions.  In fact, 3M saw this risk and quickly purchased Brontes Technologies, Inc. for $95 million in October 2006, which proved to be a disaster due to poor technology and a challenging market for dental services.  According to Northcoast, Cadent had been "for sale for years trying to achieve a Brontes type valuation."  Dentsply had studied iTero as it had much to lose if iTero became effective, but repeatedly passed upon multiple opportunities to purchase Cadent.  Instead, Dentsply partnered with

3Shape.  Similarly, Danaher opted to purchase a small technology company with plans to develop digital impression technology in-house.  Northcoast concluded that the value proposition of the Cadent business model, with recurring charges for the doctor, was "***simply not there***" and that the largest players in the dental industry were "well aware of this fact."

57.    Northcoast reiterated its concern about the long-term viability of Cadent's business model in its January 9, 2012 report entitled, "ALGN: Upgrading to BUY, Raising Estimates." Specifically, Northcoast noted, "[Align] described the Cadent opportunity as a revenue synergy story, but Cadent's current business model eliminates any return on investment for the dentist and we believe significant portions of Cadent's revenue are at risk."  Northcoast also noted that "there will be several new entrants into this market that are likely to offer superior products at considerably lower prices [*i.e.*, 3Shape, Dentsply, Heraus, Planmeca].  With increased competition and pricing pressure we do not expect Cadent to significantly contribute to total company earnings, despite cost cutting initiatives."

58.    Second, defendants knew the scanner division was experiencing a significant adverse change with respect to the business climate in Europe.  In 4Q11, Align's international revenue plummeted to just $362,000, from over $2.5 million in 3Q11.  The magnitude of this precipitous decline was exacerbated by the fact that the fourth quarter was "typically the strongest quarter for dentists and specialists to purchase capital equipment," and yet sales were almost nonexistent.  As set forth in the following chart, while sales increased marginally in 1Q12, this increase was nowhere close to sufficient to offset the dramatic reductions in international sales seen in 4Q11:



59.     Third, Cadent's carrying value was negatively affected by the substantial discounting employed at Cadent prior to Align's purchase of the company which was designed to make Cadent look more attractive to a potential buyer, and which decreased subsequent demand for Cadent products by saturating the market for iTero scanners and Cadent services.  Defendants, including Prescott and Arola, knew or recklessly disregarded the abnormal and unrepeatable revenue trend generated by the 4Q10 Cadent discounts and promotions:

(a)     Cadent's FY10 revenues, which formed the basis for Align's future growth projections and goodwill assumptions, were not the result of true demand for Cadent's products and services.  Instead, the revenue results were the result of steep discounts/promotions which generated an unsustainable revenue increase in FY10.  As a result of the sharp discounts/promotions offered to customers in 4Q10, Cadent was able to significantly increase FY10 revenues from $29.3 million in FY09 to $37.9 million in FY10.  According to FE1 and FE3, these huge customer discounts/promotions included unlimited scans for a period of time with the purchase of a scanner and discounts on one-year and three-year packages of unlimited scans for an upfront fixed price;

(b)     FE1, a former Cadent Inside Sales Specialist reported that in 4Q10 there was an aggressive push at Cadent to generate more scanner leads and sell more scanning packages by offering customers steep discounts, including one-year and three-year packages with unlimited scans.  According to FE1, this aggressive sales and discounting push was directed by Cadent Vice President of Marketing Kerri Sebring and the discounts were unprecedented during FE1's tenure at Cadent.  Based on her own experiences, FE1 believed that the overall sales increase in Cadent's 4Q10 was a result of these discounts and promotions.  These steep discounts allowed FE1 to increase her own sales of Cadent products from an average of approximately $12,000-$18,000 a month to over $192,000 in December 2010.  FE1 also reported that other Cadent sales specialists experienced similarly sharp increases in sales during 4Q10.  According to FE1, these deep discounts even prompted customers to inquire if Cadent was being sold, as customers were concerned that whoever acquired Cadent would not honor the terms of the discounted deals, particularly the unlimited scans.

1    Finally, FE1 reported that from her perspective, the sharp spike in 4Q10 sales would have been

2    apparent from a review of Cadent's financials during any due diligence process;

3                    (c)     FE3, a former Cadent Credit and Collections Supervisor, corroborated the

4    reports of FE1 and reported that there was a significant increase in scanner sales in 4Q10 and that

5    they were the result of deals and promotions, which included unlimited scans with the purchase of a

6    scanner.  FE3 also confirmed that based upon her experience and review of the Company's records

7    as part of her job, Cadent sold far more scanners in 4Q10 than was typical;

8                    (d)     FE2 was a former Cadent VP of Operations.  According to FE2, prior to 2010,

9    while she was a Cadent Senior VP of Operations, she personally spoke with Align's then VP of

10   Operations, Emory Wright, about having Align distribute Cadent products.  By fall 2010, the

11   relationship was far beyond that and Align was engaged in efforts to acquire Cadent.  FE2 reported

12   those efforts were delayed however because Align wanted Cadent to become SOX and GAAP-

13   compliant.  FE2 reported that Align hired independent auditors to review Cadent's financials as part

14   of this process;

15                   (e)     FE2 also stated that as part of the due diligence process, Cadent set up a data

16   room (essentially a shared hard drive) for Align, Straumann and Carestream, each of which were

17   potential acquisition partners.  The shared drive contained Cadent's forecasts, budgets, historical

18   financials and legal documents such as customer and distributor agreements, and according to FE2,

19   Cadent's CEO, Tim Mack, and Cadent's CFO, Roger Blanchette, were the people who loaded

20   documents onto the shared drive.  FE2 stated that she knew these facts because for a short period she

21   too had access to the data room;

22                   (f)     With respect to increased sales in 4Q10, FE2 reported that special offers or

23   promotions were in fact made to a lot of customers in 4Q10, which included flat price scanners with

24   a year of service and a year of usage.  FE2 also stated that in 4Q10, the Company also offered

25   current users deals to switch to an annual subscription.  Whereas previous customers paid per scan,

26   they could now pay a flat fee for unlimited scans;[11]

27   _____

28   [11]    Indeed, as future quarters would demonstrate, Align never came close to achieving the growth
     Prescott told investors they would achieve in SCCS revenues.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                            - 25 -

1    (g)    Notwithstanding defendants' knowledge or reckless disregard of these facts,

2  Align based its valuation of Cadent, and encouraged Align's analysts to base their projections, on the

3  assumption that Cadent had achieved $40 million in revenue in FY10, and that Cadent would

4  generate 20%-plus growth each year.  In fact, as defendants knew, Cadent's actual FY10 revenue

5  was only $37.9 million and these revenue levels were only generated through unprecedented and

6  unsustainable discount offers which slashed Cadent's scanner margins to a level far below that

7  which Align represented they would achieve;

8    (h)    The reports of FEs are further corroborated by Cadent's FY09 and FY10

9  revenues which reveal the sharp increase in scanner revenue between 2009 and 2010.  In 2009

10  Cadent recognized $29.3 million in revenue in 2009, the vast majority of which came from services.

11  In 2010, Cadent's revenue spiked to $37.9 million, almost entirely due to a ***147%*** increase in revenue

12  from the sale of scanners;[12] and

13    (i)    Cadent's unprecedented and undisclosed discounting was an indication that

14  the scanner division's carrying value may have been overstated, and yet these facts were never

15  disclosed by Align.

16    60.    Fourth, the value of the scanner division had been significantly impacted by Align's

17  aggressive integration efforts.  Following Align's purchase of Cadent, Align began dismantling

18  much of Cadent's standalone infrastructure.  On September 7, 2011, Align issued a press release

19  entitled "Align Technology Announces Plans to Consolidate New Jersey Operations With Existing

20  Manufacturing and Shared Services Organizations."   The press release announced that Align

21  intended to shut down Cadent's "CAD/CAM services and scanner-related activities based in

22  Carlstadt, New Jersey" and move them to Align's existing location in San Jose, Costa Rica.  Align

23  also announced that Align's distribution and repair facilities would be moved to Align's facilities in

24  Costa Rica and Juarez, Mexico, and that accounting and finance functions would be consolidated at

25  Align's headquarters in San Jose, California.  As a result of this "consolidation," Align fired 119

26

27  ─────────────────
   [12]    Service revenue was purportedly recognized in the quarter in which the services were provided,
28  whereas revenue from the direct sale of scanners was recognized in the quarter in which the sale was
   completed.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                          - 26 -

1   full-time Cadent employees, many during 4Q11, and began training Align employees to take over

2   these functions.  But the integration did not go smoothly.  Align fired many of Cadent's customer

3   support and customer-facing personnel before Align's existing employees had significant knowledge

4   and experience to assist customers with Cadent's complex scanner technology and software

5   upgrades.

6       61.    As early as September 19, 2011, there began to be postings on online message boards,

7   such as Dental Lab Network, complaining about problems with Cadent's customer service.  By

8   January 2012, complaints were being made about "spotty tech support, clumsy file handling on the

9   iTero part, and a general lack of understanding as to what[']s going on."  Others complained of

10  inexperienced and uninformed customer support representatives affecting their ability to utilize their

11  scanners:

12          Itero[']s customer support is shoddy at best. Long hold times (often resulting
            in no contact with a rep. at all, just recycle you through their hold system) the reps
13          that do answer are usually uninformative and only put you back on hold to contact
            the next tier of support, they have no sense of urgency and I can[']t even get my
14          area sales rep to call me back after I leave a message. I had a file sitting in my system for
            over a week before I could get a hold of someone who knew how to split the file to
15          send for a 3i abutment.

16      62.    By April 2012, Prescott was forced to admit that the integration had "negatively

17  impacted several important customer-facing functions like customer service, tech support and even

18  delivery schedules in some cases."  By January 2012, defendants knew of, or recklessly disregarded,

19  these significant integration problems, which contributed to reductions in scanner-division revenue,

20  yet failed to disclose them until April 2012.

21      63.    <u>False Statement</u>: The 2011 Form 10-K falsely stated that the Company had performed

22  an impairment test in 4Q11 and that "[b]ased on the goodwill impairment analysis results during the

23  fourth quarter of 2011, we determined that no impairment needed to be recorded as the fair value of

24  our reporting units were ***significantly in excess of the carrying value***."  This statement represented

25  to the market not only that no impairment charge needed to be taken, but also that there was little to

26  no danger of an impairment charge in the near future, as the value of the reporting units were

27  "***significantly***" in excess of the stated goodwill.

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                    - 27 -

1    64.    Reasons Why the Statement in ¶63 Was Knowingly False and Misleading.  This

2    statement was materially false and misleading because, as set forth above, the fair value of Cadent's

3    scanner was not in excess of the reported carrying value, and was nowhere close to being

4    "significantly in excess of the carrying value."

5    **B.    False Statements Regarding 1Q12**

6    65.    False Statement:  On April 23, 2012, the Company announced its 1Q12 financial

7    results in a press release, including 1Q12 non-GAAP EPS of $0.27, which beat Wall Street analyst

8    estimates by $0.06 per share.  The press release falsely reported: (a) $670.4 million in total assets;

9    (b) $21.0 million in net profit; and (c) GAAP EPS of $0.26.  The press release stated in part:

10    **Align Technology Announces First Quarter Fiscal Year 2012 Results**

11    ·    Q1 net revenues of $135.1 million increased 4.8% sequentially and 28.8%
         year-over-year

12                                          *        *        *

13    ·    Q1 scanner and CAD/CAM services revenue of $11.8 million increased
14        17.8% sequentially

15    ·    Q1 GAAP diluted EPS was $0.26 and Q1 Non-GAAP diluted EPS was $0.27

16    66.    In reaction to the April 23, 2012 announcement of Align's 1Q12 financial results and

17    the forecasted EPS for 2Q12, the Company's stock price spiked 15% from a close of $27.44 per

18    share on April 23, 2012 to a close of $31.76 per share on April 24, 2012, on massive trading volume

19    of more than 5 million shares on April 24, 2012, compared to 1.4 million shares on April 23, 2012.

20    67.    False Statement:  On May 8, 2012, the Company filed its 1Q12 Form 10-Q with the

21    SEC.  The Form 10-Q was signed by Arola and Prescott.  The Form 10-Q repeated the following

22    false and misleading financial results first announced on April 23, 2012: (a) $670.4 million in total

23    assets; (b) $21.0 million in net profit; and (c) GAAP EPS of $0.26.

24    68.    Reasons Why Statements in ¶¶65, 67 Were False and Misleading.  Each of the

25    statements in ¶¶65, 67 and specifically Align's reported 1Q12 financial results, including reported

26    assets, net profit, EPS and goodwill, were materially false and misleading for all of the reasons set

27    forth below in §IX, entitled "Defendants' Financial Statements Failed to Comply with GAAP and

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                    - 28 -

1  SEC Rules," and as set forth below.  Align's reported goodwill and reported 1Q12 assets, net profit

2  and EPS were both false, and not honestly believed at the time the statements were made.

3         69.     Align's reported goodwill and reported 1Q12 assets, net profits and EPS were false

4  for the same reasons as set forth above with respect to Align's 4Q11 financial results, including that

5  Align's reported goodwill was not supported by the income approach or the market approach that

6  Align purported use in evaluating impairment.

7         70.     Further, there were no improvements in the scanner division's performance between

8  4Q11 and 1Q12 which could have led Align to a different conclusion:

9         (a)     While the scanner division's international sales had increased from 4Q11, they

10  were still down *75%* from 3Q11.  ¶58.  Nor was there any reason to believe that international sales

11  would improve, as Prescott acknowledged, characterizing Europe as a "difficult environment" and

12  stating that Align continued "to see a more challenging environment for Scanners and CAD/CAM

13  Services";

14         (b)     Cadent's gross margins also continued to be materially lower than defendants

15  previously forecast and projected.  Despite claiming that Cadent would achieve 50% gross margins,

16  and in spite of announcing that Align would be laying off 119 full-time Cadent employees, Cadent's

17  1Q12 gross margins were just 34.6%:[13]

18

19

20

21

22

23

24

---

25    [13]   It should be noted that Plaintiff has shown the post-acquisition gross margins conservatively in

26  the chart as the non-GAAP gross margins reported by Align each quarter. These gross margin percentages are higher than the GAAP gross margins because non-recurring expenses are removed

27  and therefore gross margin increases. Even showing the higher non-GAAP gross margin, the Company was badly missing its gross margin expectation for Cadent of approximately 50% as stated

28  by defendant Arola at the time of acquisition.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO        - 29 -



(c)    By the end of 1Q12, Cadent was missing the revenue projections used to value Cadent and the resulting goodwill in March 2011 by a cumulative total of $9.2 million.  Indeed, the difference between Cadent's actual revenue and the revenue projected by Arola and Prescott in March 2011 increased every single quarter between 1Q11 and 4Q12, as set forth in the chart below:



(d)    Defendants knew or deliberately disregarded that Cadent's financial results for 2Q11, 3Q11, 4Q11 and 1Q12 had failed to achieve the revenue and margin results which defendants projected and therefore knew that the assumptions upon which Align's goodwill valuations were unreasonable and baseless. *See infra* §IX.  If Align had recorded a goodwill impairment charge of

approximately $28.2 million in 1Q12,  the Company's 1Q12 income and diluted EPS would have been materially lower:

| (In Thousands of $ Except EPS) | 1Q 2012 |
|---|---|
| Net Income as Reported | $20,984 |
| Diluted EPS as Reported | $0.26 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,200) |
| **Net Income Reflecting Goodwill Write-Off** | **($7,216)** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($0.09)** |

71.   <u>False Statement:</u>  In the Form 10-Q filed May 8, 2012, defendants also stated that Align performed impairment testing "whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable," and yet no impairment test was undertaken in 1Q12:

> We perform an impairment test whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable. Examples of such events or circumstances include significant underperformance relative to historical or projected future operating results, significant changes in the manner of use of acquired assets or the strategy for its business, significant negative industry or economic trends, and/or a significant decline in our stock price for a sustained period. Impairments are recognized based on the difference between the fair value of the asset and its carrying value, and fair value is generally measured based on discounted cash flow analyses. There were no impairments of intangible assets during the periods presented.

72.   <u>Reasons Why the Statement in ¶71 Was False and Misleading</u>: This statement was materially false and misleading because Align did not perform impairment testing when events, facts or circumstances indicated that the carrying value may not be recoverable.

73.   Two of the specific examples set forth in Align's Form 10-Q, "significant underperformance relative to historical or projected future operating results" and "significant negative industry or economic trends," were ongoing in 1Q12, and yet Align failed to perform an impairment test.  ¶¶48-50.

**C.   False Statements Regarding 2Q12**

74.   <u>False Statement:</u>  On July 19, 2012, the Company announced its 2Q12 financial results in a press release, including 2Q12 EPS of $0.34, which beat Wall Street analyst estimates by

$0.06 per share.  The press release falsely reported: (a) $744.2 million in total assets; (b) $28.5 million in net profit; and (c) EPS of $0.34:

**Align Technology Announces Second Quarter Fiscal Year 2012 Results**

·     Q2 net revenues of $145.6 million increased 7.8% sequentially and 21.3% year-over-year

\*       \*       \*

·     Q2 scanner and CAD/CAM services revenue of $11.9 million increased 1.8% sequentially

·     Q2 diluted EPS was $0.34

. . . Align Technology, Inc. today reported financial results for the second quarter of fiscal 2012 ended June 30, 2012.

\*       \*       \*

Net profit for Q2 12 was $28.5 million, or $0.34 per diluted share.  This is compared to net profit of $21.0 million, or $0.26 per diluted share in Q1 12 and net profit of $11.2 million, or $0.14 per diluted share in Q2 11.

75.    <u>False Statement</u>: On August 2, 2012, the Company filed its Form 10-Q for the period ending June 30, 2012.  The Form 10-Q was signed by both Prescott and Arola.  The Form 10-Q repeated the following false and misleading financial results first announced on July 19, 2012: (a) $744.2 million in total assets; (b) $28.5 million in net profit; and (c) EPS of $0.34.

76.    <u>Reasons Why Statements in ¶¶74-75 Were False and Misleading</u>.  Each of the statements in ¶¶74-75 and specifically Align's reported 2Q12 financial results, including reported assets, net profit, EPS and goodwill, were materially false and misleading for all of the reasons set forth below in §IX, entitled "Defendants' Financial Statements Failed to Comply with GAAP and SEC Rules," and as set forth below.  Align's reported goodwill and reported 2Q12 assets, net profit and EPS were both false, and not honestly believed at the time the statements were made.

77.    Align's reported goodwill and reported 2Q12 assets, net profits and EPS were false for the same reasons as set forth above with respect to Align's 4Q11 financial results, including that Align's reported goodwill was not supported by the income approach or the market approach that Align purported use in evaluating impairment.  ¶¶48-50.

78.     There were no improvements in the scanner division's performance between 4Q11 and 2Q12 which could have led Align to a different conclusion.

79.     In 2Q12, the scanner division's international sales dropped to an all-time low, just $205,000, a massive **92%** drop from 3Q11 and **68%** decline from 1Q12.  There was no reason to believe that international sales would improve, as Prescott acknowledged, stating that there was "great uncertainty" about Europe's economic future and that the Company was "not expecting any significant improvement from our Scanner and CAD/CAM Services business in [Europe]." Arola further stated that the Company expected 3Q12 Scanner Division revenue to be "down sequentially from quarter two," and that 3Q12 scanner sales in Europe would be "flat":

(a)     Cadent's gross margins also continued to be materially lower than defendants previously forecast and projected.  Despite claiming that Cadent would achieve 50% gross margins, and in spite of announcing that Align would be laying off 119 full-time Cadent employees, Cadent's 2Q12 gross margins were just 30.3%;

(b)     By the end of 2Q12, Cadent was missing the revenue projections used to value Cadent and the resulting goodwill in March 2011, by a cumulative total of $11.4 million.  Indeed, the difference between Cadent's actual revenue and the revenue projected by Arola and Prescott in March 2011, increased every single quarter between 1Q11 and 4Q12; and

(c)     Defendants knew or deliberately disregarded that Cadent's financial results for 2Q11, 3Q11, 4Q11, 1Q12 and 2Q12 had failed to achieve the revenue and margin results which defendants projected and therefore knew that the assumptions upon which Align's goodwill valuations were unreasonable and baseless.  *See infra* §IX.  If Align had recorded a goodwill impairment charge of approximately $28.4 million in 2Q12,  the Company's 2Q12 income and diluted EPS would have been materially lower:

| (In Thousands of $ Except EPS) | 2Q 2012 |
|---|---|
| Net Income as Reported | $28,492 |
| Diluted EPS as Reported | $0.34 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,400) |
| **Net Income Reflecting Goodwill Write-Off** | **$92** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **$.001** |

80.     <u>False Statement</u>:  In the Form 10-Q filed August 2, 2012, defendants also stated that goodwill would be tested for impairment "when events or changes in circumstances indicate the carrying value may not be recoverable."

> We perform an impairment test whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable.  Examples of such events or circumstances include significant underperformance relative to historical or projected future operating results, significant changes in the manner of use of acquired assets or the strategy for its business, significant negative industry or economic trends, and/or a significant decline in our stock price for a sustained period.  Impairments are recognized based on the difference between the fair value of the asset and its carrying value, and fair value is generally measured based on discounted cash flow analysis.  There were no impairments of intangible assets during the periods presented.

81.     <u>Reasons Why the Statement in ¶80 Was False and Misleading</u>: This statement was materially false and misleading because Align did not perform impairment testing when events, facts or circumstances indicated that the carrying value may not be recoverable.

82.     Two of the specific examples set forth in Align's Form 10-Q, "significant underperformance relative to historical or projected future operating results" and "significant negative industry or economic trends," were ongoing in 2Q12, and yet Align failed to perform an impairment test.  ¶¶48-50.

## VIII.   POST-CLASS PERIOD DISCLOSURES AND ADMISSIONS CONFIRM THAT GOODWILL WAS MATERIALLY OVERSTATED

83.     Shortly following the Class Period, defendants made further disclosures regarding SCCS goodwill impairment, including even further write-downs to the SCCS goodwill which would quickly be written off in its entirety.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO

- 34 -

84.     On November 9, 2012, Align filed a Form 10-Q setting forth their financial results for 3Q12 ended September 30, 2012.  The 10-Q was signed by Prescott and Arola.  The Form 10-Q provided further details about Align's goodwill write-down including trends that were known to defendants since the end of 2011, including:  (i) deteriorating business trends in the SCCS reporting unit; and (ii) lower financial results and future expectations for the SCCS reporting unit.  The Form 10-Q disclosed an impairment charge of $24.7 million, reducing the goodwill from $77.3 million to $52.6 million:

> *Goodwill Impairment*. During the third quarter of 2012, we determined that sufficient indicators of potential impairment existed to require an interim goodwill impairment analysis of our SCCS reporting unit.  These indicators included the termination of the distribution arrangement with Straumann for iTero intra-oral scanners in Europe and North America, together with market conditions and business trends within the SCCS reporting unit. ***While we continue to expect revenue growth in our SCCS business, our expectations for future growth and profitability rates projected for the SCCS reporting unit are lower than our previous estimates primarily driven by overall lower than expected financial results.***[14]  As of September 30, 2012, we concluded that the fair value of the SCCS reporting unit was less than its carrying value . . . . ***Based on our preliminary analysis, the implied fair value of goodwill was substantially lower than the carrying value of the goodwill for the SCCS reporting unit by an estimated $24.7 million which we recorded*** as impairment to goodwill in the third quarter of 2012.  In the fourth quarter of 2012, we expect to finalize the step two analysis and, if necessary, record any change from our original estimate.

85.     On January 30, 2013, Align issued a press release entitled "Align Technology Announces Fourth Quarter and Record Fiscal Year 2012 Results."  The press release once again announced lackluster performance in Align's SCCS reporting unit, and Align announced that as a result of its continued impairment analysis, ***additional write-offs would be required, bringing the total to $36.6 million***:

> In Q3 12, we determined that there were sufficient indicators of a potential impairment to the goodwill attributed to the scanner and CAD/CAM services reporting unit, therefore we conducted step one of the goodwill impairment analysis and concluded that the goodwill was impaired.  Based on our preliminary step two analysis, we recorded an estimated goodwill impairment charge of $24.7 million in Q3 12.  In Q4 12, we finalized step two of our analysis and recorded an additional goodwill impairment charge of $11.9 million.

---

[14]  Align's delayed reduction of "***future growth and profitability rates***" utilized in its 3Q12 goodwill impairment test should have occurred for the 2011 impairment test given that its 20% revenue projection and 50% margin projection were missed every quarter from 2Q11 to 3Q12.

86.     In a separate press release on the same day, the Company announced the departure of CFO Kenneth Arola:

**Align Technology Announces Departure of Kenneth B. Arola, VP Finance and CFO, Effective March 4, 2013**

\*          \*          \*

Align Technology, Inc. (NASDAQ: ALGN) today announced that Kenneth B. Arola will step down as vice president, finance and chief financial officer effective March 4, 2013 and will remain an employee of the Company through June 28, 2013. Mr. Arola will remain in his capacity as CFO through the completed audit of the Company's 2012 financial statements and filing of the 2012 Form 10-K with the SEC.

87.     On April 18, 2013, Align issued a press release entitled "Align Technology Announces First Quarter Fiscal 2013 Results." In the press release, Align announced that they were writing off the entirety of the remaining SCCS goodwill:

Recent changes in the competitive environment for intra-oral scanners including announcements in March 2013 of new low-priced scanners targeted at Orthodontists and GP Dentists in North America caused us to lower our expectations for growth and profitability for our scanner and CAD/CAM services business during Q1 13. As a result, we conducted an impairment analysis of long-lived assets and goodwill related to our scanner and CAD/CAM services reporting unit. Based on these analyses, we recorded a $26.3 million impairment of our long-lived assets and a $40.7 million impairment of goodwill. The $40.7 million represents the remaining goodwill balance in the scanner and CAD/CAM services reporting unit.

## IX.     DEFENDANTS' FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC RULES

88.     Defendants caused the Company to falsely report its financial results for 4Q11, FY11, 1Q12 and 2Q12 by failing to timely write-off impaired goodwill associated with its SCCS reporting unit, which materially overstated the Company's assets, net income and EPS for those periods.

89.     Align's financial results were included in a Form 10-K for the year ended 2011 and in Forms 10-Q for 1Q12 and 2Q12, filed with the SEC. ¶¶45,67, 75. The results were also included in press releases disseminated to the public and discussed on conference calls with analysts and investors. ¶¶44, 65, 74. Defendants claimed that the financial information they reported was a fair statement of Align's financial results and that the results were prepared in accordance with GAAP.[15]

---

[15]   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that

90.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Align's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

**A.     Goodwill Accounting Standards**

91.     Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  ASC 805-10-05-4 requires that a business combination be accounted for by applying what is referred to as the acquisition method.  Under the acquisition method, the assets acquired and liabilities assumed are recorded at their respective fair market values as of the date of the acquisition.  ASC 805-20-30-1.  "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  ASC 805-10-20.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.  ASC 350-20-35-16.

92.     An asset is an item which provides economic value to an entity.  Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition.  ASC 805-30-20 ("goodwill" definition from glossary).

93.     Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20.  Goodwill is not amortized over a pre-determined number of years; instead, ASC 350-20-35-1 requires that a company test goodwill

---

are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the FASB issued SFAS No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162.*  FASB ASC became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing U.S. GAAP.  This complaint uses the ASC references because the Class Period is after September 15, 2009.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO

1  for impairment annually at a level of reporting referred to as a reporting unit.[16]  "Impairment is the

2  condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair

3  value."  ASC 350-20-35-2.

4          94.     Impairment testing on a quarterly basis is only required if events or circumstances

5  change (*i.e.*, triggering events) that would more likely than not reduce the fair value of a reporting

6  unit below its carrying amount.  ASC 350-20-35-30.  In evaluating whether it is more likely than not

7  that the fair value of a reporting unit is less than its carrying amount, an entity shall assess relevant

8  events and circumstances.  Examples of such events and circumstances include the following:

9          a.     Macroeconomic conditions such as deterioration in general economic
                   conditions, limitations on accessing capital, fluctuations in foreign exchange
10                 rates, or other developments in equity and credit markets;

11         b.     Industry and market considerations such as a deterioration in the environment
                   in which an entity operates, *an increased competitive environment*, a decline
12                 in market-dependent multiples or metrics (consider in both absolute terms
                   and relative to peers), *a change in the market for an entity's products or*
13                 *services*, or a regulatory or political development;

14         c.     Cost factors such as increases in raw materials, labor, or other costs that have
                   a negative effect on earnings and cash flow;

15
           d.     *Overall financial performance such as negative or declining cash flows or*
16                 *a decline in actual or planned revenue or earnings compared with actual*
                   *and projected results of relevant prior periods*;
17
           e.     Other relevant entity-specific events such as changes in management, key
18                 personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

19         f.     Events affecting a reporting unit such as a change in the composition or
                   carrying amount of its net assets, a more-likely-than-not expectation of
20                 selling or disposing all, or a portion, of a reporting unit, the testing for
                   recoverability of a significant asset group within a reporting unit, or
21                 recognition of a goodwill impairment loss in the financial statements of a
                   subsidiary that is a component of a reporting unit; and
22
           g.     If applicable, a sustained decrease in share price (consider in both absolute
23                 terms and relative to peers).

24  ASC 350-20-35-3C.

25

---

26  [16]  A reporting unit is an operating segment of a Company or one level below an operating segment
     (also known as a component).  ASC 350-20-20 ("reporting unit" definition from glossary).  Align
27   had two operating segments during the Class Period: (i) SCCS; and (ii) Clear Aligner.  For purposes
     of its goodwill impairment testing, Align considers its operating segments to be its reporting units.
28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                          - 38

95.     If, after assessing the totality of the events and circumstances described above, an entity determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, then the entity shall perform the first step of the two-step goodwill impairment test. ASC 350-20-35-3E.  Testing for goodwill impairment is a two-step process.  The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment.  In the first step, a company will compare the fair value of a reporting unit to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is not deemed to be impaired and thus the second step of the impairment test is unnecessary.  ASC 350-20-35-6.  However, if the carrying value of the unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any.  ASC 350-20-35-8.

96.     The second step of the goodwill impairment test compares the implied fair value of goodwill with the carrying amount of that goodwill.  ASC 350-20-35-9.  If the carrying amount of goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.  ASC 350-20-35-11.  Subsequent reversal of a previously recognized goodwill impairment loss is prohibited once the measurement of that loss is recognized.  ASC 350-20-35-13.

### B.     Defendants Intentionally Failed to Timely Write-Down Impaired Goodwill

97.     Defendants' failure to timely write-down the impaired goodwill associated with the Cadent acquisition in compliance with GAAP or ASC 350 is an all too common fraudulent scheme, which scholars have proven through empirical evidence to be pervasive.

98.     In a recent academic study, Li and Sloan concluded that the implementation of SFAS 142 has resulted in "relatively inflated goodwill balances and untimely impairments."  They also concluded that "investors do not appear to fully anticipate the untimely nature of post SFAS 142 goodwill impairments" and that "managers exploit the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated."  Kevin K. Li and Richard

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO
- 39 -

1   G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (December

2   2012), available at http://ssrn.com/abstract=1466271.[17]

3        99.    Defendants here engaged in the exact same conduct Li and Sloan found to be

4   prevalent by failing to record a goodwill impairment charge in 4Q11, 1Q12 or 2Q12 and materially

5   overstating assets, net income and EPS. ***Defendants failed to use reasonable and supportable***

6   ***assumptions regarding Cadent's future revenues and profits utilized in its 4Q11 impairment test***

7   that defendants represented resulted in no impairment charge to the goodwill, nor did the

8   assumptions reflect management's "best estimates," as defendants represented.  During the Class

9   Period, defendants ignored ***Cadent's poor overall financial performance***, particularly in its SCCS

10  reporting unit, along with ***a deterioration in its business environment***, including a significant

11  deteriorating relationship with Straumann, their exclusive European distributor and non-exclusive

12  North American distributor, which negatively impacted revenues.  Both the poor overall financial

13  performance and deterioration in its business environment triggered the requirement under GAAP

14  that an interim goodwill impairment test be performed by Align prior to 3Q12, but defendants failed

15  to do so.  *See* ¶94.

16       100.   For instance, during the Class Period, defendants ignored that:

17       (a)    Revenues reported for Cadent were badly missing the 20%-plus annual

18  growth rate that was guided at the time of acquisition, and defendants failed to consider this fact

19  when utilizing unreasonable future revenue growth rate assumptions in its 2011 impairment testing;

20       (b)    Cadent's international sales after 3Q11 had been reduced down to virtually

21  nothing due to a faltering relationship with Straumann along with an economic recession occurring

22  in Europe;

23       (c)    Gross margins reported for Cadent post-acquisition plummeted more than

24  33% compared to gross margins reported for Cadent pre-acquisition, from approximately 45% in

25  2009 and 2010 to an average of approximately 30% from 2Q11 to 3Q12, and defendants failed to

26

27    [17]  FASB SFAS No. 142, *Goodwill and Other Intangibles*, is the same goodwill accounting standard

28  that is referred to in this complaint under the new FASB codification as ASC 350.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO             - 40 -

1    adequately consider these results in its future profit projection assumptions for its 2011 impairment

2    testing; and

3              (d)      Competition in the intra-oral scanning market was significantly increasing

4    during the Class Period causing a reduction to Cadent's sales.  Further, 50% of Cadent's revenues

5    were in jeopardy of disappearing due to changing business strategies by competitors in the industry.

6    101.    Nonetheless, in order to avoid causing Align to miss earnings expectations or

7    acknowledge that Align had vastly overpaid for Cadent, defendants chose to ignore and conceal all

8    the above factors until the end of the Class Period, when they announced they were finally

9    performing an interim goodwill impairment test that could (and ultimately would) result in a

10   substantial impairment charge to the $77.3 million goodwill balance for its SCCS reporting unit.  In

11   fact, the Company recorded an initial goodwill impairment charge of $24.7 million in 3Q12 and later

12   increased the 3Q12 impairment charge another $11.9 million in 4Q12 bringing the total impairment

13   charge to $36.6 million.  This left a remaining goodwill balance of $40.7 million which was written

14   down to zero in 1Q13, less than two years from the time Cadent was acquired.

15   102.    Had the Company properly assessed Cadent's **_poor overall financial performance_**

16   **_and deterioration in its business environment_** on a timely basis and in compliance with GAAP, the

17   Company would have recorded a goodwill impairment charge of at least $28.3 million by the close

18   of 4Q11.

19   103.    Cadent also failed to conduct interim goodwill impairment tests for 1Q12 and 2Q12

20   as they were required under GAAP.

21   104.    Defendants ignored continued **_poor overall financial performance_** in actual revenue

22   and gross margin results for the first half of 2012 as compared to the revenue and gross margin

23   projections that were communicated to investors at the time of acquisition.  Further, defendants

24   ignored an **_increased competitive environment_** in the first half of 2012.  **_Both poor overall financial_**

25   **_performance and an increased competitive environment_** were triggering events under GAAP that

26   required an impairment test to be performed in 1Q12 and 2Q12.  *See* ¶94.

27   105.    If the Company had performed a goodwill impairment test in 1Q12, they would have

28   recorded an impairment charge of at least $28.2 million as of 1Q12.  And if the Company had

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                    - 41 -

1  performed a goodwill impairment test in 2Q12, they would have recorded an impairment charge of

2  at least $28.4 million as of 2Q12.

3          106.    If Align had recorded goodwill impairment charges of approximately $28.3 million in

4  4Q11, $28.2 million in 1Q12, or $28.4 million in 2Q12, the Company's reported net income and

5  diluted EPS would have dramatically decreased as follows:

| (In Thousands of $ Except EPS) | **4Q 2011** | **1Q 2012** | **2Q 2012** |
|---|---|---|---|
| Net Income as Reported | $20,449 | $20,984 | $28,492 |
| Diluted EPS as Reported | $0.25 | $0.26 | $0.34 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairment | ($28,300) | ($28,200) | ($28,400) |
| **Net Income Reflecting Goodwill Write-Off** | **($7,851)** | **($7,216)** | **$92** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($0.10)** | **($0.09)** | **$.001** |

**C.    Defendants' Failure to Timely Write-off Goodwill Associated with Cadent was Intentional or Deliberately Reckless**

        107.    Prior to the acquisition of Cadent in April 2011, Align had virtually no goodwill

recorded on its balance sheet.  The $187.6 million acquisition of Cadent was the first major purchase

of a company by Align and defendants were determined to show the market that it was a smart

business decision that would position Align as a major player to the intra-oral scanning market and

increase sales of the Company's legacy product, Invisalign.  In fact, defendants, when announcing

the acquisition on March 29, 2011, stated that Cadent's revenues were expected to grow in the 20%-

plus range annually.[18]  As a result of the acquisition of Cadent, Align recorded approximately $135.3

million in goodwill with $77 million allocated to its SCCS reporting unit and $58 million allocated

to its Clear Aligner reporting unit.

        108.    Though defendants attempted to spin the $187.6 million purchase price as "pretty

fair" and that it "range[d] into the midrange or even better" for comparable companies, Cadent had

---

[18]   Defendant Prescott in answering an analyst's question about his confidence in growing sales at least 20% annually stated, "We'd say on a CAGR [Compounded Annual Growth Rate] basis, we think that we ought to be able to grow *as fast as the market growth or better*.  I think the third-party data suggests that installed-based scanners are going to be growing 20%-plus.  I think that's a pretty good place to start for you."

1    more liabilities than tangible assets on its balance sheet at the time of acquisition and historically had

2    been an unprofitable company.  In fact, Cadent had generated only $37.9 million in revenues in

3    2010, had approximately $11.3 million in debt, and had a cumulative net loss of nearly $15 million

4    for 2009 and 2010.  Moreover, of the $187.6 million purchase price, 65% represented goodwill, 26%

5    represented intangible assets (other than goodwill), such as trademarks, existing technology and

6    customer relationships, and only 9% represented tangible and financial assets.[19]

7        109.    As alleged herein, defendants knew or deliberately disregarded that the historical

8    revenues reported by Cadent were inflated by the end of 2010 due to significant discounted pricing

9    of its scanners, apparently designed to make its total sales and revenues look more attractive to

10   possible acquirers.  Due to the significant discounts given to customers in 2010, Cadent's gross

11   margins for its scanner sales component had dropped nearly 23% from 44% in 2009 to only 34% in

12   2010.  As a result, defendants actually knew or deliberately disregarded that their representation that

13   Cadent's revenues would grow 20%-plus annually was without reasonable basis and was not

14   achievable because the Company's historical revenues had been inflated on heavy discounting to

15   improve their chances of being acquired.

### 1.    Align Used Unreasonable Assumptions in Its Goodwill Impairment Test at the End of 2011

18       110.    As prescribed by ASC 350-20, defendants were required in 4Q11 to conduct an

19   annual impairment test for the goodwill recorded as a result of the Cadent acquisition.  Based on

20   their testing, defendants maintained and reported that no impairment needed to be recorded for the

21   goodwill associated with either of its reporting units, SCCS and Clear Aligner.  The Company even

22   represented in its 2011 Form 10-K that, based on its testing, the fair values of each of its reporting

23   units "***were significantly in excess***" of their respective carrying values and hence asserted that no

24   impairment charge was required.

25       111.    However, the Company could not have used reasonable assumptions or the "best

26   estimates" for their impairment test regarding their SCCS reporting unit because Cadent's actual

27   _____

[19]   Intangible assets are assets (not including financial assets) that lack physical substance (the term intangible assets is used to refer to intangible assets other than goodwill).  ASC 350-20-20.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO                                                                     - 43 -

1   performance was in no respect a "significant" improvement over the metrics that defendants touted

2   when they announced the deal on March 29, 2011.  In fact, Cadent's financial performance measured

3   in revenues failed, in each successive quarter following the acquisition, to achieve the 20%-plus

4   growth rates and "cost improvement(s)" defendants had expected and promised.  As a result,

5   defendants could not have used reasonable future revenue and profit assumptions in its 2011

6   impairment test.

7       112.   For example, the chart below reflects Cadent's actual quarterly revenues reported for

8   2011 versus the significantly higher quarterly revenues that Align expected to report based on

9   Cadent achieving a 20%-plus projected annual growth rate.  As the chart shows, Cadent missed its

10  20% annual growth rate expectation in every quarter in 2011:



21      113.   Further, defendants knew or deliberately disregarded that Cadent's international sales

22  were almost nonexistent by the end of 2011 due to a faltering relationship with Straumann and an

23  increasing economic recession in Europe.  For example, Cadent's 4Q11 international sales were a

24  mere $362,000, a decline of over 85% from 3Q11 sales of $2.5 million.  The magnitude of this

25  precipitous decline was exacerbated by the fact that the fourth quarter was "typically the strongest

26  quarter for dentists and specialists to purchase capital equipment," and yet sales were almost

27  nonexistent.  Defendants failed to consider this steep drop-off in international sales, its ongoing

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                            - 44 -

problems with Straumann and the economic recession in Europe by utilizing unreasonable revenue growth rate assumptions in its 2011 goodwill impairment test.

114.    Another item defendants disregarded in reaching their conclusion of no impairment at the end of 2011 was the significant decline in Cadent's gross margin after Align acquired Cadent. Before the acquisition, for example, Cadent had historically reported robust gross margins in the 45%-50% range.  Defendants justified the deal, in part, by confirming their expectation to analysts that gross margins would continue to be near 50%.[20]  Defendants also stated that Align would have "*lots of opportunities to improve cost structure*" with Cadent.  However, there were no cost improvements, rather, there was a huge drop-off in gross margins reported for Cadent post-acquisition as compared to the gross margins reported for Cadent pre-acquisition.

115.    Cadent's actual results fell far short of their revenue and gross margin projections that were supposed to be met to justify the $187.6 million purchase price and the associated $135.3 million goodwill reported as an asset on Align's balance sheet.  As a result, defendants could not have used reasonable assumptions in their 2011 impairment test as part of their discounted cash flow analysis (*i.e.*, under the income approach) regarding the Company's future revenue growth rates and gross margin projections since Cadent's actual performance was significantly below the 20% sales growth and 50% gross margin projections defendants guided at the time of acquisition.  Given that the $187.6 million purchase price and the resulting $135.3 million of goodwill recorded were priced on an expectation that these two metrics would be achieved and even exceeded in order to avoid an impairment charge, it follows that severely missing these metrics should have resulted in a significant impairment charge at the end of 2011.  Plaintiff has conservatively calculated this impairment charge at $28.3 million under the income approach.

---

[20]    Defendant Arola, on the March 29, 2011 conference call discussing the Cadent acquisition, stated: "They have two different components of their business.  The service business has a higher margin, obviously, than the hardware part of their business in the scanner.  I would think the typical hardware margin's in the 50%-ish range.  ***Again, I think, there, we have lots of opportunities to improve cost structure*** with things that we can do over the longer term timeframe for the next several years from a cost-of-the-box perspective."

1

## 2.      Align's Improper Goodwill Accounting for 1Q12 and 2Q12

2    116.    The Company continued to improperly delay the recording of an impairment charge

3 for the $77.3 million of goodwill associated with its SCCS reporting unit by failing to conduct any

4 impairment test in 1Q12 or 2Q12.  In fact, Cadent's poor overall financial performance (including its

5 continuance of missing revenue and gross margin projections in the first half of 2012), deteriorating

6 relationship with Straumann that negatively impacted its international sales and the increased

7 competitive environment in the industry, were each independently and in the aggregate triggering

8 events that required defendants to conduct an interim goodwill impairment test in 1Q12 or 2Q12

9 under ASC 350-20-35-3C.  Impairment testing was required under GAAP on a quarterly basis if

10 events or circumstances changed to make it more likely than not that the fair value of a reporting unit

11 was below its carrying amount.  ASC 350-20-35-30.  Cadent's "***overall poor financial***

12 ***performance***" and the "***increased competitive environment***" in the first half of 2012 were the exact

13 events or circumstances (*i.e.*, triggering events) discussed under the goodwill accounting standard,

14 which required an interim impairment test be performed for 1Q12 and 2Q12.  ASC 350-20-35-3C.

15 But defendants chose to disregard this GAAP requirement.  Similar to the end of 2011, had

16 defendants completed a goodwill impairment test in 1Q12 or 2Q12 with neutral and verifiable

17 assumptions regarding Cadent's performance, in accordance with the financial accounting concepts

18 underlying GAAP, defendants would have been required to report a significant impairment charge at

19 each of those time periods.[21]

20    117.    Ultimately, at the end of the Class Period, the Company could no longer delay an

21 impairment charge.  The Company pre-announced disappointing 3Q12 earnings on October 17, 2012

---

22 [21]   "To be useful[,] financial information not only must represent relevant phenomena, but it also
23 must faithfully represent the phenomena that it purports to represent.  To be a perfectly faithful
representation, a depiction would have three characteristics.  It would be *complete, neutral,* and *free*
24 *from error. . . .* The Board's objective is to maximize those qualities to the extent possible." FASB
Statement of Concepts ("CON") No. 8, Qualitative Characteristic ("QC") 12.  "A neutral depiction is
25 without bias in the selection or presentation of financial information.  A neutral depiction is not
slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability
26 that financial information will be received favorably or unfavorably by users."  CON 8, QC 14.
"Verifiability helps assure users that information faithfully represents the economic phenomena it
27 purports to represent.  Verifiability means that different knowledgeable and independent observers
could reach consensus, although not necessarily complete agreement, that a particular depiction is a
28 faithful representation."  CON 8, QC 26.

1   and stated it was in the process of conducting step one of a goodwill impairment test for its SCCS

2   reporting unit.  According to Align, the events that triggered the need for an interim impairment test

3   in 3Q12 were the discontinuation of their relationship with Straumann and the decline in results of

4   operations of its SCCS reporting unit.

5         118.   However, as alleged herein, defendants knew or deliberately disregarded that well

6   before 3Q12 its relationship with Straumann was untenable, as international sales had been

7   hemorrhaging since 3Q11 – a year earlier, and Cadent never achieved the sales and margin

8   projections that defendants used to justify paying the $187.6 million purchase price and more

9   importantly, maintaining the reported $135.3 million goodwill balance.  In fact, the Company's

10  3Q12 Form 10-Q disclosed that the projections utilized in its goodwill impairment test were lowered

11  as compared to previous estimates *due to "overall lower than expected financial results"* for

12  Cadent.  However, the Company was missing its sales growth and profit projections for Cadent

13  throughout 2011 and that pattern continued in 2012 up until the time defendants recorded a goodwill

14  impairment charge in 3Q12.

15        119.   For example, the chart below extends out the time period from the chart seen at ¶112

16  to include Cadent's sales for the first three quarters of 2012.  This chart shows that Cadent's

17  quarterly revenues in 2012 never achieved the sales levels that should have been realized if Cadent

18  had been meeting the 20%-plus annual growth rate expectation that defendant Prescott represented

19  would be "a pretty good place to start" at the time of acquisition:



| | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 | Q1 2012 | Q2 2012 | Q3 2012 |
|---|---|---|---|---|---|---|---|
| Actual Quarterly Revenues for Cadent | $9,187 | $9,979 | $11,616 | $9,973 | $11,751 | $11,957 | $9,771 |
| Projected Quarterly Revenues Assuming a 20% (CAGR) Growth Rate | $10,743 | $11,541 | $12,398 | $13,319 | $13,738 | $14,170 | $14,616 |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                           - 47

120.    Also, the competitive landscape in 2012 in the intra-oral scanning market was increasing significantly with new product launches from competitors, which created another challenge regarding Cadent's financial performance.  For example, an analyst from Northcoast Research stated in a January 9, 2012 report that management knew there would be several new entrants into the intra-oral scanning market that were "*likely to offer superior products at considerably lower prices*" in 2012.  Further, a Morgan Stanley analyst report dated April 24, 2012 stated that three competitive launches over the next two quarters were expected to compete with Cadent in the intra-oral scanning market.  Finally, a July 19, 2012 William Blair analyst report noted that Sirona, a competitor of Cadent and the leading company in the intra-oral scanning market, was dominating sales in Germany and "making it harder for Cadent to gain traction there."  Defendants ignored the increased competitive environment in the first half of 2012, which required Align to conduct an interim goodwill impairment test in accordance with GAAP.

121.    In addition, Cadent's sales come from two distinct revenue streams: revenues from actual scanner sales and service revenues generated from those scanners including, scan fees, 3D digital modeling and lab services.  The split between the revenues generated by scanner sales versus service sales was about a 50/50 split during the Class Period.  However, the same Northcoast analyst report dated January 9, 2012 warned that the 50% of Cadent's revenues generated from its service side of the business were at significant risk of disappearing because the industry was moving to a newer model with "no per click or subscription fees."  The analyst noted:

> In particular, while sales of digital impression systems are increasing, the market is changing rapidly to a model with no per-click or subscription fees, which would eliminate about half of Cadent's revenues.  ALIGN described the Cadent opportunity as a revenue synergy story, but Cadent's current business model eliminates any return on investment for the dentist.  As a result, we believe significant portions of Cadent's revenue could be at risk.

Again, defendants ignored this change in the market for Cadent's service revenues, which was a triggering event under GAAP that requires an interim goodwill impairment test be performed.  *See* ¶94.

122.    The chart below supports the analyst's comment that a significant portion of Cadent's service revenues were at risk, as the service revenues were declining throughout 2012:

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                              - 48 -

1
2
3
4
5
6
7
8
9



10    123.    More importantly, defendants ignored that the growth rate of Cadent's service
11  revenues during 2012 was negative and badly missing the 20%-plus growth rate defendants had
12  represented would be achieved at the time of acquisition.

13    124.    As discussed herein, Cadent's disappointing overall financial performance, the
14  increasing competitive environment and the change in the market for its service revenues were all
15  triggering events that required Align to conduct an interim goodwill impairment test prior to 3Q12,
16  but defendants failed to do so.  *See* ¶94.  Had defendants done so, and utilized neutral and verifiable
17  assumptions, a significant impairment charge would have been recorded during the Class Period.

18    125.    Defendants' statement that a goodwill impairment triggering event first occurred in
19  3Q12 is simply untrue.  As detailed herein, the "results of operations of the Company's Scanner and
20  CAD/CAM Services reporting unit," which Align claims was among the factors that triggered "the
21  risk of impairment," had been materially below Align's assumptions ever since Align acquired
22  Cadent in April 2011.  Cadent's poor performance in 3Q12 was simply the continuation of a known
23  trend that had been ongoing for over a year.  *See* chart at ¶119.  Similarly, the discontinuation of
24  Align's distribution relationship with Straumann was simply a reflection of the poor and continually
25  declining market trends in sales for Cadent's scanners and in Align's relationship with Straumann.

26    126.    Indeed, Align's relationship with Straumann (inherited from Cadent) had been in peril
27  long before 3Q12.  While the initial agreement between Cadent and Straumann, announced in

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                    - 49 -

1  December 2009, was intended to increase exposure and sales of Cadent scanners in Europe,

2  European sales had been in steep decline since 2011 and showed no signs of improving.  Cadent's

3  subsequent agreement with Straumann in February 2011 to allow Straumann to distribute Cadent

4  scanners non-exclusively in the US was of little utility to Align, which was focused on training their

5  own sales teams to sell scanners domestically.  Moreover, Straumann had little motivation to sell

6  Cadent scanners.  Selling Cadent scanners represented a tiny fraction of Straumann's revenues and

7  was a drag on their margins.  Selling Cadent scanners was also incompatible with Straumann's stated

8  attempts to raise sales of its higher margin dental restorative services through support of multiple

9  intra-oral scanners.  Therefore, regardless of when the Straumann distribution agreement was

10 formally terminated, the relationship was not economically viable long before 3Q12.

11        127.    After the end of the Class Period, defendants finalized their goodwill impairment test

12 for 2012, which resulted in a total impairment charge of $36.6 million to the SCCS reporting unit

13 recorded in 3Q12 and 4Q12, respectively.  Defendants disclosed in their 2012 Form 10-K that an

14 impairment charge was recorded because the ***growth and profitability projections utilized in their***

15 ***goodwill impairment test were lowered*** from previous estimates due to lower-than-expected

16 financial results.  The "***growth and profitability projections***" are the same metrics (*i.e.*, revenues and

17 gross margins) that were unreasonably inflated in the 2011 impairment test in order to arrive at a

18 conclusion of no impairment.  Defendants should not have waited until the end of the Class Period to

19 lower their growth and profitability projections.  As Plaintiff has shown through a series of charts

20 and analysis, defendants were missing the sales and gross margin projections announced at the time

21 of the Cadent acquisition throughout 2011 and into 2012.  These projections needed to be achieved

22 or even exceeded in order to avoid an impairment charge at the end of 2011 or in the first half of

23 2012.  As a result, defendants failed to use reasonable revenue and gross margin projections in their

24 2011 annual goodwill impairment test and then improperly delayed the impairment by waiting until

25 3Q12 to perform an interim goodwill impairment test.

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                              - 50 -

### 3. Determining the Fair Value of SCCS Under the Market Approach

128.    As described in ¶95, testing for goodwill impairment is a two-step process.  The first step in the process is used to identify potential goodwill impairment and the second step is used to measure the amount of the impairment.  "The first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill."  ASC 350-20-35-4.  "The fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date."  ASC 350-20-35-22.  The second step of the goodwill impairment test compares the implied fair value of goodwill with the carrying amount of that goodwill.  ASC 350-20-35-9.  If the carrying amount of goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.  ASC 350-20-35-11.

129.    Defendants' improper use of assumptions is clearly evident with the market approach, using the guideline public company method of valuation.[22]  The FASB specifically refers to the usefulness of the market approach:

> In estimating the fair value of a reporting unit, a valuation technique based on multiples of earnings or revenue or a similar performance measure may be used if that technique is consistent with the objective of measuring fair value.  Use of multiples of earnings or revenue in determining the fair value of a reporting unit may be appropriate, for example, when the fair value of an entity that has comparable operations and economic characteristics is observable and the relevant multiples of the comparable entity are known.

ASC 350-20-35-24.  Because the market approach and the guideline public company method of valuation in particular primarily rely on assumptions that are observable and verifiable, as required by GAAP to the extent possible, the market approach also serves as a "sanity check" on other

---

[22]   "Guideline Public Company Method – a method within the market approach whereby market multiples are derived from market prices of stocks of companies that are engaged in the same or similar lines of business and that are actively traded on a free and open market."  Statement on Standards for Valuation Services, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*, Appendix B, "International Glossary of Business Valuation Terms" (American Institute of Certified Public Accountants, June 2007).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO

1   valuation techniques, such as the discounted cash flow method under the income approach, which

2   may use unobservable inputs and unverifiable assumptions.[23]

3        130.   The recognized valuation texts on valuing a privately held business enterprise, such as

4   the SCCS reporting unit, also highly recommend – and provide specific guidance on properly

5   applying – the market approach and the guideline public company method when valuing such a

6   business enterprise:

7            The use of comparable publicly held corporations as a guide to valuation, as a
             practical matter, may be the most important and appropriate technique for valuing a
8            privately held operating business.  Obviously finding a business exactly the same as
             the enterprise to be valued is an impossibility.  The standard sought is usually one of
9            reasonable and justifiable similarity.  This degree of likeness is attainable in most
             cases.[24]

10

11       131.   The first step in the guideline public company method is to identify a company or

12   companies that are most comparable to SCCS.  The publicly traded company that appears to have

13   product lines and characteristics most similar to SCCS is Sirona Dental Systems, Inc. ("Sirona").

14   Sirona manufactures dental equipment and operates in three segments: Dental CAD/CAM Systems,

15   Imaging Systems, and Treatment Centers and Instruments.  Sirona markets its products globally to

16   dental practices, clinics and laboratories through an international network of distributors.  Although

17   Sirona is a much larger and more profitable company than the SCCS reporting unit, with annual

18   revenues that were more than 20 times SCCS' annual revenues and with gross margins that were

19   greater than 52% during the relevant periods, whereas SCCS' gross margins were always less than

20   37%, comparing Sirona to SCCS should, if anything, result in bias toward overvaluing SCCS.

21       132.   The next step in the guideline public company method is to determine Sirona's

22   market value of "invested capital" as of September 30, 2011, March 31, 2012, and June 30, 2012 to

---

23   [23]   "In all cases, a reporting entity shall maximize the use of relevant **observable inputs** and
24   minimize the use of **unobservable inputs** to meet the objective of a fair value measurement . . . ."
     ASC  820-10-35-16AA.    "Verifiability means that different knowledgeable and independent
25   observers could reach consensus, although not necessarily complete agreement, that a particular
     depiction is a faithful representation."  CON 8, QC 26.

26   [24]   *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* by Shannon P. Pratt
27   with Alina V. Niculita, Fifth Edition (The McGraw-Hill Companies, Inc., 2008) (quoting Frank M.
     Burke, Jr., *Valuation and Valuation Planning for Closely Held Businesses* (Englewood Cliffs, NJ:
28   Prentice-Hall, Inc., 1981 at 49)).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                        - 52 -

correspond to the relevant periods in this case of 4Q11, 1Q12 and 2Q12, respectively.[25]  For each time period, plaintiffs have: (1) calculated Sirona's market value of equity or market capitalization by multiplying Sirona's closing stock price by the number of shares outstanding as of each date; (2) added the 12-month median "control premiums" of 35% applicable to 3Q11 or 4Q11, 38% applicable to 1Q12 and 40% applicable to 2Q12, based on the Mergerstat Control Premium Study 2012, to the market value of equity;[26] (3) adding all interest-bearing debt on Sirona's balance sheet; and (4) adding the market value of equity in steps (1) and (2) to the value of interest-bearing debt in (3) to obtain the market value of invested capital ("MVIC").

133.    For September 30, 2011, Sirona's market value of equity was $2,366,607,011 (*i.e.*, $42.41 per share x 55,803,042 shares).  Adding the 35% control premium results in a "control" value of equity of $3,194,919,465.  Adding the interest-bearing debt of $368,403,000 results in an ***MVIC of $3,563,322,465 as of September 30, 2011***.  For March 31, 2012, Sirona's market value of equity was $2,865,944,991 (*i.e.*, $51.54 per share x 55,606,228 shares).  Adding the 38% control premium results in a "control" value of equity of $3,955,004,088.  Adding the interest-bearing debt of $77,562,000 results in an ***MVIC of $4,032,566,088 as of March 31, 2012***.  For June 30, 2012, Sirona's market value of equity was $2,479,548,643 (*i.e.*, $45.01 per share x 55,088,839 shares). Adding the 40% control premium results in a "control" value of equity of $3,471,368,100. Adding the interest-bearing debt of $79,017,000 results in an ***MVIC of $3,550,385,100 as of June 30, 2012***.

134.    The next to final step in the guideline public company method is to determine the appropriate multiples that should be applied to SCCS.  In this case, plaintiffs are limited to using

---

[25] "Invested Capital – the sum of equity and debt in a business enterprise.  Debt is typically *(a)* all interest-bearing debt or *(b)* long-term interest-bearing debt.  When the term is used, it should be supplemented by a specific definition in the given valuation context."  Standards for Valuation Services, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset, op. cit.*

[26] "Control Premium – an amount or a percentage by which the *pro rata* value of a controlling interest exceeds the *pro rata* value of a non-controlling interest in a business enterprise to reflect the power of control."  *Ibid.*  Adding control premiums of these magnitudes, if anything, results in a bias toward overvaluing SCCS.  This is so because the premiums that are paid to acquire publicly traded companies include not just a "control" premium but also an "acquisition premium" based on the synergies specific to each underlying transaction that forms the basis for the Mergerstat Control Premium Data.  Those premiums are specific to the facts and circumstances of each acquisition, and they would not necessarily apply to a prospective buyer of SCCS.

1  revenue multiples because they are the best available data.  However, as discussed earlier, revenues

2  multiples, if anything, yield a bias toward overvaluation of SCCS because Sirona's annual revenues

3  were larger than those of SCCS; and Sirona's gross margins were substantially more robust than

4  those of SCCS.  **As of September 30, 2011, Sirona's revenue multiple was 3.8992** (*i.e.*, MVIC of

5  $3,563,322,465 ÷ 12 months of revenue as of 9/30/2011 of $913,866,000).  **As of March 31, 2012,**

6  **Sirona's revenue multiple was 4.2294** (*i.e.*, MVIC of $4,032,566,088 ÷ 12 months of revenue as of

7  3/31/2012 of $953,463,000).  **As of June 30, 2012, Sirona's revenue multiple was 3.7342** (*i.e.*,

8  MVIC of $3,550,385,100 ÷ 12 months of revenue as of 6/30/2012 of $950,784,000).

9       135.    As part of the last step of the guideline public company method, SCCS' revenues for

10  the 12 months for each period are multiplied by the corresponding revenue multiple calculated above

11  to produce initial indications of value for each period.  However, there is another part of the final

12  step that must be considered to determine appropriate valuations of SCCS as of each relevant time

13  period.  Just as there was a control premium adjustment that increased SCCS' value, there is another

14  adjustment that must be deducted in this case, called a "discount for lack of marketability" (referred

15  to as "DLOM").[27]  The most widely used studies for the DLOM are studies of discounts on sales of

16  restricted shares of publicly traded companies and discounts on sales of closely held shares relative

17  to the subsequent initial public offering price per share.  Both groups of studies are based on a body

18  of research that consistently indicated a general DLOM range of 20%-60% to reflect a minority

19  interest's lack of marketability.[28]  However, DLOMs also apply to controlling interests, as well as

20  minority interests, although generally at a significantly lower discount level than indicated by that

21  range.  Consequently, plaintiff applies a very moderate DLOM of only 10%.

22       136.    For September 30, 2011, the initial valuation indication for SCCS was $158,911,896

23  (*i.e.*, FY11 revenues for SCCS of $40,755,000 x 3.8992 revenue multiple); and after deducting the

---

[27]   "Discount for Lack of Marketability – an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability."  *Ibid.*  The idea behind the DLOM is that a discount exists between the value of a company's stock that is and is not marketable.

[28]   Ronald D. DiMattia, CPA, ABV, CMA, "Controlling Interests – Discount for Lack of Marketability: The Empirical Evidence," CPA Expert (American Institute of Certified Public Accountants, Summer 2008).

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                              - 54 -

10% DLOM, *the fair value of SCCS was approximately $143.0 million as of 4Q11*. For March 31, 2012, the initial valuation indication for SCCS was $183,010,367 (*i.e.*, 12 months' revenues for SCCS as of 3/31/2012 of $43,271,000 x 4.2294 revenue multiple); and after deducting the 10% DLOM, *the fair value of SCCS was approximately $164.7 million as of 1Q12*. And for June 30, 2012, the initial valuation indication for SCCS was $168,968,816 (*i.e.*, 12 months' revenues for SCCS as of 6/30/2012 of $45,249,000 x 3.7342 revenue multiple); and after deducting the 10% DLOM, *the fair value of SCCS was approximately $152.1 million as of 2Q12*.

137.    In each valuation calculation described above, the data and assumptions are observable to the extent possible, verifiable and reasonable, based upon GAAP, recognized valuation practices for the guideline public company market method and valuation case law. Given that Sirona has much greater annual revenues and substantially more robust gross margins, these valuation calculations are, if anything, biased toward overvaluations of SCCS for each period.

138.    Nonetheless, even with this bias, giving defendants all benefit of the doubt, the results amply demonstrate for each time period that SCCS was valued much less than the original $187.6 million that Align paid to acquire Cadent:

(a)    *As of 4Q11, SCCS was valued approximately $44.6 million less (i.e., $187.6 million purchase price – $143.0 million estimated fair value);*

(b)    *As of 1Q12, SCCS was valued approximately $22.9 million less (i.e., $187.6 million purchase price – $164.7 million estimated fair value); and*

(c)    *As of 2Q12, SCCS was valued approximately $35.5 million less (i.e., $187.6 million purchase price – $152.1 million estimated fair value).*[29]

139.    The implied declines in the fair values of SCCS of $44.7 million as of 4Q11, $22.9 million as of 1Q12 and $35.5 million as of 2Q12 are also reasonable proxies for the goodwill impairment charges under step two of the goodwill impairment test for those respective time periods.

---

[29]    Even if the DLOM were omitted and the above valuations assumed that no costs or expenses would be incurred to bring about the prospective sale of the SCCS reporting unit, the valuations would still be substantially less than the $187.6 million purchase price, and the Company would have failed the goodwill impairment test at each time period.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                                      - 55 -

### 4. Determining the Fair Value of SCCS Under an Income Approach

140.     Another reasonable indicator of the fair value of the SCCS reporting unit as of the end of 4Q11 would be to first determine the implied forward multiple of expected revenues that Align paid to acquire Cadent and then to apply that multiple to Cadent's actual revenues as of 4Q11. This valuation calculation is, in effect, a partial discounted cash flow ("DCF") valuation under the income approach, expressed as a multiple.[30]   This valuation employs the Company's own growth rate assumption at the time that the Company acquired Cadent.

141.     To determine the implied multiple of expected revenues that Align paid to acquire Cadent, the $187.6 million purchase price is divided by the total revenues that Align expected Cadent to generate by the end of 2011. Align's management indicated on the March 29, 2011 conference call that Cadent had approximately $40 million in annual revenue in 2010. When defendants announced the acquisition, defendants indicated that Cadent's revenues were expected to grow in the 20%-plus annual range. Defendant Prescott stated, in pertinent part, that "on a CAGR [Compounded Annual Growth Rate] basis. . . the third-party data suggests that installed-based scanners are going to be growing 20%-plus." *See* ¶107 n.18. Consequently, Align expected that Cadent would generate revenue of at least $48 million by the end of 4Q11 (*i.e.*, $40 million annual revenue in 2010 + 20% of $40 million = $48 million expected revenue in 2011). Thus, Align effectively paid a forward revenue multiple of 3.9084 times Cadent's $48 million expected revenue in 2011 (*i.e.*, $187.6 million purchase price ÷ $48 million expected revenue in 2011 = 3.9084).

142.     But Cadent did not earn anywhere near $48 million revenue in 2011, let alone 20%-*plus* growth. Cadent, in fact, only earned $40.755 million revenue in 2011, a substantial shortfall from the revenue that Align expected to earn from Cadent. If Cadent were a publicly-traded company, had given guidance in early 2011 that the company projected revenues to be $48 million, and then ultimately reported that revenues missed that target by nearly $7.3 million, the market would have severely discounted Cadent's stock price. Consequently, a reasonable indication of the

---

[30]   "Effectively a forward-priced multiple is a partial DCF valuation expressed as a multiple." *Valuation Multiples: A Primer*, UBS Warburg Global Equity Research, Issue 1, November 2001 at 11.

1  fair value of SCCS as of 4Q11 was $159.3 million (*i.e.*, $40.755 million actual revenue in 2011 ×

2  3.9084 multiple of expected 2011 revenue = $159.3 million).  The fair value of SCCS, in effect,

3  declined at least $28.3 million from $187.6 million at acquisition to $159.3 million by the end of

4  4Q11, a 15% drop in value.

5       143.  Similarly, even if the Company had delayed goodwill impairment testing until 1Q12,

6  when revenue for SCCS improved from the prior quarter, the fair value of SCCS declined by at least

7  $28.2 million.  And if the Company had instead delayed goodwill impairment testing until 2Q12, the

8  fair value of SCCS declined by at least $28.4 million.[31]

9       144.  The implied declines in the fair values of SCCS of $28.3 million as of 4Q11, $28.2

10  million as of 1Q12, or $28.4 million as of 2Q12, are also reasonable proxies for the goodwill

11  impairment charges under step two of the goodwill impairment test for those respective time periods.

12  Step two would only indicate less goodwill impairment than step one results if the fair value of net

13  assets other than goodwill declined from the acquisition date to any of the three goodwill impairment

14  measurement dates.  But there could not have been any material decline in the fair value of net assets

15  other than goodwill during those time periods.  Indeed, defendants represented that amortizable

16  intangible assets – which comprise most of SCCS's net assets other than goodwill – were ***not***

17  impaired at 4Q11, 1Q12, and 2Q12.  Therefore, the amount of goodwill that Align should have

18  written-down as of 4Q11, 1Q12, or, at the latest, 2Q12, would not have been reduced because there

19  would have been no offsetting decrease in the fair value of Cadent's net assets.  Moreover, the

20  estimated goodwill impairments of $28.3 million at 4Q11, $28.2 million at 1Q12, or $28.4 million at

21  2Q12, are conservative measurements because this forward revenue multiple valuation method does

22  not take into account that Cadent's gross margin plunged from about 45% in 2010 to an average of

23  approximately 30% from 2Q11 to 2Q12, which also adversely affected Cadent's value.

24       145.  Under this approach, Align was required under GAAP to record a goodwill

25  impairment charge of at least $28.3 million after the close of 4Q11, $28.2 million after the close of

26  1Q12, or at the very latest, $28.4 million after the close of 2Q12 because the carrying amount of

27   

---

[31]  The negative financial impact to net income and EPS, had an impairment charge been recorded
in 4Q11, 1Q12 or 2Q12, can be seen at ¶106.

28   

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO

1   goodwill exceeded its implied fair values on those respective time periods.  "Impairment is the

2   condition that exists when the carrying amount of goodwill exceeds its implied fair value."  ASC

3   350-20-35-2.  But the defendants did not comply with GAAP, and defendants' representations

4   regarding the financial information that Align reported were false and misleading.

5   **X.    LOSS CAUSATION/ECONOMIC LOSS**

6   146.    During the Class Period, as detailed herein, defendants made false and misleading

7   statements regarding the Company's current and future financial condition, its quarterly and year-

8   end financial statements, and engaged in a scheme which deceive investors regarding the same. The

9   false and misleading statements alleged herein fraudulently set investors' expectations and caused

10  Align's stock to trade at artificially inflated prices.  Later, when defendants' misrepresentations and

11  fraudulent conduct became known to the market, Align's stock price declined, as the prior artificial

12  inflation came out of the stock price. As a result of their purchases of Align's common stock during

13  the Class Period and defendants' conduct alleged herein, Plaintiff and other members of the Class

14  suffered economic loss, *i.e.*, damages, under the federal securities laws.

15  147.    Specifically, as alleged herein, the Company materially misstated its financial results

16  for each of the reporting periods alleged herein.  In addition to the false financial statements, the

17  Individual Defendants and Align misrepresented the overall financial condition of the Company's

18  business by falsely and repeatedly misrepresenting the true facts concerning the Company's key

19  Cadent acquisition and the goodwill associated with certain of its business units, particularly, its

20  scanner business.  This known conduct or reckless disregard of the material overstatement of

21  goodwill, income and earnings masked the true financial condition of the Company as set forth in

22  detail herein and caused the financial statements to be materially false and misleading.

23  148.    For example, on January 30, 2012, the Company initially announced false 4Q11 and

24  FY11 financial results, which materially misstated the value of goodwill associated with the Cadent

25  acquisition and overstated Align's earnings and income.  The Company simultaneously set false

26  investor expectations based in part on those false financial results and related business condition and

27  prospects of Cadent.  The 4Q11 and FY11 false financial results were repeated in the Form 10-K

28  filed with the SEC on February 29, 2012, which included additional false statements concerning the

1     adequacy, thoroughness and results of the Company's purported goodwill impairment testing and

2     conclusions.

3        149.     On April 23, 2012, Align announced false, materially overstated 1Q12 EPS and net

4     income while failing to take the required goodwill write-down for known goodwill impairment in its

5     Cadent scanner unit.

6        150.     Similarly, on July 19, 2012, Align announced false, materially overstated 2Q12 EPS

7     and net income, again failing to take the required goodwill write-down for Cadent.

8        151.     These material misrepresentations and omissions caused Align stock to trade at

9     artificially inflated prices during the Class Period, which reached a Class Period high of $39.82 on

10     September 13, 2012.

11        152.     The artificial inflation in Align's stock price began to be removed following the

12     Company's October 17, 2012 announcement of its 3Q12 financial report, which revealed the truth –

13     which their previous misstated financial statement had concealed – that a substantial portion of the

14     goodwill associated with the Cadent acquisition was impaired and that growth in the Cadent scanner

15     division would be materially lower than previously represented. This October 17, 2012

16     announcement and disclosure substantially caused Align's stock price decline of over 20% on

17     October 18, 2012, which closed at $28.18, down from a close of $35.41 on October 17, 2012. On

18     October 18, 2012, Align stock experienced massive trading volume of more than 20 million shares

19     traded in one day. Twenty million shares in volume trading was the highest trading volume the

20     Company experienced since 2006.

21    **XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

22

23        153.     Plaintiff's claims for securities fraud are asserted under the fraud-on-the-market

24     theory of reliance. The market price of Align securities, including common stock, regularly traded

25     on the NASDAQ, was artificially inflated by the false and misleading statements complained of

26     herein, including Align's numerous false financial statements. Defendants' false statements inflated

27     the price of Align securities during the Class Period, including by maintaining the price of those

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-06039-WHO        - 59 -

1  securities at a level they would not have traded at, had the true financial condition and other matters

2  concealed from investors been revealed at an earlier date, as alleged herein.

3      154.  At all relevant times, the market for Align's common stock was an efficient market

4  for the following reasons, among others:

5      (a)  Align's stock met the requirements for listing, and was listed and actively

6  traded on the NASDAQ, a highly efficient and automated market;

7      (b)  As a regulated issuer, Align filed periodic public Reports with the SEC and

8  the NASDAQ;

9      (c)  Align regularly communicated with public investors via established market

10  communication mechanisms, including through regular disseminations of press releases on the

11  national circuits of major newswire services, publications on its website and other Internet sites, and

12  through other wide-ranging public disclosures, such as through conference calls, communications

13  with the financial press and other similar reporting services;

14      (d)  During the Class Period, Align was followed by securities analysts employed

15  by major brokerage firms, including Jefferies, Credit Suisse, William Blair, ROTH Capital Partners,

16  Morgan Stanley, ThinkEquity, SunTrust, Sidoti & Company, JMP Securities and RAM Partners.

17  Analysts covering Align wrote reports based upon the publicly available information disseminated

18  by defendants about Align.  These reports were distributed to the sales force and certain customers of

19  their respective brokerage firms; and

20      (e)  Through the foregoing mechanisms, the information publicly disseminated by

21  defendants about Align and its operations, and the import thereof, became widely available to and

22  was acted upon by investors in the marketplace such that, as a result of their transactions in Align

23  stock, the information disseminated by defendants, including the false and misleading statements

24  described above, became incorporated into and were reflected by the market price of Align's

25  publicly-traded securities.

26      155.  As a result of the foregoing, the market for Align's common stock promptly digested

27  current information regarding Align from all publicly available sources, and reflected such

28  information in Align's stock price.  Under these circumstances, all purchasers of Align's common

1   stock during the Class Period suffered similar injury through their purchase of Align's common

2   stock at artificially inflated prices and its subsequent decline in value, and a presumption of reliance

3   applies.

4   **XII.   CLASS ACTION ALLEGATIONS**

5       156.   Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the

6   Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the

7   common stock of Align during the Class Period, and who were damaged thereby (the "Class").

8   Excluded from the Class are defendants and their families, the officers and directors of the

9   Company, at all relevant times, members of their immediate families and their legal representatives,

10  heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

11      157.   The members of the Class are so numerous that joinder of all members is

12  impracticable.   Throughout the Class Period, Align common stock was actively traded on the

13  NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

14  only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

15  thousands of members in the proposed Class.  Record owners and other members of the Class may

16  be identified from records maintained by Align or its transfer agent and may be notified of the

17  pendency of this action by mail, using the form of notice similar to that customarily used in

18  securities class actions.

19      158.   Plaintiff's claims are typical of the claims of the members of the Class as all members

20  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law

21  complained of herein.

22      159.   Plaintiff will fairly and adequately protect the interests of the members of the Class

23  and has retained counsel competent and experienced in class action and securities litigation.

24      160.   Common questions of law and fact exist as to all members of the Class and

25  predominate over any questions solely affecting individual members of the Class.  Among the

26  questions of law and fact common to the Class are:

27          (a)     whether the federal securities laws were violated by defendants' acts as

28  alleged herein;

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                        - 61 -

1     (b)     whether statements made by defendants to the investing public during the

2   Class Period misrepresented material facts about the business and operations of Align;

3     (c)     whether the price of Align common stock was artificially inflated during the

4   Class Period; and

5     (d)     to what extent the members of the Class have sustained damages and the

6   proper measure of damages.

7     161.   A class action is superior to all other available methods for the fair and efficient

8   adjudication of this controversy since joinder of all members of the Class is impracticable.

9   Furthermore, as the damages suffered by individual Class members may be relatively small, the

10  expense and burden of individual litigation make it impossible for members of the Class to

11  individually redress the wrongs done to them.  There will be no difficulty in the management of this

12  action as a class action.

13  **XIII.  NO SAFE HARBOR**

14     162.   The statutory safe harbor provided for forward-looking statements under certain

15  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

16  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

17  when made.

18                               **COUNT I**

19                **Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
                    **Promulgated Thereunder Against All Defendants**
20

21     163.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

22  forth herein.

23     164.   During the Class Period, defendants disseminated or approved the materially false

24  and misleading statements specified above, which they knew or deliberately disregarded were

25  misleading in that they contained misrepresentations and failed to disclose material facts necessary

26  in order to make the statements made, in light of the circumstances under which they were made, not

27  misleading.  In addition, defendants Prescott and Arola, while in possession of material non-public

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                           - 62

1  information about the Company's true financial and business conditions, sold millions of dollars

2  worth of Align stock at artificially inflated prices.

3      165.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue

4  statements of material fact and/or omitted to state material facts necessary to make the statements

5  made not misleading; and (c) engaged in acts, practices and a course of business that operated as a

6  fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

7      166.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

8  the market, they paid artificially inflated prices for Align common stock.  Plaintiff and the Class

9  would not have purchased Align common stock at the prices they paid, or at all, if they had been

10  aware that the market prices had been artificially and falsely inflated by defendants' misleading

11  statements.

12      167.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

13  other members of the Class suffered damages in connection with their purchases of Align common

14  stock during the Class Period.

15  **COUNT II**

16  **Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

17  
18      168.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

19  forth herein.

20      169.    The Individual Defendants acted as control persons of Align within the meaning of

21  §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or

22  directors of Align, their ownership of Align stock, and their statements made on behalf of the

23  Company, the Individual Defendants had the power and authority to cause Align and its officers and

24  employees to engage in the wrongful conduct complained of herein.  Align controlled the Individual

25  Defendants and the Company's other officers and employees.  By reason of such conduct,

26  defendants are liable pursuant to §20(a) of the Exchange Act.

27

28

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:12-cv-06039-WHO                                                                    - 63 -

1
                                          **PRAYER FOR RELIEF**

2
       WHEREFORE, Plaintiff prays for relief and judgment, as follows:

3
       A.      Determining that this action is a proper class action and certifying Plaintiff as a Class

4
representative under Rule 23 of the Federal Rules of Civil Procedure;

5
       B.      Awarding compensatory damages in favor of Plaintiff and the other Class members

6
against all defendants, jointly and severally, for all damages sustained as a result of defendants'

7
wrongdoing, in an amount to be proven at trial, including interest thereon;

8
       C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

9
action, including counsel fees and expert fees; and

10
       D.      Such other and further relief as the Court may deem just and proper.

11
                                            **JURY DEMAND**

12
       Plaintiff hereby demands a trial by jury.

13
DATED: January 8, 2014                   ROBBINS GELLER RUDMAN
                                                    & DOWD LLP

14
                                            SHAWN A. WILLIAMS
                                            CHRISTOPHER M. WOOD

15
                                            SUNNY S. SARKIS

16

17
                                             s/ Christopher M. Wood
                                        CHRISTOPHER M. WOOD

18

19
                                           Post Montgomery Center
                                           One Montgomery Street, Suite 1800

20
                                           San Francisco, CA  94104
                                         Telephone:  415/288-4545
                                         415/288-4534 (fax)

21

22
                                           Lead Counsel for Plaintiff

23
                                         VANOVERBEKE MICHAUD &
                                            TIMMONY, P.C.

24
                                         THOMAS C. MICHAUD
                                         79 Alfred Street

25
                                         Detroit, MI  48201
                                         Telephone:  313/578-1200
                                         313/578-1201 (fax)

26

27
                                           Additional Attorneys for Plaintiff

28

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on January 8, 2014, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

     I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on January 8, 2014.

9

                                    <u>s/ Christopher M. Wood</u>

10

                                    CHRISTOPHER M. WOOD

11

                                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP

12

                                    Post Montgomery Center
                                    One Montgomery Street, Suite 1800

13

                                    San Francisco, CA  94104
                                    Telephone:  415/288-4545

14

                                    415/288-4534 (fax)
                                    E-mail: cwood@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case  3:12-cv-06039-WHO City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas John Clark**
  dclark@wsgr.com

- **Caz Hashemi**
  CHASHEMI@WSGR.COM,tbell@wsgr.com,vmendoza@wsgr.com

- **Kelley Moohr Kinney**
  kkinney@wsgr.com,tbell@wsgr.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Nicholas R Miller**
  nmiller@wsgr.com,rlustan@wsgr.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Sunny September Sarkis**
  Ssarkis@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Christopher Martin Wood**
  cwood@rgrdlaw.com,tcraig@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)