1

2

3                          UNITED STATES DISTRICT COURT

4                        NORTHERN DISTRICT OF CALIFORNIA

5                                SAN JOSE DIVISION

6

7   CITY OF DEARBORN HEIGHTS ACT 345          Case No.  12-cv-06039-BLF
    POLICE & FIRE RETIREMENT SYSTEM,

8                Plaintiff,

9         v.                                  ORDER GRANTING MOTION TO
                                              DISMISS SECOND AMENDED
10  ALIGN TECHNOLOGY, INC., et al.,           COMPLAINT

11               Defendants.                  [Re:  ECF No. 46]

12

13        This is a securities fraud putative class action lawsuit based on a stock issuer's alleged

14  failure to take a timely impairment charge to goodwill.  Plaintiff City of Dearborn Heights Act 345

15  Police & Fire Retirement System ("Plaintiff") asserts two claims against Align Technology, Inc.

16  ("Align"), Align's Chief Executive Officer Thomas M. Prescott, and Align's Chief Financial

17  Officer Kenneth B. Arola (collectively, "Defendants"): (1) that Defendants violated § 10(b) of the

18  Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5,

19  promulgated pursuant to § 10(b); and (2) that Defendants are liable under § 20(a) of the Securities

20  Exchange Act, 15 U.S.C. § 78t(a), as "controlling persons."  Plaintiff brings these claims on behalf

21  of itself and all other purchasers of Align's common stock between January 31, 2012 and October

22  17, 2012 ("Class Period").

23        Before the Court is Defendants' Motion to Dismiss Second Amended Complaint.  (Def.'s

24  Mot., ECF 46)  The present motion, and Plaintiff's Second Amended Complaint ("SAC"), (ECF

25  43), come in the wake of the Court's December 9, 2013 order dismissing Plaintiff's First

26  Amended Complaint ("FAC") for failure to plead both falsity and scienter with sufficient

27  specificity.  (Order on Mot. to Dismiss, ECF 42)  The Court's prior order of dismissal identified

28  specific deficiencies in Plaintiff's factual allegations that did not satisfy the exacting requirements

of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Defendants in the present

motion contend that Plaintiff's SAC fails to remedy those deficiencies.  (*See* Def.'s Mot.)  On

April 17, 2014, the case was reassigned to the undersigned, and on June 12, 2014, this Court heard

oral argument on the motion, after which it deemed the matter submitted.  This Court has

considered and concurs in the reasoning and conclusions reached in the prior order of dismissal.

Based on the parties' respective written submissions and the oral argument of counsel, for the

reasons stated below, the Court GRANTS Defendants' Motion to Dismiss Second Amended

Complaint without leave to amend.

## I.   BACKGROUND

### A.   Factual Allegations

Align designs, manufactures, and markets Invisalign, "a proprietary method for treating . . .

the misalignment of teeth, using a series of clear, removable orthodontic aligners."  (SAC ¶ 2)

Defendant Prescott is and was at all relevant times the President and CEO of Align, as well as a

member of Align's Board of Directors.  (*Id.* ¶ 23)  Defendant Arola was Align's CFO and Vice

President of Finance during the relevant time period, though he resigned from that position after

the Class Period.  (*Id.* ¶ 24)  Lead Plaintiff, a public pension fund, purchased Align stock during

the Class Period at allegedly inflated prices.  (*Id.* ¶ 21)  The relevant events began before the Class

Period with an allegedly troubled acquisition.

#### i.   Align's Acquisition of Cadent Holdings, Inc. and Goodwill Valuation

On April 29, 2011, Align acquired Cadent Holdings, Inc. ("Cadent"), "a provider of 3D

digital scanning solutions for orthodontics and dentistry," for $187.6 million in cash.  (*Id.* ¶¶ 2-3)

Of that purchase price, $135.3 million was considered "goodwill," the amount of purchase price

exceeding the fair value of the net assets of the acquired company.[1]  (*Id.* ¶ 5)  Align allocated this

---

[1] "Goodwill," as will be discussed in greater depth below, is an intangible asset that arises when the purchase price paid by an acquiring company exceeds the value of the purchased assets and liabilities.  The Financial Accounting Standards Board ("FASB"), an independent organization tasked with updating Generally Accepted Accounting Principles ("GAAP"), defines goodwill as "an asset representing the *future* economic benefits arising from other assets acquired in a business combination . . . that are not individually identified or separately recognized."  (Def.'s Request for Judicial Notice "RJN," Exh. 5, at "Glossary" (emphasis added), ECF 46-4; *see also* SAC ¶ 92)

United States District Court
Northern District of California

goodwill from the Cadent acquisition among two reporting units, with $58.4 million allocated to Align's "Clear Aligner" unit and $76.9 million allocated to the acquired computer-aided design and manufacturing ("CAD/CAM") and scanner unit (together with CAD/CAM, the "SCCS" unit).[2]  (*Id.* ¶ 45)

Plaintiff alleges that Cadent's acquisition price—and, by extension, the goodwill valuation—was artificially inflated.  According to former Cadent employees cited as confidential sources, Cadent offered "substantial and unprecedented discounts" to its customers in the fourth quarter of 2010 ("4Q10") to drive up scanner sales by 147% and to make itself more appealing to potential buyers.  (*Id.* ¶¶ 6-7, 59)  Defendants were allegedly aware of Cadent's inflated 2010 revenues through due diligence and access to Cadent's internal financial reports and company documents.  (*Id.* ¶¶ 6, 59(e))  Further, Defendants delayed completing Align's acquisition of Cadent, allegedly due to Align's desire that Cadent "become SOX and GAAP-compliant."  (*Id.* ¶ 59(d); *see also id.* ¶ 35)  Nevertheless, the deal proceeded, with Align announcing the acquisition on March 29, 2011 and subsequently completing it one month later.  During an investor call on March 29, 2011, Prescott and Arola explained the acquisition and valuation by highlighting the complementary nature of the two companies and claiming that the acquisition would "result in new growth opportunities, revenue synergies, increasing strategic leverage, and cost improvements."  (*Id.* ¶ 39)  Industry analysts were skeptical of Align's valuation of Cadent, with at least one analyst opining that Align had "overpaid" for the company.  (*Id.* ¶¶ 40-41)

### ii.  Post-Acquisition Financial Results

Cadent's inflated 2010 revenues allegedly formed the basis for Align's future growth projections and goodwill assumptions.  (*Id.* ¶ 39)  Align projected that the "combination of the two companies would drive a growth rate for intra-oral scanners exceeding 20% between 2010 and 2015."  (*Id.* ¶¶ 5, 8, 38-39)  However, although the SCCS unit made sequential gains in some quarters, the unit consistently failed to meet the projected revenue growth in each post-acquisition

---

[2] The Clear Aligner unit's goodwill remained intact through the Class Period, and this case does not involve the Clear Aligner unit.  (Def.'s RJN Exh. 3, at 72)

quarter.[3]  (*Id.* ¶¶ 9, 70, 79, 111, 119)  Specifically, 4Q11 revenue from the SCCS unit fell significantly compared to 3Q11 due to a significant loss in European revenue.  (*Id.* ¶ 119)

Pursuant to Generally Accepted Accounting Principles ("GAAP"), companies must conduct an annual test of their goodwill to determine if any amount is impaired (*i.e.*, that the implied fair value of the goodwill is less than its carrying amount) and to measure the amount of the impairment loss to be recognized (if any).  (*See* Def.'s Request for Judicial Notice ("RJN") Exh. 2 (ASC 350-20-35), ECF 46-4)  A company may also need to conduct interim goodwill impairment analysis on a more frequent basis if, after a qualitative assessment of all relevant events and circumstances, the company determines that it is "more likely than not" that the fair value of the reporting unit is less than its carrying amount.[4]  (*Id.* (ASC 350-20-35-3A, 3C); *see also* SAC ¶¶ 93-94)

In 4Q11, Align conducted its annual goodwill impairment testing and concluded that there was no impairment to goodwill.  Specifically, in its annual SEC filing, Align stated that the fair value of its reporting units was "significantly in excess of carrying value" and that "there were no facts and circumstances that indicated that the fair value of the reporting units may be less than their current carrying amount."  (*Id.* ¶¶ 50, 63)  This valuation carried into 1Q12 and 2Q12, during which the SCCS unit's overall revenue improved sequentially over 4Q11, but the SCCS unit's international sales dropped to an all-time low.  (*Id.* ¶¶ 70, 79, 119)  In neither quarter did the SCCS unit ever attain the revenue growth or gross margins that Defendants had allegedly projected at the time of acquisition.  (*Id.*)  In spite of the underwhelming financial results and, as discussed below, other developments in the industry and in Align's business, Align did not conduct interim goodwill impairment analysis, nor did it take any interim goodwill impairments in

---

[3] The SAC refers to Cadent and the SCCS unit interchangeably.  For the sake of clarity, the Court uses the "SCCS unit" to denote post-acquisition activity—references in the SAC to "Cadent" after acquisition are assumed to refer to the SCCS unit.

[4] Relevant events that may trigger the need for interim impairment testing include, *inter alia*, "[i]ndustry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, . . . [or] a change in the market for an entity's products or services" and "[o]verall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods."  (SAC ¶ 94; *see also* Def.'s RJN Exh. 2 (ASC 350-20-35-3C))

1Q12 or 2Q12.  (*Id.* ¶¶ 69-73, 81-82, 77-79)  By failing to conduct interim impairment analysis or take a goodwill impairment charge in this time, Align allegedly kept its assets and stock price artificially inflated during the Class Period.

### iii.  Other Post-Acquisition Developments

Plaintiff alleges that before and during the Class Period, new and unanticipated competition entered the market for intra-oral scanners.  (*Id.* ¶ 52)  For example, competitor Sirona unveiled new software in March 2011 with new features and fee structures that allegedly distinguished it from Cadent's iTero system.  (*Id.* ¶ 55)  In January 2012, an analyst report indicated that "there will be several new entrants into this market that are likely to offer superior products at considerably lower prices."  (*Id.* ¶¶ 57, 120)  Other analysts' reports in April and July 2012 likewise heralded the entry of new competition into the market.  (*Id.* ¶ 120)  Moreover, Align was experiencing decline in the services side of its SCCS unit revenue stream, even as an analyst opined that "the industry was moving to a newer model with 'no per click or subscription fees.'"  (*Id.* ¶ 121)

The SCCS unit also experienced a "significant adverse change with respect to the business climate in Europe."  (*Id.* ¶ 58)  In 4Q11, the SCCS unit's international revenue "plummeted to just $362,000, from over $2.5 million in 3Q11," as a result of a faltering relationship with Cadent's exclusive European distribution partner Straumann.  (*Id.* ¶¶ 10, 58, 70, 113)  Although international sales in 1Q12 improved sequentially over 4Q11, they were still low compared to 3Q11, a fact that Prescott acknowledged during an investor call by characterizing Europe as a "difficult environment" and stating that Align continued "to see a more challenging environment for Scanners and CAD/CAM Services."  (*Id.* ¶ 70)  Worse, international sales dropped to an all-time low in 2Q12, eliciting Prescott's admission during an investor call that there was "great uncertainty" about Europe's economic future and that Align was "not expecting any significant improvement from our Scanner and CAD/CAM Services business in [Europe]."  (*Id.* ¶ 79)

Align experienced further setbacks in attempting to integrate Cadent into its own operations.  On September 7, 2011, Align issued a press release announcing that it intended to shut down Cadent's "CAD/CAM services and scanner-related activities based in Carlstadt, New

Jersey" and move them to existing Align locations.  (*Id.* ¶ 60)  This consolidation effort resulted in significant layoffs of Cadent employees without sufficient time to train Align employees to take over those functions.  (*Id.*)  In April 2012, Prescott admitted publicly that the integration had "negatively impacted several important customer-facing functions like customer service, tech support and even delivery schedules in some cases."  (*Id.* ¶ 62)

### iv.  Align Announces Goodwill Impairment and Write-Down

On October 17, 2012, Align announced that it would conduct interim impairment analysis and potentially take an impairment charge due to the termination of its distribution agreement with Straumann and 3Q12 financial results for the SCCS unit that missed revenue and earnings expectations.  (*Id.* ¶¶ 15, 117)  Following the announcement, Align's stock price decreased more than 20% from a close of $35.41 per share on October 17, 2012 to a close of $28.18 per share on October 18, 2012, on "massive trading volume of 20 million shares."  (*Id.* ¶¶ 16, 152)  This stock price drop allegedly caused millions in damages to class members who purchased Align stock. (*Id.* ¶ 16)  On November 9, 2012, Align announced a goodwill write down of $24.7 million.  (*Id.* ¶ 84)  Align's 2012 Form 10-K indicated that "an impairment charge was recorded because the growth and profitability projections utilized in their goodwill impairment test were lowered from previous estimates due to lower-than-expected financial results."  (*Id.* ¶ 127)  Additional write downs followed, resulting in the complete write down of the SCCS unit's $77.5 million goodwill by 1Q13.  (*Id.* ¶¶ 85, 87)

### v.  Allegations Specific to Individual Defendants

In 2011, Prescott and Arola received "$1.2 million in cash bonuses," the highest they ever received.  (*Id.* ¶ 49(d))  "Align's Board of Directors specifically cited Arola and Prescott's involvement in the completion of the acquisition to justify" the cash bonus.  (*Id.*)  Prescott and Arola are also alleged to have sold hundreds of thousands of shares of Align stock during the Class Period for a combined total of over $14 million.  (*Id.* ¶¶ 14, 49(d))  The largest of these stock sales during the Class Period was Prescott's February 29, 2012 sale of 322,751 shares for proceeds of nearly $8.3 million.  (*Id.* ¶ 49(d))  Plaintiff does not allege the dates and amounts of Prescott's and Arola's other sales, nor whether this is inconsistent with their prior trading pattern.

On January 30, 2013, Align issued a press release announcing that Arola would step down from his position as vice president and CFO of Align effective March 4, 2013.  (*Id.* ¶¶ 24, 86) Arola would remain in his capacity as CFO through the completed audit of Align's 2012 financial statements, and remain an employee until June 28, 2013.  (*Id.* ¶ 86)

### B.   Defendants' Allegedly False Statements

The SAC identifies seven allegedly false or misleading statements in Align's press releases and SEC filings during the Class Period spanning three fiscal quarters.

#### i.   Fourth Quarter 2011 and Fiscal Year 2011

**Statement 1** (Press Release on January 30, 2012 and Form 10-K filed February 29, 2012): false or misleading financial results for 4Q11 and FY11, wherein Align reported "(a) $649.3 million in total assets; (b) $20.4 million in net profit for 4Q11; and (c) [earnings-per-share ("EPS")] of $0.25 for 4Q11."  (*Id.* ¶¶ 44-45)  Align also reported "$135.3 million in goodwill associated with Cadent, $58.4 million allocated to Clear Aligner and $76.9 million allocated to SCCS."  (*Id.* ¶ 45)

**Statement 2** (Form 10-K): "During the fiscal year ended December 31, 2011, there were no facts and circumstances that indicated that the fair value of the reporting units may be less than their carrying amount."  (*Id.* ¶ 50)

**Statement 3** (Form 10-K): "Based on the goodwill impairment analysis results during the fourth quarter of 2011, we determined that no impairment needed to be recorded as the fair value of our reporting units were significantly in excess of the carrying value."  (*Id.* ¶ 63)

#### ii.  First Quarter 2012

**Statement 4** (Press Release on April 23, 2012 and Form 10-Q filed May 8, 2012): false or misleading financial results for 1Q12, wherein Align reported "(a) $670 million in total assets; (b) $21.0 million in net profits; and (c) GAAP EPS of $0.26."  (*Id.* ¶¶ 65, 67)

**Statement 5** (Form 10-Q): Align's 1Q12 Form 10-Q stated that Align performed impairment testing "whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable," yet Align did not undertake any interim impairment testing in that quarter.  (*Id.* ¶ 71)

United States District Court
Northern District of California

### iii.  Second Quarter 2012

**Statement: 6** (Press Release on July 19, 2012 and Form 10-Q filed August 2, 2012): false or misleading financial results for 2Q12, wherein Align reported: "(a) $744.2 million in total assets; (b) $28.5 million in net profit; and (c) EPS of $0.34."  (*Id.* ¶¶74-75)

**Statement 7** (Form 10-Q): Align's 2Q12 Form 10-Q stated that Align performed impairment testing "whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable," yet Align did not undertake any interim impairment testing in that quarter.  (*Id.* ¶ 80)

## II.    REQUEST FOR JUDICIAL NOTICE

As a preliminary matter, Defendants have filed a Request for Judicial Notice ("RJN") asking that the Court take notice of various documents incorporated by reference into the SAC, (Def.'s RJN Exhs. 1, 6-12, 16-19, ECF 46), as well as several of Align's SEC filings that are not expressly mentioned in the SAC, (*id.* Exhs. 3, 13-15).  Plaintiff has not opposed Defendants' request with respect to any of these proffered exhibits.

In the context of a Rule 12(b)(6) motion to dismiss a § 10(b) action, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  When the complaint refers to a document that is central to plaintiff's claims and no party questions the authenticity of the copy attached to the Rule 12(b)(6) motion, the Court may "treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  Defendants' Exhibits 1, 6-12, and 16-19 fall into this category of documents incorporated by reference into the SAC and may therefore be considered as part of the complaint.

Additionally, a Court may take judicial notice of an adjudicative fact that is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Defendants' Exhibits 3 and 13-

15 are copies of Align's publicly available SEC filings, and Plaintiff does not dispute their authenticity.  As such, these documents are appropriate for judicial notice.  *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings appropriate for judicial notice).

Finally, Defendants are also apparently requesting notice of accounting standards issued by the Financial Accounting Standards Board ("FASB"), (Def.'s RJN Exhs. 2, 4-5), though no explanation is offered as to why such documents are judicially noticeable.  The Court notes that much like the other documents discussed above, these accounting standards are incorporated by reference into the SAC, and Plaintiff's claims necessarily rely on such standards.  (*See* SAC ¶¶ 91-96)  Moreover, the Court has previously taken notice of these accounting standards.  (*See* Order 7:25-8:24)

Accordingly, Defendant's Request for Judicial Notice is GRANTED as to all exhibits.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock Inc.*, 349 F.3d 1191, 1199-200 (9th Cir. 2003).  To survive a motion to dismiss, a complaint must plead sufficient "factual matter, accepted as true" to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In assessing the sufficiency of the pleadings, the Court "accept[s] *factual* allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (emphasis added); *see also Tellabs*, 551 U.S. at 322 (same standard applies to 12(b)(6) motion to dismiss § 10(b) action).  The Court need not accept as true "conclusory allegations that are contradicted by documents referred to in the complaint," *id.*, or "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged," *Clegg v. Cult Awareness Network*, 18 F. 3d 752, 754-55 (9th Cir. 1994).

Generally, a motion to dismiss pursuant to Rule 12(b)(6) must be decided on the face of the complaint.  Consideration of matters outside of the complaint may require the conversion of

United States District Court
Northern District of California

9

the motion into one for summary judgment.  Fed. R. Civ. P. 12(d).  The Court may, however, consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," without converting the motion into one for summary judgment.  *Tellabs,* 551 U.S. at 322; *see also Daniels-Hall,* 629 F.3d at 998.

If a motion to dismiss is granted, a court should normally grant leave to amend, "even if no request to amend the pleading was made," unless amendment would be futile.  *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotations omitted).  However, a district court's discretion to deny leave to amend is "particularly broad" where a plaintiff has previously amended.  *Salameh v. Tarsadia Hotel,* 726 F.3d 1124, 1133 (9th Cir. 2013) (citing *Sisseton– Wahpeton Sioux Tribe v. United States,* 90 F.3d 351, 355 (9th Cir.1996)).

### B.   Securities Exchange Act Section 10(b) and Rule 10b-5

In order to plead a primary violation of SEC Rule 10b-5, promulgated pursuant to § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 990 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.,* 441 F.36 1006, 1014 (9th Cir. 2005)).  Defendants here challenge the sufficiency of Plaintiff's allegations with respect to the first two elements: the falsity of Defendants' statements and whether they were made with scienter.

"At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."  *Id.*; *see also Reese v. Malone,* 747 F.3d 557, 568 (9th Cir. 2014).  The "more exacting pleading requirements" of the PSLRA require that the complaint plead both falsity and scienter with particularity.  *Reese,* 747 F.3d at 568 (quoting *Zucco,* 552 F.3d at 990); *see also* 15 U.S.C. § 78u-4(b)(1).  The stricter standard for pleading scienter (as discussed below) naturally results in a stricter standard for pleading falsity, because "'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA."  *Daou,* 411 F.3d at 1015 (quoting *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1091 (9th Cir. 2002)).

1

2

3

4

5

6

7

8

9

10

11

12

13

United States District Court
Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.   Securities Exchange Act Section 20(a)

In the Ninth Circuit, liability under § 20(a) of the Securities Exchange Act requires a primary violation of federal securities laws, without which there can be no control person liability. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).  As such, the Court's analysis on a Rule 12(b)(6) motion focuses on the sufficiency of Plaintiff's allegations with respect to a primary Rule 10b-5 violation.

### IV.   SECTION 10(b) AND RULE 10b-5

The viability of Plaintiff's SAC turns on whether Plaintiff has adequately alleged a primary violation of § 10(b) and Rule 10b-5.  Defendants contend that the SAC fails to overcome the factual deficiencies in Plaintiff's FAC, and that Plaintiff ultimately fails to allege falsity and scienter with the specificity required under the PSLRA.  (*See* Def.'s Mot.)  As explained below, the Court agrees with Defendants.

### A.   The SAC Fails to Adequately Plead Falsity

In order to plead falsity, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Additionally, and highly relevant to this case, statements regarding goodwill are inherently subjective and involve management's opinion regarding fair value.  (*See* SAC ¶ 91 ("Goodwill represents the excess of the purchase price over the *fair value* of the net assets acquired in a business combination." (emphasis added)); *see also* Def.'s RJN Exh. 5, at "Glossary")  As the Second Circuit has observed: "There is no universally infallible index of fair market value." *Henry v. Champlain Enters., Inc.,* 445 F.3d 610, 619 (2d Cir. 2006) (quoting *Rhodes v. Amoco Oil Co.,* 143 F.3d 1369, 1372 (10th Cir. 1998)).  "Estimates of goodwill depend on management's

1   determination of the 'fair value' of the assets acquired and liabilities assumed, which are not

2   matters of objective fact . . . In other words, the statements regarding goodwill at issue here are

3   subjective ones rather than 'objective factual matters.'" *Fait v. Regions Fin. Corp.*, 655 F.3d 105,

4   111 (2d Cir. 2011).

5         Neither party has provided to the Court, nor has this Court found Ninth Circuit precedent

6   directly on point regarding what the PSLRA requires Plaintiff to allege in order to demonstrate

7   falsity with respect to a company's goodwill assessment and valuation under § 10b.  Defendants

8   submit that Plaintiff must plead particularized facts establishing that Defendants did not believe in

9   their statements concerning goodwill at the time they made them, relying on the Second Circuit's

10   ruling in *City of Omaha, Nebraska Civilian Employees' Retirement System v, CBS Corp.*, 679 F.3d

11   64 (2d Cir. 2012) (per curiam).  (Def.'s Mot. 9)

12         The Court finds that the Second Circuit's reasoning in *City of Omaha* is persuasive.  In that

13   case, the Second Circuit affirmed dismissal of a § 10b action where the plaintiffs also alleged that

14   the defendants failed to conduct timely interim goodwill impairment analysis or take an earlier

15   goodwill write-down before ultimately announcing a $14 billion impairment charge to goodwill.

16   *City of Omaha*, 679 F.3d at 66-70.  Finding that, much as in *Fait*, "'plaintiff's allegations

17   regarding goodwill d[id] not involve misstatements or omissions of material fact, but rather

18   misstatements regarding . . . opinion,'" *id.* at 67 (citing *Fait*, 655 F.3d at 110), the *City of Omaha*

19   court went on to hold that its earlier reasoning in *Fait*, which concerned claims under § 11 of the

20   Securities Exchange Act, applied equally in a § 10b case, *id.* at 68.  Specifically, the Second

21   Circuit determined that "a plaintiff must 'plausibly allege that defendants did not believe the

22   statements regarding goodwill at the time they made them' to plead a material misstatement or

23   omission." *Id.* (quoting *Fait*, 655 F.3d at 112).

24         This Court notes that in *Fait*, the Second Circuit cited the Ninth Circuit's holding in *Rubke*

25   *v. Capitol Bancorp, Ltd.*, 551 F.3d 1156 (9th Cir. 2009), favorably on this point.  *Fait*, 655 F.3d at

26   111.  Like the Second Circuit in *Fait*, the Ninth Circuit has applied the same pleading standard in

27   § 11 cases where the allegedly false statement is alleged to be a misstatement of *opinion*.  In

28   *Rubke*, the Ninth Circuit considered the pleading standard regarding a § 11 claim attacking

United States District Court
Northern District of California

12

1    fairness opinions attached to a registration statement issued by the defendants.  Finding that the

2    fairness determinations were alleged to be misleading opinions, not statements of fact, the Ninth

3    Circuit held that "they can give rise to a claim under section 11 only if the complaint alleges with

4    particularity that the statements were both objectively and subjectively false or misleading.  Thus,

5    the . . . Complaint must allege with particularity that [defendant's] directors and officers believed

6    the Exchange Offer was *un*fair."  *Rubke*, 551 F.3d at 1162 (emphasis added) (internal citations

7    omitted).

8         This Court finds it appropriate to apply the Ninth Circuit's holding in *Rubke* to this § 10b

9    case for the reasons set forth by the Second Circuit in *City of Omaha*.  As addressed below, the

10   Court will evaluate the SAC allegations regarding goodwill valuation as expressions of opinion

11   and apply the standard articulated in *Rubke*, *City of Omaha*, and *Fait*.

12        In the SAC, Plaintiff again alleges that Defendants deliberately overvalued the Cadent

13   goodwill at acquisition and continued to overvalue the goodwill through the Class Period, thereby

14   injecting falsity into statements made concerning Align's goodwill estimates and related other

15   financial statements.  Each of Align's allegedly false statements in 4Q11, 1Q12, and 2Q12

16   purportedly violated GAAP requirements that, had they been followed, would have resulted in a

17   write down of goodwill in 4Q11 or triggered interim goodwill impairment analysis in the first two

18   quarters of 2012.  (*See* Pl.'s Opp. 4-8, 11-13)  Thus, "[t]he issue before the court is whether

19   Plaintiff's allegations are reduced to a non-actionable claim of poor business judgment or

20   actionable securities fraud based upon accounting violations coupled with corresponding

21   fraudulent intent."  *In re Remec Inc. Sec. Litig.*, 415 F. Supp. 2d 1106 (S.D. Cal. 2006); *see also*

22   *City of Omaha*, 679 F.3d at 68-69.

23              **i.   Fourth Quarter 2011 Goodwill Impairment Analysis**

24        At the heart of Plaintiff's securities fraud case is the allegation that Defendants failed to

25   timely write down goodwill associated with the SCCS unit.  This theory in large part depends on

26   Plaintiff's contention that the publicly stated results of Defendants' annual goodwill impairment

27   analysis in 4Q11 were false or misleading because Align reported no impairment, even though

28   Plaintiff believes the goodwill was already impaired.  (Pl.'s Opp. 4-8)

United States District Court
Northern District of California

13

1        It is important to note here that the SAC does not allege that the 2011 revenue results were

2    false or misleading.  Rather, Plaintiff contends that the 2011 revenue results should have led

3    management to a different conclusion when Align performed its annual goodwill impairment

4    analysis.  That is, based on Plaintiff's own calculations using Align's publicly disclosed revenue

5    results, Align should have recorded an impairment in 4Q11.  (Pl.'s Opp. 4-8; SAC ¶¶ 128-45)  In

6    support of this contention, Plaintiff has not identified internal documents or confidential witness

7    testimony showing that Align's 4Q11 impairment analysis was performed on unreasonable

8    assumptions and that Defendants knew this was the case.  Plaintiff has instead added in the SAC

9    extensive discussion of two possible methods of calculating fair value—the market approach and

10   the income approach—either of which Plaintiff contends demonstrates that Align "must have"

11   used objectively unreasonable assumptions in conducting its own goodwill impairment analysis.

12   (*See* ¶¶ 48, 69-70, 77-79, 129-139)  Against this backdrop, the Court agrees with Defendants that

13   Plaintiff's amended allegations are insufficient to surmount the deficiencies identified in the

14   Court's prior order.  (Def.'s Mot. 9-10; Def.'s Reply 3-4, ECF 51)

15       Still missing from the complaint are factual allegations identifying the assumptions

16   Defendants *actually* relied on in conducting Align's annual goodwill impairment analysis.  As

17   previously pointed out by the Court, "the Amended Complaint has not pleaded what assumptions

18   were used in goodwill testing, let alone that they were unreasonable or improper."  (Order at 12)

19   Additionally, Plaintiff has failed to allege facts showing that Defendants did not consider the

20   actual revenue results from 2011 in its annual goodwill testing as required by the Court in its prior

21   ruling.  (*Id.*)  Plaintiff argues instead, based on its own calculations using Align's publicly and

22   accurately disclosed 2011 revenue data for the SCCS unit, that "there are no set of supportable

23   assumptions that would have allowed Align to conclude that goodwill at Align's scanner division

24   exceeded the carrying value."  (Pl.'s Opp. 5)

25       Plaintiff places undue emphasis on its own calculations of what the fair value of the SCCS

26   unit should have been in 2011.  At best, these calculations represent Plaintiff's *opinion* as to how

27

28

United States District Court
Northern District of California

14

United States District Court
Northern District of California

Align could have or should have calculated the fair value of its reporting units in 4Q11,[5] and are not a substitute for *facts* describing how Align actually conducted its analysis.  As previously noted, fair market value is a subjective assessment, and "[t]here may be a range of prices with reasonable claims to being fair market value." *Henry*, 445 F.3d at 619.  Although companies should use the most objective metric available in making such valuations, absent an objective measure such as market price for the assets under assessment, "an estimate of the fair value of those assets will vary depending on the particular methodology and assumptions used." *Fait*, 655 F.3d at 111 (citing Statement of Financial Accounting Standards No. 142 issued by the FASB).  Here, Plaintiff has precisely demonstrated that point: there can be—and frequently is—a difference of opinion over fair market value for a given asset.

Furthermore, Plaintiff's explanations of its own selection of factors and multipliers under the market and income approaches speak volumes to the inherent degree of subjectivity that goes into this "subjective, multi-factored test."  (Order at 13; *see, e.g.*, SAC ¶¶ 128-37; *see also* Def.'s Mot. 15-16)  That Plaintiff selected certain assumptions to reach a conclusion of impairment does not demonstrate what assumptions *Align* made in conducting its 4Q11 impairment analysis, nor does it suffice to show that Align's selection of different assumptions would have been so unreasonable as to amount to fraud.  And while the calculations that Plaintiff puts forth may have been part of the goodwill analysis, Plaintiff simply does not plead *facts* indicating that the major assumptions Plaintiff selected were the only assumptions that went into Align's analysis, especially in view of Align's disclosure of a number of other factors informing its goodwill analysis, such as historical data, internal estimates, and external sources that are "developed as part of [its] regular long-range planning process."  (Def.'s RJN Exh. 12, at 80 (2011 Form 10-K), ECF 46-5)  Without factual enhancement, Plaintiff's allegations and calculations are mere conclusions hinting at the possibility that Defendants' assumptions were improper.  (SAC ¶ 129 ("Defendants' improper use of assumptions is clearly evident with the market approach."))

---

[5] Defendants note, and the Court agrees, that there is no evidence or affirmation included in the SAC that this "sophisticated forensic analysis" was conducted by an expert or trained accountant. (*See* Def.'s Mot. 15)  Thus, it is not clear how much weight should be afforded to these allegations, as they are clearly not facts to be taken as true.

1  Because Plaintiff never identifies actual assumptions used that were allegedly unreasonable,

2  however, the Court cannot plausibly infer that Align's goodwill impairment analysis was false

3  when made, or that Align disregarded actual 2011 revenue data when conducting such analysis.

4  Plaintiff's speculative allegations under the market and income approaches are no substitute for

5  factual allegations demonstrating Defendants' actual assumptions were false, and accordingly do

6  not rise to the level of particularity required by the PSLRA.[6]

7          Additionally, the allegations in the SAC are missing facts indicating that Defendants did

8  not believe the results of the goodwill testing at the time they disclosed them, and Plaintiff does

9  not explain why it would have been objectively unreasonable to maintain cautious optimism about

10 the SCCS unit's future earnings prospects.  "Recognition of an impairment involves an accounting

11 judgment about the future: to take an impairment is an admission that future prospects do not

12 justify carrying the asset on the books at its present value, whereas maintaining one's goodwill

13 evaluation is a prediction that the company's prospects for earnings are sound."  *Iron Workers*

14 *Local No. 25 Pension Fund v. Oshkosh Corp.* ("*Oshkosh*"), No. 08-C-797, 2010 WL 1287058, at

15 *14 (E.D. Wis. Mar. 30, 2010).  To be sure, the SCCS unit experienced a precipitous drop in

16 revenue in 4Q11.  However, in 1Q11, 2Q11, and 3Q11, the unit had experienced sequential

17 increases in quarterly revenue, (*see* SAC ¶ 119), the company overall experienced sequentially

18 increasing revenue and record revenues for Invisalign, (*see id.* ¶ 44), and the company was

19 undertaking integration efforts—albeit mishandled, in hindsight—to consolidate internal

20 functions, (*see id.* ¶ 60).  In 4Q11, it would appear that Align's scanner division prospects were

21 better than either of the companies at issue in *In re Wet Seal, Inc. Securities Litigation*, 518 F.

22 Supp. 2d 1148 (C.D. Cal. 2007), and *Oshkosh*.  Although Plaintiff has attempted to argue that the

23 alleged facts indicate that optimism was not warranted, the Court does not find that the facts

24 indicate that future prospects for the SCCS unit were so bleak that Defendants could not have

25 reasonably believed that they could turn the ship around.  Instead, Plaintiff's allegations amount to

26

27 [6] The parties also dispute the relevance and evidentiary weight of unqualified audit opinions with
   respect to Align's financial results.  (Def.'s Mot. 8; Pl.'s Opp. 10)  Because Plaintiff failed to
28 satisfy its affirmative burden to allege falsity with factual specificity, the Court need not consider
   whether and how unqualified audit opinions impact the analysis.

United States District Court
Northern District of California

1   complaining that Align was "simply too bullish in its quarterly predictions," which is not

2   sufficient to be actionable under the securities laws.  *Oshkosh*, 2010 WL 1287058, at *17.

3          As noted in *Wet Seal*, numerous courts have rejected the assertion that a delayed write-

4   down, without more, is so violative of GAAP as to fall within the purview of § 10(b).  *See* 518 F.

5   Supp. 2d at 1162 (collecting cases); *see also City of Omaha*, 679 F.3d at 68-69.  Here, Plaintiff has

6   alleged only that Align should have but did not write down the goodwill associated with the SCCS

7   unit in 4Q11.  Plaintiff has not adduced contemporaneous facts substantiating the allegation that

8   such subjective statements were false and not believed when made, and has instead endeavored to

9   demonstrate through hypothesis and proxy a type of misrepresentation that is frequently difficult

10   to allege even with the benefit of confidential informants and insider information.  *See Wet Seal*,

11   518 F. Supp. 2d 1148; *Remec*, 415 F. Supp. 2d 1106; *Oshkosh*, 2010 WL 1287058.  While the

12   Court does not foreclose the possibility that a plaintiff can satisfy the PSLRA's exacting

13   requirements when relying exclusively on publicly available information to allege that a

14   company's goodwill impairment analysis was so unreasonably conducted as to amount to fraud,

15   Plaintiff has not done so here.

16          Without the benefit of hindsight, and considering all of the facts as they existed at the time,

17   the Court cannot reasonably infer that Align's judgments concerning goodwill in 4Q11 were false

18   and not believed at the time that they were made.  *See Fait*, 655 F.3d 105, 110-112; *City of

19   Omaha*, 679 F.3d at 68-69; *see also Wet Seal*, 518 F. Supp. 2d at 1162; *In re Fritz Co. Sec. Litig.*,

20   282 F. Supp. 2d 1105, 1113 (N.D. Cal. 2003) (citing *Vantive*, 282 F. 3d at 1091).  In sum,

21   Plaintiff's SAC alleges few new *facts* to substantiate the allegation that Align's reported goodwill

22   impairment analysis results, which were inherently subjective and based on assumptions

23   unidentified by Plaintiff, were false when made.  For that reason, Plaintiff has failed to allege

24   falsity with the specificity required by the PSLRA and Rule 9(b).

25          **ii.  Qualitative Statements in Fourth Quarter and Fiscal Year 2011**

26          Plaintiff also points to allegedly false and misleading qualitative statements concerning

27   Align's goodwill in its FY11 Form 10-K:  "[Statement 3:] Based on the goodwill impairment

28   analysis results during the fourth quarter of 2011, we determined that no impairment needed to be

United States District Court
Northern District of California

17

recorded as the fair value of our reporting units were significantly in excess of the carrying value. [Statement 2:] During the fiscal year ended December 31, 2011, there were no facts and circumstances that indicated that the fair value of the reporting units may be less than their current carrying amount." (SAC ¶¶ 50, 63; FY11 Form 10-K, at 80)

### a. Statement 2

Taking these statements in the order that Plaintiff has presented them, the thrust of Plaintiff's complaint with respect to Statement 2 is that there were in fact undisclosed circumstances that indicated that the fair value of the reporting units *may* be less than their carrying amount. (*See* Pl.'s Mot. 13-16)  On top of the SCCS unit's disappointing financial results, which were publicly disclosed, Plaintiff points to four other factors signaling potential impairment: the increasingly competitive market for intra-oral scanners, the change in the market for SCCS products particularly associated with the declining European market, the substantial discounting at Cadent prior to acquisition that made Align's growth projections unsustainable, and significant impact to the scanner unit from Align's aggressive integration efforts.  Plaintiff, however, has not alleged any facts indicating that Defendants did not consider these factors before stating that the facts and circumstances in FY11 indicated no impairment, only that Align had not provided a "more fulsome report" of each factor that could possibly have impacted the scanner unit's fair value.  *See Police Retirement System of St. Louis v. Intuitive Surgical, Inc.* ("*Intuitive*"), --- F.3d ---, No. 12-16430, 2014 WL 3451566, at *7 (9th Cir. 2014).  The securities laws do not require such detailed and expansive disclosure.  In order to be actionable, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

With the possible exception of Cadent's alleged channel stuffing prior to acquisition, all of the factors Plaintiff identified were publicly known through Align's SEC filings, which accurately disclosed each quarter's revenue results and included cautionary language concerning potential negative factors.  (Def.'s RJN Exhs. 13, at 30; 14, at 36; 15, at 36-37, ECF 46-6)  Specifically, Align cautioned against potential competition and integration problems that could adversely affect

the company's financial results.  (*See id.*)  That such integration problems manifested—and that Align admitted this publicly in April 2012—does not mean that Align did not take that situation into account when determining that goodwill was not impaired in 4Q11.  Moreover, Defendants correctly note that there are no facts to indicate that the customer service and delivery problems associated with integration were of such a level to have impaired the SCCS unit's goodwill. (Def.'s Mot. 14)  Similarly, competition is not something new.  To accept Plaintiff's argument would require all executives to be so seized with paranoia by the prospect of competition that they immediately re-evaluate their company's prospects at every competitor's announcement.  The securities laws do not require this level of paranoid disclosure.  *See Scandlon v. Blue Coat Sys., Inc.*, No. C 11-4293 RS, 2013 WL 5313168, at *3 (N.D. Cal. Sept. 23, 2013) ("Even if some of the assessments turn out to have been wrong, a failure by the company to have disclosed every potentially negative detail does not render the positive assessments as fraudulent.").  Plaintiff also has not alleged any facts showing that Defendants did not consider the increased competitive atmosphere in reaching the conclusion that goodwill was not impaired.  Thus, it cannot be said that omitting facts concerning competition and integration problems affirmatively created an impression of the state of affairs that materially differed from the one already known to the public.

Finally, while it is arguable whether Defendants knew that Cadent had artificially inflated its sales prior to acquisition, there are no facts alleged to indicate that in 4Q11 Defendants continued to rely on revenue growth projections based upon the pre-acquisition data.  By 4Q11, the SCCS unit had contributed revenues of approximately $28.0 million, (FY11 Form 10-K, at 79), and had experienced sequential revenue growth from approximately $10 million in 2Q11 to $11.6 million in 3Q11, (SAC ¶ 119).  Although revenue then dropped in 4Q11, it would not have been unreasonable for Defendants to maintain cautious optimism about the SCCS unit's outlook, particularly in light of the accurate public disclosures concerning the unit's revenue throughout the Class Period.  As Defendants correctly note, the allegations emanating from former Cadent employees purporting to demonstrate Defendants' knowledge of Cadent's aggressive and unsustainable sales activity pre-merger, (*see* SAC ¶ 59), do nothing to support Plaintiff's conclusory allegations regarding Defendants' assumptions and beliefs post-merger.  (*See* Def.'s

United States District Court
Northern District of California

1    Mot. 11-12; Def.'s Reply 7)  The SAC is devoid of any confidential employee allegations from

2    individuals who were employed by Align *after* the Cadent acquisition, and thus devoid of facts

3    indicating that Defendants continued to rely on the 4Q10 Cadent sales data in conducting Align's

4    goodwill impairment analysis a year later.

5         Contrary to Plaintiff's argument, this is not the situation in *In re HP Securities Litigation*,

6    in which management had actual notice of accounting fraud from a whistleblower but omitted

7    discussions of accounting fraud as a plausible alternative explanation for disappointing

8    performance by an acquired company.  No. 12-05980 CRB, 2013 WL 6185529, at *8-10, *11-12

9    (N.D. Cal. Nov. 26, 2013)  Plaintiff has not alleged any facts to demonstrate that Defendant had

10   actual knowledge of material information concerning potential impairment of its goodwill in 4Q11

11   that was withheld from the public.  Because of Align's consistent disclosure to the public, the

12   more reasonable inference is that Align considered all of the factors identified by Plaintiff before

13   concluding that facts and circumstances in FY11 did not indicate that "the fair value of the

14   reporting units may be less than their current carrying amount."

15        **b.  Statement 3**

16        The statement that "the fair value of our reporting units were *significantly in excess* of the

17   carrying value" is purportedly false because, by Plaintiff's calculations, "the fair value of Cadent's

18   scanner division was not in excess of the reported carrying value, and was nowhere close to being

19   'significantly in excess of the carrying value.'"  (Pl.'s Opp. 16)  This Court has, however, rejected

20   Plaintiff's assertion that its calculations reliably demonstrate that the SCCS unit's fair value was in

21   fact lower than reported.  It is a closer call as to whether stating that the fair value of the reporting

22   units was *significantly in excess* of their carrying value was a qualitatively misleading statement.

23   Aside from Plaintiff's assertion that the fair value of the SCCS unit was *below* its carrying

24   amount, there are no facts indicating what Align determined the fair value of the SCCS unit to be

25   in 4Q11 when it conducted comprehensive impairment analysis.  Suffice it to say, there are no

26   facts alleged to indicate that Defendants did not believe the fair value calculated in 4Q11, and thus

27   no facts to indicate that Statement 3 was qualitatively false or misleading.  Moreover, this

28   statement also necessarily encompasses assertions concerning the Clear Aligner unit's fair and

1    carrying values, and Plaintiff has not asserted that Align's analyses with respect to that unit were

2    false.  On balance, stripping away Plaintiff's conclusion that Align's 4Q11 goodwill analysis

3    incorrectly determined that there was no impairment, and without injecting hindsight into the

4    analysis, the Court cannot reasonably infer from the facts alleged that it was objectively false or

5    misleading to state that the fair value of Align's reporting units was significantly in excess of their

6    carrying amounts.

7                    **iii.  First Quarter and Second Quarter 2012 Statements**

8            The alleged falsity of quantitative Statements 4 and 6 in 1Q12 and 2Q12 respectively relate

9    back to Plaintiff's theory that goodwill was already impaired in 4Q11.  Without that assumption,

10   Plaintiff's allegations of falsity are reduced to Defendants' alleged failure to conduct interim

11   goodwill impairment analysis in the face of continued lackluster SCCS unit revenues (Statements

12   5 and 7).  (*See* Pl.'s Opp. 11-13)  Although the SCCS unit revenue in 1Q12 increased sequentially

13   over 4Q11 to approximately $11.7 million, it still failed to meet the projected 20% revenue *growth*

14   that Plaintiff asserts was used to justify Cadent's purchase price.  (*Id.*; *see also* SAC ¶ 119)

15   Furthermore, although international revenue in 1Q12 also increased sequentially over 4Q11, it was

16   still down 75% from the scanner divisions 3Q11 results.  (SAC ¶ 70)  Likewise in 2Q12, overall

17   SCCS unit revenue experienced a small sequential increase over 1Q12 that was largely

18   countermanded by international revenue dropping to an all-time low.  (*Id.* ¶ 79, 119; Pl.'s Opp. 11-

19   13)  Finally, in both 1Q12 and 2Q12, the SCCS unit failed to achieve projected 50% gross margins

20   despite layoff announcements.  (*See* SAC ¶¶ 70, 79)  Based on these facts, Plaintiff asserts that

21   "poor overall financial performance" and "increased competitive environment" were

22   circumstances sufficient to trigger interim goodwill impairment testing in 1Q12 and 2Q12

23   pursuant to ASC 350-20-35-3C.  (*Id.* ¶ 116)

24           Plaintiff's argument understandably focuses on the facts most salient to its position, but

25   this Court must also consider the totality of circumstances in 1Q12 and 2Q12.  And, as Defendants

26   note, Plaintiff's narrative neither identifies any specific "triggering events" requiring interim

27   analysis nor accounts for facts that the Court previously found relevant to the falsity analysis.

28   (Def.'s Mot. 16-18)  It is relevant, for example, that all of the scanner division's financial results

                                               21

were accurately disclosed, that Prescott and Arola cautioned investors concerning the prospects in Europe in each quarter, and that international sales appeared to improve in 1Q12.  (*See id.* ¶¶ 70, 79; *see also* Order, at 14-16)  As the Court already noted, the facts alleged do not plausibly identify a point in 1Q12 and 2Q12 when management *knew* that it was more likely than not that the SCCS unit's goodwill was impaired.  (Order at 14)  Although overall division revenue continued to fail to meet projections, the unit's revenue increased sequentially in each of the first two quarters of 2012.  It would be reasonable to infer that in the face of improved results, management remained reasonably optimistic about the scanner division's outlook.  *Compare Wet Seal*, 518 F. Supp. 2d at 1161-62 (even in face of 20 straight months of declining store sales, plaintiff's allegations were devoid of facts proving that earlier impairment was required).  Plaintiff again alleges that Align's relationship with Straumann was "untenable" long before 3Q12 without elaborating on specific facts in Defendants' possession indicating that the relationship was dead in the water.  (*See* SAC ¶ 118, 126;[7] Order at 15)  Finally, as previously stated, there are no allegations indicating that the failure to take an earlier write-down—in the face of improving results—was so significant a misapplication of GAAP as to be fraudulent, as opposed to merely a bad business decision.  As such, the facts alleged do not objectively demonstrate that Align had seen the light at the end of the tunnel so much earlier than 3Q12 that its failure to conduct interim goodwill impairment analysis or take an earlier write-down amounted to fraud.  *See Oshkosh*, 2010 WL 1287058, at *18.

### B.    The SAC Fails to Adequately Plead Scienter

Scienter requires that the defendants have made false or misleading statements "either intentionally or with deliberate recklessness."  *Zucco*, 552 F.3d at 991 (internal quotations omitted).  To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §

---

[7] Although the SAC alleges that Straumann "had little motivation to sell Cadent scanners" due to a various reasons relating to Straumann's financial goals, it is not clear that this information was in Defendants' possession and known to have been the reason why Align's relationship with Straumann ultimately ended.

United States District Court
Northern District of California

78u-4(b)(2).  A "strong inference" of such intentional or deliberate recklessness arises "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324 (emphasis added).   Under this standard, a court "must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

"Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness."  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Such facts must, however, be considered holistically with all other allegations in the complaint to determine whether, as a whole, the inference of scienter is cogent and at least as compelling as the opposing inference.  *Tellabs*, 551 U.S. at 326; *see also Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (reiterating the holistic analysis).

In the SAC, Plaintiff offers the following facts in support of scienter: (1) Defendants allegedly had actual knowledge of facts that contradicted the impairment analysis and statements made in Align's public filings such that the alleged GAAP violation was intentional or deliberately reckless; (2) Defendants' alleged misleading of the investing public before the Cadent acquisition was even announced; (3) Prescott and Arola's stock sales during the Class Period; (4) the rapid write down of the SCCS unit's goodwill; and (5) Arola's termination.  (*See* Pl.'s Opp. 17-24)  Plaintiff effectively acknowledges that the latter three facts—Prescott and Arola's trading, the rapidity of the goodwill write down, and Arola's termination—are each insufficient, standing alone, to create a strong inference of scienter.  (*See id.* 21-24 (arguing that each factor, considered holistically with other allegations, supports an inference of scienter))  As such, the Court will address the independent sufficiency of the first two facts and whether, considering all allegations holistically, there is a strong inference that Defendants acted with scienter.

### i.   GAAP Violations

As the Court has already noted, Plaintiff has not alleged sufficient facts to demonstrate that

United States District Court
Northern District of California

1    the goodwill analysis was objectively wrong when performed.  Even assuming that the results of

2    the goodwill impairment analysis were false when disclosed, however, the Court agrees with

3    Defendants' argument that Plaintiff has not alleged sufficient facts placing the knowledge or belief

4    that the results were false or unreasonable in any of the individual defendants' possession.  (Def.'s

5    Reply 9-10)

6          Plaintiff's attempt to demonstrate scienter through GAAP violations appears to rely on the

7    "core operations" theory, which states that "corporate officers have knowledge of the critical core

8    operation of their companies." *Reese*, 747 F.3d at 569.  As the Ninth Circuit recently noted,

9    "[p]roof under this theory is not easy." *Intuitive*, 2014 WL 3451566, at *9.  "A plaintiff must

10   produce either specific admissions by one or more corporate executives of detailed involvement in

11   the minutia of a company's operations, such as data monitoring; or witness accounts

12   demonstrating that executives had actual involvement in creating false reports." *Id.*

13         Here, Plaintiff contends that Defendants knew of accounting standards related to goodwill

14   impairment because "defendants characterized goodwill, and the impairment of goodwill, as one

15   of their 'critical accounting policies and estimates'" in Align's 2011 Form 10-K, (SAC ¶ 49); that

16   Prescott and Arola were "intimately involved in the acquisition and integration of Cadent," (*id.*);

17   and that Prescott and Arola had access to financial results indicating that impairment was

18   necessary, and "it would be absurd to suggest that management was without knowledge of the

19   matter, as Prescott and Arola were the ones that announced the Company's financial results each

20   quarter, signed the Company's SEC filings, and were intimately involved in the Cadent acquisition

21   and integration." (Pl.'s Opp. 18 (internal quotations omitted))  Plaintiff also argues that Prescott

22   and Arola had actual knowledge of the increasing competition in the market for intra-oral

23   scanners, the substantial discounting that took place at Cadent prior to acquisition, and the

24   disruption caused by problems attempting to integrate Cadent into Align's business operations.

25   (*See id.* 18-19)  The problem with all of these arguments is that Plaintiff largely depends on

26   supposition rather than facts to place each piece of information in the individual defendants'

27   hands.  "At best, these facts support a 'mere inference of [the defendants'] knowledge of all core

28   operations,' not scienter." *Intuitive*, 2014 WL 3451566, at *9.  "Missing are allegations linking

United States District Court
Northern District of California

1  specific reports and their contents to the executives, not to mention the link between the [former

2  employees] and the executives."[8]  *Id.*

3         In contrast to Plaintiff's arguments both in its papers, (*see* Pl.'s Opp. at 22), and at the

4  hearing, this is not a situation in which widespread industry knowledge substantiates the allegation

5  that an asset was so obsolete and demanding of a write-down that a company's failure to take the

6  write-down earlier supports a strong inference of deliberate recklessness.  *See In re Ibis Tech. Sec.*

7  *Litig.*, 422 F. Supp. 2d 294 (D. Mass. 2006); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51

8  F. Supp. 2d 1 (D. Mass. 1999).  In both *Ibis* and *Number Nine*, the allegedly delayed write-down

9  occurred in connection with the value of asset inventories, for which obsolescence of the asset was

10  a key consideration.  In both cases, observable conduct by the defendant as well as widespread

11  industry knowledge indicated that the assets in question were likely *obsolete*, and not merely

12  devalued.  *See Ibis*, 422 F. Supp. 2d at 315-16; *Number Nine*, 51 F. Supp. 2d 1 at 26-27.  As the

13  *Ibis* court noted, the facts showing obsolescence well before the class period "allege more than a

14  dispute simply about the timing of a write-off *based on wholly subjective criteria*."  *Id.* at 315

15  (emphasis added).  Rather, the *facts* alleged were sufficient to carry the plaintiff's burden to

16  "provide particularized factual support for their claim that the inventory had become obsolete by

17  the start of the Class Period."  *Id.*

18         Here, Plaintiff challenges the timing of Defendants' goodwill write-down as well as its

19  failure to conduct earlier impairment analysis.  The factors that Plaintiff identifies as more likely

20  than not to have caused the SCCS unit's fair value to fall below its carrying value—thus triggering

21  interim impairment analysis—are all subject to a degree of interpretation and judgment, as the

22  FASB directs companies to consider the totality of circumstances—including positive and

23  mitigating circumstances—in determining the significance of events and circumstances relevant to

24  _____

25  [8] Defendants note, and the Court agrees, that the confidential witness statements set forth in the SAC fail to rise above the deficiencies identified in the Court's prior order.  (Order at 20; Def.'s Mot. 10-11)  Specifically, the confidential witness statements concerning Align's knowledge of

26  Cadent's pre-acquisition discounting are insufficiently particular to establish the former employees' personal knowledge of the Defendants' state of mind, and relate to events too far

27  removed from the alleged misrepresentation to be indicative of scienter.  *See Zucco*, 552 F.3d at 995 (citing *Daou*, 441 F.3d at 1006).  As such, though the Court considered the confidential

28  witness statements in the context of falsity, they are of little value to the scienter analysis.

United States District Court
Northern District of California

1    potential impairment.  (*See* Def.'s RJN Exh. 2, ASC 350-20-35-3F-G)  It is not known what

2    significance Align accorded to the triggering circumstances that Plaintiff has identified, nor what

3    positive and mitigating factors were considered in determining that interim impairment analysis

4    was not warranted.  As such, Plaintiff has not alleged sufficient facts to demonstrate, as a matter of

5    objective fact under the totality of circumstances, that an impairment charge was so necessary by

6    4Q11 that Align's failure to take one was deliberately reckless.

7         Plaintiff was on notice that it needed to plead with greater specificity Defendants' "actual

8    knowledge that the . . . assumptions about goodwill was unreasonable" and that "the defendants

9    knew or believed that their goodwill numbers were inaccurate."  (Order, at 20-22)  Defendants'

10   alleged GAAP violations, even when coupled with academic literature suggesting that insiders

11   have an incentive and opportunity to trade in advance of a goodwill write-down, at most

12   demonstrate motive and opportunity but again fall short of a strong inference that Defendants'

13   such alleged violations were so unreasonable as to have been made with fraudulent intent or

14   deliberate recklessness.  In short, "[t]he allegations here are insufficient to defeat the competing

15   inference and conclude that the executives 'had reasonable grounds to believe material facts

16   existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts

17   although [they] could have done so without extraordinary effort.'"  *Intuitive*, at *9 (quoting *Reese*,

18   747 F. 3d at 569)).

19              **ii.  Pre-Acquisition Statements**

20        Plaintiff alleges that Defendants had intentionally misled the investing public even before

21   announcing its acquisition of Cadent.  Specifically, in January 10, 2011, Align announced a joint

22   development agreement with Cadent to "develop software applications, which would allow Cadent

23   scanners to 'optimize case assessment and planning for Invisalign treatment.'"  (SAC ¶ 36)  This

24   release was allegedly false because Align did not mention "the fact that Align and Cadent had

25   signed a letter of intent in December 2010, and that Align was soon to acquire Cadent."  (*Id.* ¶ 37)

26        First, it is not clear how this alleged omission would have been misleading to investors.

27   Plaintiff argues that Defendants omitted this fact to avoid explaining why the Cadent acquisition

28   was delayed, but does not explain why Defendants had a duty to disclose the anticipated

United States District Court
Northern District of California

United States District Court
Northern District of California

1    acquisition when announcing a wholly different type of venture with Cadent, other than to quote

2    from cases in which the alleged omission was much more intimately connected to the affirmative

3    statement.  (*See* Pl.'s Opp. 20)

4         More fatal, and as pointed out by Defendants, is that Plaintiff's reliance on allegedly false

5    statements made pre-acquisition is based on an inference of conspiracy that is less plausible than

6    the competing inference that, in hindsight, Defendants simply made a bad deal.  (Def.'s Reply 11)

7    Much as in *In re HP Securities Litigation*, the SAC does not "establish any coherent motive as to

8    why Defendants would knowingly purchase a company for several times its actual value" when

9    they allegedly knew that the expected growth rates used to justify the acquisition were

10   unsustainable.  2013 WL 6185529, at *6.  That Prescott and Arola received record bonuses in

11   2011 partially in connection with their involvement in completing the Cadent acquisition is

12   insufficient.  To accept the inference that Prescott and Arola knowingly guided their company into

13   a doomed acquisition in order to impress Align's Board of Directors into awarding a larger bonus

14   strains credulity.  The more plausible inference is that Defendants made a business judgment that,

15   in hindsight, proved to be extremely poor.  That is not actionable securities fraud.

16        **iii.  Holistic Analysis**

17        Although none of the SAC's allegations individually give rise to a strong inference of

18   scienter, the Court must also "consider the complaint in its entirety" to determine whether "all of

19   the facts alleged, taken collectively," give rise to the required strong inference of scienter.

20   *VeriFone*, 704 F.3d at 701.  As the Ninth Circuit cautioned in *In re VeriFone Litigation*, a district

21   court should avoid "undue discounting" of the claims following an individualized analysis of each

22   allegation of scienter.  *Id.* at 703.  "[A] dual analysis remains permissible so long as it does not

23   unduly focus on the weakness of individual allegations to the exclusion of the whole picture."  *Id.*

24        As already discussed, Plaintiff's allegations concerning Defendants' knowledge of

25   undisclosed facts indicating that goodwill was impaired as early as 4Q11 and Defendants'

26   allegedly misleading pre-acquisition statements do not individually support a strong inference of

27   scienter.  Taken together, those facts paint a picture of corporate mismanagement and unrealized

28   optimism, but they still do not evince such fraudulent intent or deliberate recklessness as to make

1    the inference of scienter cogent.

2         The allegations concerning Prescott's and Arola's insider trading do not add much to the

3    calculus.  Although Plaintiff is correct that the allegations "can be considered as part of the

4    Court's holistic review and contribute to an inference of scienter," (Pl.'s Opp. 22), the Ninth

5    Circuit recently reiterated the principle that evidence of insider trading "is suspicious only when it

6    is dramatically out of line with trading practices at times calculated to maximize the personal

7    benefit from undisclosed inside information." *Intuitive*, 2014 WL 3451566, at *10 (quoting

8    *Zucco*, 552 F.3d at 1005); *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.

9    1989); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,

10   320 F.3d 920, 938 (9th Cir. 2003).  Much as in *Intuitive*, "[t]he allegations that the individual

11   defendants . . . made significant profits from the sale of [Align] stock do not raise *an* inference of

12   scienter, let alone a strong inference, because the [SAC] contains no allegations regarding the

13   defendants' prior trading history." *Intuitive*, 2014 WL 3451566, at *10 (emphasis added).

14        Likewise, although the rapidity of the write-down of the SCCS unit's goodwill speaks

15   volumes to Defendants' possible mismanagement of the post-acquisition situation, adding that fact

16   to the mix merely indicates that Defendants may have had a motive and opportunity to commit

17   fraud. *See id.*, at *8.  Similarly, while the timing and circumstance of the announcement of

18   Arola's departure—on the same day that Align announced an additional $11.9 million impairment

19   charge, and with no permanent replacement or successor for his position—may be suspicious, it is,

20   contrary to Plaintiff's argument, no more than suspicious. (*See* Pl.'s Opp. 24)  The Court has

21   already noted that Arola was not terminated, but rather stepped down as vice president and

22   remained an employee of the company through June 28, 2013.  (Order at 23; *see also* SAC ¶ 86)

23   Moreover, other equally compelling inferences abound, such as Align deciding to terminate Arola

24   due to his negligent mismanagement of the situation or Arola departing voluntarily for personal

25   reasons.  Thus, this allegation does not add much to the overall narrative.

26        Read as a whole, the allegations in the SAC continue to fall short of an inference of

27   scienter that is "at least as compelling as any opposing inference one could draw from the facts

28   alleged." *Tellabs*, 551 U.S. at 323.  The more plausible inference drawn from the allegations is

United States District Court
Northern District of California

that Align made a bad business judgment by overpaying for Cadent, continued to be cautiously optimistic that the SCCS unit's outlook would improve through 1Q12 and 2Q12 based on better than expected performance in those quarters, and finally realized in 3Q12 that, with the unit's significantly reduced revenue and the termination of a key relationship in Europe, there would be no improvement.  The allegations in the SAC do little to diminish the plausibility of this counter-inference previously noted by the Court in dismissing the FAC.  (Order at 25).  Notwithstanding the amendments set forth in the SAC, Plaintiff's allegations establish, at best, "'motive and opportunity, which is not enough to create a strong inference of scienter." *Rubke*, 551 F.3d at 1166; *see also Intuitive*, 2014 WL 3451566, at *8 (quoting *Reese*, 747 F.3d at 569); *Scandlon*, 2013 WL 5313168, at *3-4.

## V.    SECTION 20(A)

As previously stated, liability under § 20(a) of the Securities Exchange Act requires a primary violation of federal securities laws, without which there can be no control person liability. *Howard*, 228 F.3d at 1065 (9th Cir. 2000).  Because Plaintiff has failed to sufficiently plead a primary violation of § 10(b) and Rule 10b-5, Plaintiff has likewise failed to plead a claim for violation of § 20(a).

## VI.   LEAVE TO AMEND

At the June 12, 2014 hearing, Plaintiff urged this Court to grant leave to amend should its order deviate from the Court's prior analysis of Plaintiff's FAC.  Defendants argued that Plaintiff has had sufficient time in which to investigate its allegations and should not be extended yet more time in which to unearth facts that were not previously alleged.  The Court agrees with Defendants.  The ultimate failure in the SAC is the same as that identified by the Court in the FAC: Plaintiff's allegations of falsity and scienter fail for lack of factual specificity.  Plaintiff's amendments in the SAC are insufficient to substantiate its allegation that the shortcomings in Defendants' goodwill analyses were so unreasonable as to amount to actionable fraud, and these shortcomings were previously identified by the Court in dismissing Plaintiff's FAC.  As such, this Court declines to grant further leave to amend.

**VII.   ORDER**

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss the Second Amended Complaint without leave to amend.  The Clerk of the Court shall close the case file.

Dated: August 22, 2014

_____
BETH LABSON FREEMAN
United States District Judge